**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MAURICE OPARAJI,

Plaintiff,

-against-

TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK ("TRS"), BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF CITY OF NEW YORK, PATRICIA REILLY, SANFORD R. RICH, MELANIE WHINNERY

Defendant.

**Amended Verified Complaint for a Civil Case**

Case No.: 23-CV-5212

DEC 13 PM 2:20

## Introduction

1. Plaintiff Maurice Oparaji ("Plaintiff") proceeding pro se brings this action against the defendants, Teachers' Retirement System of the City of New York ("TRS"), the Board of Education of the City School District of New York ("BOE"), Patricia Reilly, Sanford R. Rich, and Melanie Whinnery.
2. The initial case of discrimination was heard in the United States District Court, S.D. New York[1].

---

[1] In the case of Gulino v. The Bd. of Educ. of the City Sch. Dist. of N. Y, the plaintiffs brought an action against the defendant, The Board of Education of the City School District of the City of New York. The case number is 96-CV-8414 (KMW). The case was heard in the United States District Court, S.D. New York. The case was referred to Special Master John S. Siffert on May 20, 2014, pursuant to Federal Rule of Civil Procedure 53 (a) (1) (B) and the court's inherent equitable powers and authority. On June 1, 2013, Special Master Siffert filed a Report and Recommendation ("R&R") regarding a cohort of claimants whose damages awards were reduced to proposed judgments (the "May 2013 Cohort"). The Special Master recommended that the court adopt the Proposed Findings of Fact and Conclusions of Law for each claimant, direct entry of the Proposed Judgments for those claimants, and certify those Proposed Judgments as

3. Plaintiff is challenging the defendants' use of retaliation, coercion, and intimidation to deny and deprive him of his pension relief. The plaintiff is not challenging the Gulino Judgment itself.

4. Because Plaintiff Maurice Oparaji participated in a class discrimination action against the Bd. of Educ. of the City Sch. Dist. of N. Y, 96-CV-8414 (KMW), the defendants Teachers' Retirement System of the City of New York Teachers' Retirement System of the City of New York ("TRS"), the Board of Education of the City School District of New York ("BOE"), Patricia Reilly, Sanford R. Rich, and Melanie Whinnery retaliated against him.

5. Plaintiff Maurice Oparaji raised a claim, assisted and participated[2] in a proceeding under the EEO laws, that is protected, 96-CV-8414 (KMW).

---

final and appealable pursuant to Federal Rule of Civil Procedure 54 (b). The court reviewed de novo all objections to conclusions of law and findings of fact made or recommended by the Special Master and adopted the Special Master's R&R in its entirety.

[2] One type of protected activity is participation. An individual is protected from retaliation for having made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII, the ADEA, the EPA, the ADA, the Rehabilitation Act, or GINA. Participation may include, for example, filing or serving as a witness in an administrative proceeding or lawsuit alleging discrimination. The EEO laws make it unlawful to discriminate because an individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII, the ADEA, the EPA, the ADA, the Rehabilitation Act, or GINA. This language, known as the "participation clause," provides protection from retaliation for many actions, including filing or serving as a witness for any side in an administrative proceeding or lawsuit alleging discrimination in violation of an EEO law. The participation clause applies even if the underlying allegation is not meritorious or was not timely filed.

6. To remedy acts of employment discrimination[3] and retaliation[4] perpetrated against Plaintiff Maurice Oparaji, this action seeks injunction relief and compensatory damages against Teachers' Retirement System of the City of New York Teachers' Retirement System of the City of New York ("TRS"), the Board of Education of the City School District of New York ("BOE"), Patricia Reilly, Sanford R. Rich, and Melanie Whinnery, for discrimination and retaliation against plaintiff and refusal to comply with the

---

[3] Title VII of the Civil Rights Act prohibit employers from discriminating against their employees due to reasons such as race, gender, color, creed, national origin, and disability status. What many people do not know, however, is that these protections also extend to people who are retaliated against for reporting discrimination.

In discrimination law, "retaliation" refers to any act taken by an employer against a worker, or any other individual, who reports discrimination they experience or witness. Acts of retaliation may be responses to a report of discrimination to a company's Human Resources department, or it can be in response to a complaint to a government agency. They can be overt, explicitly, responses to a complaint of retaliation, or they can be more subtle or indirect, but either way, they are a violation of employment law.

[4] The Supreme Court has defined retaliation as an intentional act in response to a protected action. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005). Citing Jackson, the court in Gutierrez underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." Gutierrez, 2005 WL 2346956, at *5. The complained of matter need not be a complaint; it can be any lawful conduct that an individual engages in connected with a protected right. "The very concept of retaliation is that the retaliating party takes action against the party retaliated against after, and because of, some action of the latter." Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 514 (1958). It carries with it the notion of "getting even." See id. As noted in a 2011 law review article:

> Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled "troublemakers." Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution.

Stipulation[5] and Order So Ordered by the United States District Judge, Kimba M. Wood on December 17, 2018:

> "IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Mr. Oparaji will be entitled to the following non-monetary relief:
>
> The BOE is ordered to amend its internal service, salary, payroll, and human resources systems as follows:
>
> Incorporate the findings of fact contained in the "Pension Damages" section, Section II(E) of Exhibit 1; b. Incorporate Mr. Oparaji's counterfactual monthly service history, as listed on Exhibit B to the Findings of Fact and Conclusions of Law for Maurice Oparaji; and c. Incorporate the findings of fact contained in the "Retroactive Seniority Adjustment" section, Section II(F) of Exhibit 1.
>
> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Court adopts the Special Master's recommendation that this judgment be certified as final and appealable pursuant to Federal Rule of Civil Procedure 54(b) and expressly determines that there is no just reason for delay for the reasons stated in the Special Master's Report and Recommendation. This Judgment Entry is certified and entered by the Court pursuant to Rule 54(b) of the Federal Rules of Civil Procedure". **Exhibit C.**

7. The Teachers' Retirement System of the City of New York Teachers' Retirement System ("TRS"), the Board of Education of the City School District of New York ("BOE"), Patricia

---

[5]Under federal law, a stipulation is generally defined as an agreement, a bargain, proviso, or condition. If the stipulation complies with an applicable statute or rule of court, it will be binding. In the context of contracts, a stipulation is used to define an agreement that ended with specific formalities in a ceremony. In contemporary use, stipulation means a material condition or a requirement in an agreement_

Here, this Court has determined that the Settlement and Release Agreement signed by plaintiff Maurice Oparaji and the Board of Education of the City School District of the City of New York "is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns". **Exhibit C.**

Reilly, Sanford R. Rich, and Melanie Whinnery, breached the so ordered Pension Stipulation[6] & Order entered on December 17, 2018[7] [8] by the United States District Judge (the Honorable Kimba M. Wood), and retaliated against him for having participated in a class action against the Board of Education of the City School District of New York ("BOE"), case number 96-CV-8414 (KMW), which was heard in the United States District Court, Southern District of New York.

8. In order to avoid the compliance of the contractual stipulation, Teachers' Retirement System of the City of New York coerced and intimidate plaintiff to deny and deprive him of his pension relief by compelling withdrawal of contributions with TRS. **Exhibit M.**

9. Teachers' Retirement System of the City of New York sent a package (forms) to plaintiff to withdraw his contributions with TRS.

---

[6]A stipulation is a contract and may be enforced as one. If a landlord breaches a stipulation and keeps a deposit that they are not entitled to, a legal action can be brought to force the landlord to return the deposit and correct the credit. The contract is to be construed as a whole, and the intention of the parties is to be gathered from the four corners of the instrument.

[7] Contractual stipulations are generally interpreted by courts in the strictest sense and courts endeavor to permit them their literal meaning. This is the conventional manner in which courts interpret contractual stipulations whereby they adhere to the letter of the document and glean the intention of the parties from the four corners of the contract itself. Generally construction of the contract's meaning begins with its specific language. The words used in the contract are afforded the plain meaning that a reasonable person would give to them. The intention of the parties is to be determined from the language of the agreement and the words should be given their common and generally accepted meaning.

[8] See January 24, 2018 Special Master Conference Summary, Classwide Exhibits at GULCS 000380-387 ("The parties stated that they agree claimants will receive retroactive seniority with respect to salary-step advancement, longevity bonuses, accrual of years of service for pension, post-retirement health care benefits, accrual of CAR days, sabbatical leave rights, restoration of health leave rights, and hardship transfers.").

10.Copies of forms sent to plaintiff by Teachers' Retirement System of the City of New York to withdraw his contributions with TRS is attached to this Complaint as **Exhibit M.**

11. See also Copies of Rollover Election forms sent to plaintiff by Teachers' Retirement System of the City of New York is attached to this Complaint as **Exhibit K.**

12.42 U.S. Code § 12203 prohibits retaliation and coercion. The law states that no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. It is also unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter. 42 U.S. Code § 12203.

13. The defendants' retaliation by refusing to comply with the Pension-related relief pursuant to the terms of the Court's Orders, causing him to suffer major depression.

14. Defendants denied/deprived Plaintiff of his pension relief.

15. Plaintiff was awarded monetary relief pursuant to the terms of the Judgment and other applicable orders of the Court, including the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order, [ECF No. 1014])". **Exhibit C**

16. Also, plaintiff is entitled to the lost pensions he would have received absent the discriminatory. **Exhibit A.**

17. Defendants refused to comply with the Stipulation and Order So Ordered by the United States District Judge, Kimba M. Wood on December 17, 2018

18. As a result of defendants' refusal to comply with the Court so ordered Stipulation & Order entered on December 17, 2018, caused him to suffer major depression.

19. In BURLINGTON NORTHERN & SANTA FE RAILWAY CO.v. Sheila WHITE, June 22, 2006, Justice BREYER delivering an opinion of the Court, pertinently states:

> "Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." Pub.L. 88–352, § 704, 78 Stat. 257, as amended, 42 U.S.C. § 2000e–2(a).
>
> A separate section of the Act—its anti-retaliation provision—prohibits an employer from "discriminating against an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation. § 2000e–3(a)". (BURLINGTON NORTHERN & SANTA FE RAILWAY CO.v. Sheila WHITE). **Exhibit N.**

## JURISDICTION

20. The Court has jurisdiction over the subject matter of this action pursuant to Title Vll of the Civil Rights of 1964, 42 U.S.C. § 2000e et seq. and 28 U.S.C. §§ 1331 and 1345.

21. Defendants, Teachers' Retirement System of the City of New York ("TRS"), the Board of Education of the City School District of New York ("BOE"), Patricia

Reilly, Sanford R. Rich, and Melanie Whinnery, discriminated against plaintiff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq, by requiring plaintiff to pass certain discriminatory certification exams in order to secure a teaching license. Without that teaching license, Plaintiffs are not eligible for employment as New York City public school teachers.

22. Defendants retaliated[9] against Maurice Oparaji Sr. by refusing to comply with the December 17, 2018 Court ordered Stipulation by the United States District Judge, Kimba M. Wood.

23. The United States District Judge (the Honorable Kimba M. Wood) signed the Judgment for Maurice Oparaji Snr on February 19, 2021.

---

[9] Title VII of the Civil Rights Act of 1964 (the "Act") prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act. Until recently, federal courts were split as to the definition of that term. Some courts held, for example, that it had to be an "ultimate employment decision" such as hiring, terminating, promoting or compensating, while others held that it was any "materially adverse change in the terms and conditions of employment," such as suspension without pay or demotion. On June 22, 2006, the United States Supreme Court resolved this split, issuing a decision which expands the rights of employees under Title VII. In *Burlington Northern Santa Fe Railroad Co. v. White*, the Court held that an employer's actions will be considered an adverse employment action if the conduct "would have been *materially adverse* to a reasonable employee or job applicant," and the action could "dissuade a *reasonable worker* from making or supporting a charge of discrimination." In addition, the Court expanded the scope of the definition of "adverse employment action" by stating that it "extends beyond workplace-related or employment-related retaliatory acts and harms." This expansive definition, therefore, could include things that occur beyond everyday interactions in the office, such as vandalism, refusing to provide post-employment information (such as references), or continually calling or driving by an employee's home for intimidation purposes.

24. A copy of the February 19, 2021 Judgment for Maurice Oparaji Snr is attached to this Complaint as **Exhibits A, B, and C.**

25. This court retains jurisdiction over the matter for purposes of disputes arising out of the Pension Stipulation & Order. See paragraph 67 of the Stipulation & Order, where this Court "retains jurisdiction over any disputes regarding the operation of the Stipulation & Order." **Exhibit B.**

## Venue

26. Venue is proper under 42 U.S.C. § 2000e-5(f) (3) and 28 U.S.C. § 1391.

## THE PARTIES

27. Plaintiff is an African-American male who is at least 70-years old, a resident of Queens, a citizen of the State of New York and the United States.

28. At all times relevant to this suit, plaintiff is a class member entitled to the lost pensions he would have received absent the discriminatory LAST").

29. Plaintiff is a member of Teachers' Retirement System of the City of New York.

30. Plaintiff made contributions that was invested by Teachers' Retirement System of the City of New York.

31. Teachers' Retirement System of the City of New York provides New York City educators with retirement, disability, and death benefits.

32. Teachers' Retirement System of the City of New York collects contributions, and make investment of retirement funds.

33. Teachers' Retirement System of the City of New York is responsible for disbursement of member benefits, and the delivery of member services.

34. The Board of Education of the City School District of New York is responsible for operating the public school program in New York City.

35. State law vests control of the Board of Education of the City School District of New York with a Chancellor who is appointed by the Mayor of the City of New York. N.Y. Educ. Law § 2590-h.

36. The City is also responsible for appointing a majority of the members to the Panel for Educational Policy, which runs the Board of Education of the City School District of New York.

37. The Chancellor is tasked with overseeing every aspect of the schooling of New York City children.

38. The City is a recipient of federal financial assistance related to the provision of educational services.

39. At all material times herein, the Board of Education of the City School District of New York is a municipal entity created and authorized under the laws of the State of New York.

40. Patricia Reilly is the Executive Director of the Teachers' Retirement System of City of the New York.

41. Sanford R. Rich is the Executive Director Board of Education Retirement System of City of the New York.

42. Melanie Whinnery is the Executive Director of the New York City Employee 'Retirement System.

43. Sanford R. Rich; Patricia Reilly; and Melanie Whinnery, signed the Pension Stipulation & Order on behalf of Teachers' Retirement System of the City of New York ("TRS"), and the Board of Education of the City School District of New York ("BOE"). **Exhibit C.**

## STATEMENT OF FACTS

44. In 1996, plaintiff was employed as a teacher with the Board of Education of the City School District of New York ("BOE").

45. At the time, the Board of Education of the City School District of New York required permanent teachers to pass various iterations of the Liberal Arts and Sciences Test ("LAST") as a condition of employment, even though the tests were not properly validated and had a disparate impact on plaintiff and other African-American and Latino teachers.

46. As a result, plaintiff was denied permanent teacher position, and eventually lost the teaching position with the Board of Education of the City School District of New York.

47. In 2012, the District Court found that the Board of Education of the City School District of New York's use of the LAST violated Title VII, and in 2013, it certified a remedy-phase class.

48. Since then, the Court enjoined defendant from using the test to make hiring decisions and has ordered that certain class members, including plaintiff, be deemed certified for the purposes of BOE hiring decisions.

49. The District Court ordered that plaintiff and other class members be entitled to pension damages to compensate them for pension benefits that they would have received absent the discrimination for which defendant has been found liable. *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, No. 96-cv-8414 (KMW), 2016 WL 4129111, at 3 (S.D.N.Y. Aug. 3, 2016).

50. The parties agree that plaintiff and other class members are entitled to the lost pensions that they would have received absent the discriminatory LAST.

51. The District Court appointed the Honorable John S. Siffert, as a Special Master to oversee the two-stage remedial phase that it outlined in its Certification Order.

52. That Order directed that the first stage address "class wide issues, including calculation of back pay, pension benefits, and seniority" and that the second stage address "individual issues, including mitigation and the amount of back pay to which each claimant is entitled." *See Gulino v. Bd. of Educ. of the City*

*Sch. Dist. of the City of N.Y*, No. 96-cv-8414, 2013 WL 4647190, (S.D.N.Y. Aug. 29, 2013) (Wood, J.).

53. In accordance with the Honorable John S. Siffert Order of Appointment (*see* May 20, 2014 Order of Appointment, [ECF No. 435]; November 12, 2014 Second Amended Order of Appointment, [ECF No. 524]), the Honorable John S. Siffert submitted Interim Reports and Recommendations which the Court adopted. (*See* IRR dated October 24, 2014, [ECF No. 516], Order, [ECF No. 536]; IRR dated July 17, 2015, [ECF No. 678], Opinion & Order, [ECF No. 674]; IRR dated June 13, 2016, [ECF No. 777], Order, [ECF No. 800]).

54. The case was referred to Special Master John S. Siffert on May 20, 2014, pursuant to Federal Rule of Civil Procedure 53 (a) (1) (B) and the court's inherent equitable powers and authority. On June 1, 2014, Special Master Siffert filed a Report and Recommendation ("R&R") regarding a cohort of claimants whose damages awards were reduced to proposed judgments and submitted to the Special Master in May 2013 (the "May 2013 Cohort"). The Special Master recommended that the court adopt the Proposed Findings of Fact and Conclusions of Law for each claimant in the May 2021 Cohort, direct entry of the Proposed Judgments for those claimants, and certify those Proposed Judgments as final and appealable pursuant to Federal Rule of Civil Procedure 54 (b). The court reviewed de novo all objections to conclusions of law and findings of fact made

or recommended by the Special Master and adopted the Special Master's R&R in its entirety.

55. On October 27, 2020, the Court found, and defendants did not object to the finding, that plaintiff Maurice Oparaji is entitled to pension related relief based on his contractual service and salary histories, as determined pursuant to the procedures set forth in the Pension Stipulation & Order[10].

56. A copy of the October 27, 2020, findings of fact and conclusions of law for plaintiff Maurice Oparaji Snr is attached to this Complaint as **Exhibit D.**

57. On February 19, 2021, the United States District Judge (the Honorable Kimba M. Wood) signed a Judgment for the plaintiff, Maurice Oparaji Snr.

58. A copy of the February 19, 2021 Judgment for plaintiff Maurice Oparaji Snr is attached to this Complaint as **Exhibit A.**

59. The Board of Education of the City School District of the City of New York ("BOE") and Plaintiff Maurice Oparaji entered into, and the Court so ordered, a Stipulation of Classwide Facts & Procedures, [ECF No. 1009].

60. Sanford R. Rich; Patricia Reilly; and Melanie Whinnery, signed the Pension Stipulation & Order on behalf of Teachers' Retirement System of the City of

[10] See Classwide Conclusions of Law, [ECF No. 1008]; see also Pension Stipulation & Order, [ECF No. 1014]; Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y., Opinion and Order, 1:96-cv-08414, [ECF No. 800] ("[T]he parties agree that class members are entitled to the lost pensions they would have received absent the discriminatory LAST").

New York ("TRS"), and the Board of Education of the City School District of New York ("BOE"). Stipulation and Order So Ordered by the United States District Judge, on December 17, 2018.

61. A copy of the December 17, 2018, Stipulation and Order So Ordered by the United States District Judge, Kimba M. Wood, signed Sanford R. Rich; Patricia Reilly; and Melanie Whinnery, on behalf of Teachers' Retirement System of the City of New York ("TRS"), and the Board of Education of the City School District of New York ("BOE") is attached to this Complaint as **Exhibit C.**

62. Pursuant to the of the December 17, 2018, Stipulation and Order So Ordered by the United States District Judge, Kimba M. Wood; Teachers' Retirement System of the City of New York ("TRS"), and the Board of Education of the City School District of New York ("BOE") are required to "effectuate the non-monetary relief to which plaintiff Maurice Oparaji Sr. is entitle pursuant to the terms of the Judgment and any other applicable orders of the Court, including the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order, [ECF No. 1014])". **Exhibit C.**

63. The BOE and Plaintiff Maurice Oparaji entered into, and the Court so ordered, a Fifth Supplemental Stipulation Concerning Admissibility of Exhibits, which attached a Fifth Supplemental Index of Exhibits (collectively referred to as the "Classwide Exhibits") filed with the Court, [ECF No. 5942].

64. On December 17, 2018, the Court entered Pension-related relief pursuant to the terms of the Court's Order (Pension Stipulation & Order, [ECF No. 1014]), which states that Mr. Oparaji will be entitled to the following non-monetary relief and ordered the BOE to amend its internal service, salary, payroll, and human resources systems as follows: Court found that the New York City Department of Education ("DOE") failed to comply the Court's Order:

a. Incorporate the findings of fact contained in the "Pension Damages" section, Section II (E) of Exhibit 1;

b. Incorporate Mr. Oparaji's counterfactual monthly service history, as listed on Exhibit B to the Findings of Fact and Conclusions of Law for Maurice Oparaji; and

c. Incorporate the findings of fact contained in the "Retroactive Seniority Adjustment" section, Section II (F) of Exhibit 1. **Exhibit A.**

65. The Board of Education of the City School District of the City of New York failed to amend its internal service, and human resources systems as ordered by the Court.

66. The Board of Education of the City School District of the City of New York failed to incorporate the findings of fact contained in the "Pension Damages" section, Section II (E) of Exhibit 1 as ordered by the Court. **Exhibit A.**

67. The Board of Education of the City School District of the City of New York failed to incorporate Mr. Oparaji's counterfactual monthly service history, as

listed on Exhibit B to the Findings of Fact and Conclusions of Law for Maurice Oparaji, as ordered by the Court. **Exhibit A.**

68. The Board of Education of the City School District of the City of New York failed to incorporate the findings of fact contained in the "Retroactive Seniority Adjustment" section, Section II (F) of Exhibit 1 as ordered by the Court. **Exhibit A.**

69. On or about December, 2021, plaintiff Maurice Oparaji received Gulino Invoice Pension Contributions from Teachers' Retirement System of the City of New York.

70. A copy of the invoice for payment for Basic Member Contribution (BMC) is attached to this Complaint as **Exhibit** I.

71. On or about December 23, 2021, by check number 334, Plaintiff paid $2575.65 for Basic Member Contribution (BMC) to Teachers' Retirement System of the City of New York.

72. A copy of check number 334 for $2575.65 for Basic Member Contribution (BMC) to Teachers' Retirement System of the City of New York is attached to this Complaint as **Exhibit L.**

73. On January 3, 2022, plaintiff received a "Welcome to TRS" letter and TRS News Publication.

74. A copy of the Welcome to TRS letter and TRS News Publication.is attached to this Complaint as **Exhibit F;** see also TRS News Publication. **Exhibit H.**

75. On Jun 22, 2022 at 4:28 PM, plaintiff received an email that states "Once a review of your case is completed, you will be notified in writing".

76. Since then, plaintiff has made at least 50 calls, and sent several emails, yet received no response from Teachers' Retirement System of the City of New York.

77. Plaintiff Maurice Oparaji filed and received a Notice of Claim from the City of New York Office of the Comptroller on September 30, 2022, Claim No: 2022LW027731.

78. A copy of the Claim Number: 2022LW027731 assigned by the City of New York Office of the Comptroller on September 30, 2022 is attached to this Complaint as **Exhibit G.**

79. Despite the discrimination layoff, plaintiff would have remained employed at the Board of Education of the City School District of the City of New York until he was sixty-five years old.

80. Defendants, without good cause, failed to comply with the terms of the Court's Order (Stipulation & Order); whereas, the Parties had agreed:

> The Pension Stipulation & Order was drafted by the parties in consultation with me. It is the culmination of many months of effort to deal with complex and arcane factual and legal issues. In particular, the efforts of Bryan Berge, Senior Counsel at the New York City Law Department, should be credited with engaging the three New York City retirement systems to achieve a fair solution to what initially appeared to be an intractable problem. Plaintiffs' counsel, especially Robert A. Mantel, also deserve special mention for completing the Pension Stipulation & Order.

> The New York City Teachers' Retirement System ("TRS"), the Board of Education Retirement System ("BERS"), and the New York City Employee Retirement System ("NYCERS")—public pension systems in which a portion of the plaintiff class are current or retired members—consent to those protocols and procedures detailed in the Pension Stipulation & Order.
>
> TRS, BERS, and NYCERS are non-parties that have consented to the terms that pertain to them and for which consent has not been expressly withheld. TRS, BERS, and NYCERS have consented to these terms solely for the purpose of effectively administering the pension relief due to class members. TRS, BERS, and NYCERS were not parties to the discrimination for which the BOE has been found liable and take no position on the litigation.
>
> The parties agree to waive the timeframe and procedure in the Second Amended Order of Appointment [ECF No. 524] for submission of their objections, as they agree the objections they previously set forth should be deemed submitted to the Court. **Exhibit J.**

81. Whereas, "TRS, BERS, and NYCERS are non-parties that have consented to the terms that pertain to them and for which consent has not been expressly withheld. TRS, BERS, and NYCERS have consented to these terms solely for the purpose of effectively administering the pension relief due to class members. TRS, BERS, and NYCERS were not parties to the discrimination for which the BOE has been found liable and take no position on the litigation".

82. TRS, BERS, and NYCERS consented to the terms that pertain to them and for which consent has not been expressly withheld.

83. TRS, BERS, and NYCERS consented to these terms solely for the purpose of effectively administering the pension relief due to class members.

84. TRS, BERS, and NYCERS were not parties to the discrimination for which the BOE has been found liable and take no position on the litigation".

85. A copy of the Court's Order (Stipulation & Order), filed December 17, 2018.is attached to this Complaint as **Exhibit J.**

86. "To the extent Maurice Oparaji Sr. has any questions or concerns related to the administration of his Monetary and/or Non-Monetary Relief, without limitation, any non-contractual claim, dispute or matter shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts to be performed wholly within State of New York". **Exhibit C.**

87. The Parties also "agree that this agreement may be executed in counterparts which when taken together shall constitute a single document". **Exhibit C.**

88. For the non-monetary relief (pension relief), the Board of Education of the City School District of the City of New York agree to amend its internal service, salary, payroll, and human resources systems. **Exhibit C.**

89. Also, the Board of Education of the City School District of the City of New York agree to incorporate the "Pension Inputs" detailed in Paragraph 3(d) of Exhibit 1; but it failed to incorporate the "Pension Inputs. **Exhibit C.**

90. Furthermore, the Board of Education of the City School District of the City of New York and TRS agree to Incorporate Mr. Oparaji's counterfactual monthly service history, as listed on Exhibit B to the Findings and Fact and Conclusions of Law for Mr. Oparaji; and grant Mr. Oparaji retroactive seniority based on his counterfactual monthly service history, as described in Paragraph 3 of Exhibit 1, but the Board of Education of the City School District of the City of New York and TRS failed to comply. **Exhibit C.**

91. Whereas, plaintiff Maurice Oparaji gave "up his right to payment of post-judgment interest. **Exhibit C.**

92. Whereas, plaintiff Maurice Oparaji agree to pay $2575.65 for Basic Member Contribution to Teachers' Retirement System of the City of New York. **Exhibit L.**

93. Plaintiff Maurice Oparaji also agree and paid the Basic Member Contribution to Teachers' Retirement System of the City of New York. **Exhibit L.**

94. Plaintiff Maurice Oparaji is entitled to non-monetary relief pursuant to the terms of the Judgment and any other applicable Orders the Court, including the Pension-related relief pursuant to the terms of the Court's Order (Pension Stipulation & Order, [ECF No. 1014]). **Exhibit C.**

95. The Board of Education of the City School District of the City of New York and TRS failed to comply with the non-monetary relief pursuant to the terms of the Judgment and the Pension-related relief pursuant to the terms of the Court's Order (Pension Stipulation & Order, [ECF No. 1014]). **Exhibit C.**

96. As a result of their noncompliance to the Court's Order (Pension Stipulation & Order, [ECF No. 1014]), Plaintiff Maurice Oparaji was denied the Pension-related relief pursuant to the terms of the Court's Order, which he is entitled.

97. Plaintiff Maurice Oparaji was subjected to retaliation in violation of Title VII.

98. Defendants failed and refused to take reasonable action to prevent the discriminatory treatment of plaintiff.

99. When plaintiff called Member Services Center at 1 (888) 869-2877, Teachers' Retirement System of the City of New York's Andre Murray made inappropriate comments that was directed at Plaintiff Maurice Oparaji because of his class action participation against the Board of Education of the City School District of New York (96-CV-8414 (KMW); "You are not entitled to be reinstated as a member of TRS, your judgment is a nullity because New York City Pension Funds have a statutory obligation to follow NYC Administrative Code §13-184, and that for you to join TRS, the Court must modify Admin. Code § 13-184".

100. On numerous occasions, Andre Murray told plaintiff, "Because you separated from service prior to becoming vested, you are required to withdraw your Qualified Pension Plan (QPP) funds by submitting an Application for Withdrawal of QPP Accumulations".

101. In June 19, 2022, Plaintiff Maurice Oparaji complained to the Board of Education of the City School District of the City of New York about Teachers' Retirement System of the City of New York's Andre Murray conduct and comments toward him.

102. The Board of Education of the City School District of the City of New York took no action in response to Plaintiff Maurice Oparaji's complaints.

103. The Settlement and Release Agreement signed by plaintiff Maurice Oparaji and the Board of Education of the City School District of the City of New York "is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns". **Exhibit C.**

104. Defendants' conduct here is Intentional because the Order of the Court is clear and unambiguous "amend its internal service, salary, payroll, and human resources systems to Incorporate the findings of fact contained in the "Pension Damages" section, Section II(E) of Exhibit 1; b. Incorporate Mr. Oparaji's counterfactual monthly service history, as listed on Exhibit B to the Findings of Fact and Conclusions of Law for Maurice Oparaji; and c. Incorporate the findings of fact contained in the Retroactive Seniority Adjustment section, Section II(F) of Exhibit 1; and "expressly determines that there is no just reason for delay for the reasons stated in the Special Master's Report and Recommendation. This Judgment Entry is certified and entered by the Court pursuant to Rule 54(b) of the Federal Rules of Civil Procedure".

105. Defendants Teachers Retirement System of the City of New York ("TRS"), the Board of Education of the City School District of New York ("BOE"), Patricia Reilly, Sanford R. Rich, and Melanie Whinnery, intentionally refused to comply with the Court Orders.

106. Under false pretense[11], these defendants claim plaintiff is challenging the Judgment "Because you separated from service prior to becoming vested, you are required to withdraw your Qualified Pension Plan (QPP) funds by submitting an Application for Withdrawal of QPP Accumulations". **Exhibit M.** See also **Exhibit K.**

107. Here, there is a contract between Plaintiff Maurice Oparaji and Defendants; the Settlement and Release Agreement signed by plaintiff Maurice Oparaji and the Board of Education of the City School District of the City of New York "is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns". **Exhibit C.**

108. Maurice Oparaji Sr signed a contract/agreement with BOE which is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents,

[11] If any person shall knowingly and designedly by means of any kind of false pretense whatsoever, whether the false pretense is of a past or subsisting fact or of a future fulfillment or event, obtain or attempt to obtain from any person within this State any money, goods, property, services, chose in action, or other thing of value with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value, such person shall be guilty of a felony: Provided, that if, on the trial of anyone indicted for such crime, it shall be proved that he obtained the property in such manner as to amount to larceny or embezzlement, the jury shall have submitted to them such other felony proved; and no person tried for such felony shall be liable to be afterwards prosecuted for larceny or embezzlement upon the same facts: Provided, further, that it shall be sufficient in any indictment for obtaining or attempting to obtain any such money, goods, property, services, chose in action, or other thing of value by false pretenses to allege that the party accused did the act with intent to defraud, without alleging an intent to defraud any particular person, and without alleging any ownership of the money, goods, property, services, chose in action or other thing of value; and upon the trial of any such indictment, it shall not be necessary to prove either an intent to defraud any particular person or that the person to whom the false pretense was made was the person defrauded, but it shall be sufficient to allege and prove that the party accused made the false pretense charged with an intent to defraud.

officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns". **Exhibit C.**

109. The signed settlement and release contract/agreement is complete, clear and unambiguous; the language used is definite and precise, and So Ordered by the United States District Judge, Kimba M. Wood on September 9, 2021, in paragraph 6, the parties agree that "this agreement is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns". **Exhibit C.**

110. These defendants refused to comply with the signed settlement and release contract/agreement because they claim, under false pretense, that it is not binding.

111. It is unreasonable to assume that an agreement signed by both parties, Joshua S. Sohn, William S. Fraenkel, Patricia Reilly, Sanford R. Rich, and Melanie Whinnery, signed on behalf of the Board of Education of the City School District of New York, Notarized and So Ordered by the United States District Judge, is not legally binding[12]? **Exhibit C.**

112. These defendants are still discriminating; and still retaliating, till date.

113. Plaintiff Maurice Oparaji gave "up his right to payment of post-judgment interest. **Exhibit C.**

---

[12] A contract is an agreement that specifies certain legally enforceable rights and obligations pertaining to two or more parties. A contract typically involves the transfer of goods, services, money, or a promise to transfer any of those at a future date, and the activities and intentions of the parties entering into a contract may be referred to as contracting. In the event of a breach of contract, the injured party may seek judicial remedies such as damages or equitable remedies such as specific performance or rescission. A binding agreement between actors in international law is known as a treaty.

114. Plaintiff Maurice Oparaji agreed and paid $2575.65 for Basic Member Contribution to Teachers' Retirement System of the City of New York. **Exhibit L.**

115. Defendants did nothing other than coerced plaintiff to withdraw his Qualified Pension Plan (QPP) funds by submitting an Application for Withdrawal of QPP Accumulations". **Exhibit M.** See also **Exhibit K.**

116. Simply put, defendants breached the agreement because they assume it is not enforceable.

117. Defendants the Board of Education of the City School District of New York, Teachers' Retirement System of the City of New York, Patricia Reilly, Sanford R. Rich, and Melanie Whinnery have failed and/or refused to effectuate the non-monetary relief to which Maurice Oparaji Sr. is entitle pursuant to the terms of the Judgment applicable orders of the Court, including the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order, [ECF No. 1014]). **Exhibits A, B, and C.**

118. The Settlement and Release Agreement entered into between Maurice Oparaji Sr. and the Board of Education of the City School District of New York, Notarized and So Ordered by the United States District Judge, The parties stipulate and agree as follows:

> "1 (e). Maurice Oparaji Sr. giving up his right to payment of post-judgment interest".
>
> "2. The non-monetary relief to which plaintiff Maurice Oparaji Sr. is entitled pursuant to the terms of the Judgment remains unaffected by the terms of this agreement, and BOE will effectuate the non-monetary relief to which Maurice Oparaji Sr. is entitled pursuant

> to the terms of the Judgment and any other applicable orders of the Court, including the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order, [ECF No. 1014])".
>
> "6. This agreement is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns".
>
> "7. This agreement represents the entire agreement between BOE and Maurice Oparaji Sr. with respect to the subject matter hereof. This agreement may not be modified, changed, amended, supplemented or rescinded except pursuant to a written instrument duly executed by BOE and Maurice Oparaji Sr.." **Exhibit C.**

119. There is no record of a written instrument duly executed by BOE and Maurice Oparaji Sr.

120. Plaintiff Maurice Oparaji Sr. executed no written instrument modifying, changing, amending, supplementing or rescinding the agreement

121. Defendants and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns have refused to comply with the Court's Order Pension-related relief pursuant to the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order, [ECF No. 1014]). **Exhibit C.**

122. Compensatory and Punitive Damages available under § 102 of the Civil Rights Act of 1991.

**Count One**
**(Breach of Contract/Stipulation)**

123. The foregoing paragraphs are realleged and incorporated by reference herein.

124. The Defendant's conduct as alleged herein constitutes Breach of Contract/Stipulation.

125. The parties, for valuable consideration, entered into a valid and enforceable Pension Stipulation & Order on December 17, 2018 so ordered by the United States District Judge (the Honorable Kimba M. Wood).

126. Defendants have willfully and without lawful justification refused to comply with the December 17, 2018 Pension Stipulation & Order.

127. Defendants' unlawful conduct has damaged plaintiff in an approximate amount

**Count Two**
**(Reprisal for Engaging in Protected Activity)**

128. The foregoing paragraphs are realleged and incorporated by reference herein.

129. The Defendants' conduct as alleged above constitutes retaliation against the Plaintiff because he engaged in activities protected by Title VII. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

**Count Three**
**(Discrimination)**

130. The foregoing paragraphs are realleged and incorporated by reference herein.

131. The Defendants' conduct as alleged above constitutes racial discrimination against plaintiff, African-American.

132. Defendants discriminated against plaintiff Maurice Oparaji on the basis of his age, and race in violation of 42 U.S.C. § 2000e-2(a) by refusing to comply with the terms of the Court's Order (Pension Stipulation & Order, [ECF No. 1014]) and that adversely affected the terms, conditions and privileges of plaintiff.

133. Plaintiff Maurice Oparaji has suffered injuries as a result of the defendants' discriminatory treatment.

134. Defendants failed to take reasonable action to prevent or promptly correct the discriminatory treatment of plaintiff Maurice Oparaji Sr.

**Jury Demand**

135. Plaintiff Maurice Oparaji Sr. hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

136. **WHEREFORE**, plaintiff Maurice Oparaji Sr., prays that this Court enter judgment:

A. awarding compensatory damages to the complainant to fully compensate him for injuries caused by defendants' discriminatory conduct;

B. enjoining defendants, their agents, employees, successors, and all persons in active concert or participation with defendants, from engaging in discriminatory and retaliation;

C. directing defendants to take such affirmative steps as may be necessary to prevent and to remedy discriminatory and retaliation Program;

D. awarding Emotional Distress, nightmares, sleeplessness, humiliation, and other subjective distress.

E. granting back and front Pension pay; and

F. granting such further relief as the Court may deem just, together with costs and disbursements in this action.

DATED: Queens, New York
December 12, 2023.

Respectfully Submitted,

Maurice Oparaji

MAURICE OPARAJI
245-11 133 Road
Rosedale, NY 11422
(347) 283-6009
mroparaji@yahoo.com

To: H. Keith Belfield
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
T: (212) 356-8767
E: hbelfiel@law.nyc.gov

**Plaintiff Maurice Oparaji's Attachment incorporated to the Amended Verified Complaint (A-N):**

1. **EXHIBIT A -** Judgments for Maurice Oparaji Sr.
2. **EXHIBIT B –** Stipulation and Order
3. **EXHIBIT C** – Settlement and Release Agreement
4. **EXHIBIT D –** Findings and Conclusion of Law for Maurice Oparaji
5. **EXHIBIT E** - Maurice Oparaji Sr. letter to TRS
6. **EXHIBIT F –** Welcome to TRS
7. **EXHIBIT G –** Acknowledge Claim Number 2022LW027731
8. **EXHIBIT H –** TRS News Letter
9. **EXHIBIT I –** TRS Invoice for Pension Contribution
10. **EXHIBIT J –** Report and Recommendation
11. **EXHIBIT K** – OPP Form for Withdrawal of Accumulation
12. **EXHIBIT L** – BMC Cancelled Check to TRS
13. **EXHIBIT M** – Application for Withdrawal of OPP Accumulation
14. **EXHIBIT N -** U. S. Supreme Court Ruling Title VII of the Civil Rights Act of 1964

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELSA GULINO, MAYLING RALPH, PETER WILDS, and NIA GREENE, on behalf of themselves and all others similarly situated, Plaintiffs, - against - THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Defendant. | 96 Civ. 8414 (KMW) **~~[PROPOSED]~~ JUDGMENT FOR MAURICE OPARAJI SR.** |

WHEREAS, the Court certified a remedy-phase class of Plaintiffs (*See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, Opinion and Order, No. 96-cv-8414, [ECF No. 386]), and Maurice Oparaji Sr. ("Claimant") is a member of that class and submitted an individual demand for damages on May 28, 2020;

WHEREAS, the Court appointed a Special Master (*See* May 20, 2014 Order of Appointment, [ECF No. 435]; November 12, 2014 Second Amended Order of Appointment, [ECF No. 524]) to hear, among other things, demands for damages;

WHEREAS, the Special Master held a hearing on July 23, 2020, with respect to Mr. Oparaji's demand for damages and Defendant's objections, [ECF No. 6407];

WHEREAS, the Special Master made, and the Court adopted, Classwide Conclusions of Law, [ECF Nos. 999, 1008];

WHEREAS, the Board of Education of the City School District of the City of New York ("BOE") and Plaintiffs entered into, and the Court so ordered, a Stipulation of Classwide Facts & Procedures, [ECF No. 1009];

WHEREAS, the BOE and Plaintiffs entered into, and the Court so ordered, a Fifth Supplemental Stipulation Concerning Admissibility of Exhibits, which attached a Fifth Supplemental Index of Exhibits (collectively referred to as the "Classwide Exhibits") filed with the Court, [ECF No. 5942];

WHEREAS, the Special Master made Findings of Fact and Conclusions of Law for Maurice Oparaji, annexed hereto as Exhibit 1, that he recommended the Court adopt;

WHEREAS, the Special Master recommended, and the parties agreed with the Special Master's recommendation, that the Court certify this judgment as final and appealable pursuant to Federal Rule of Civil Procedure 54(b);

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the annexed Findings of Fact and Conclusions of Law for Maurice Oparaji (Exhibit 1) are adopted;

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Mr. Oparaji will have judgment against the BOE as follows:

1. Backpay in the amount of $21,986;
2. Tax-component award in the amount of $2,583;
3. LAST Fees in the amount of $420;
4. CAR Day award in the amount of $430;
5. Pre-judgment interest calculated to be $11,701; and
6. Pension-related relief pursuant to the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order, [ECF No. 1014]).

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Mr. Oparaji will be entitled to the following non-monetary relief:

1. The BOE is ordered to amend its internal service, salary, payroll, and human resources systems as follows:
    a. Incorporate the findings of fact contained in the "Pension Damages" section, Section II(E) of Exhibit 1;
    b. Incorporate Mr. Oparaji's counterfactual monthly service history, as listed on Exhibit B to the Findings of Fact and Conclusions of Law for Maurice Oparaji; and
    c. Incorporate the findings of fact contained in the "Retroactive Seniority Adjustment" section, Section II(F) of Exhibit 1.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Court adopts the Special Master's recommendation that this judgment be certified as final and appealable pursuant to Federal Rule of Civil Procedure 54(b) and expressly determines that there is no just reason for delay for the reasons stated in the Special Master's Report and Recommendation.

This Judgment Entry is certified and entered by the Court pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Dated: 2/19/21

ENTERED:

/s/ Kimba M. Wood

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELSA GULINO, MAYLING RALPH, PETER WILDS, and NIA GREENE, on behalf of themselves and all others similarly situated, Plaintiffs, | 96 Civ. 8414 (KMW) |
| - against - | **[PROPOSED] STIPULATION AND ORDER** |
| THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Defendant. | |

**WHEREAS:**

1. The Court in this Title VII class action has ordered that class members are entitled to pension damages to compensate them for pension benefits that they would have received absent the discrimination for which the Defendant Board of Education of the City School District of the City of New York ("BOE") has been found liable.[1] To facilitate the provision of these damages and benefits, the signatories agree to the following protocols and procedures. By agreeing to this Stipulation & Order, however, the BOE and Plaintiffs do not waive any other objections they have made to date in this action, or any rights related to those objections.

2. The New York City Teachers' Retirement System ("TRS"), the Board of Education Retirement System ("BERS"), and the New York City Employee Retirement System

[1] *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, No. 96-CV-8414 (KMW), 2016 WL 4129111, at *3 (S.D.N.Y. Aug. 3, 2016) ("[T]he parties agree that class members are entitled to the lost pensions they would have received absent the discriminatory LAST.").

("NYCERS")—public pension systems in which a portion of the plaintiff class are current or retired members—consent to those protocols and procedures detailed below that pertain to them.[2]

3. The pension relief a class member is entitled to receive as a result of this case derives from the service history he or she would have accrued and the salary he or she would have earned absent BOE discrimination (the "counterfactual" service and salary history), as determined by the parties' damages experts and found by the Court, as detailed in the class member's individual judgment award.

4. As described below, regularly appointed BOE Teachers who are members of TRS pursuant to Article 15 of the Retirement and Social Security Law ("RSSL"): (1) make contributions to, and accrue benefits from, the TRS Qualified Pension Plan ("QPP"); (2) select, or are mandated to join, supplementary early-retirement plans, depending on membership date; (3) select beneficiaries for certain benefits; and (4) upon retirement, select a retirement-payment option. Due to the BOE's discrimination, certain class members were denied the opportunity to accrue these benefits or make these selections, including class members who have passed away without having made selections.

Employee and Employer Contributions to TRS

5. BOE employees who join TRS are required to make certain employee contributions to TRS QPP accounts.

[2] TRS, BERS, and NYCERS are non-parties that have consented to the terms of this Stipulation & Order that pertain to them and for which consent has not been expressly withheld. TRS, BERS, and NYCERS have consented to these terms solely for the purpose of effectively administering the pension relief due to class members. TRS, BERS, and NYCERS were not parties to the discrimination for which the BOE has been found liable and take no position on the litigation.

a. BOE employees who joined TRS after August 31, 1983, but prior to April 1, 2012, are Tier IV members and contribute, generally on a pre-tax basis,[3] 3% of their BOE annual wages to TRS for the first ten (10) years of their credited service. Eligible Tier IV TRS members who opted into, or were mandated to enter, supplementary early-retirement plans make additional member contributions ("AMC"s) above this 3% contribution amount.

b. BOE employees who became TRS members on or after April 1, 2012, without prior public service entitling them to Tier IV membership, are Tier VI members and contribute between 3% and 6% of annual wages to their QPP accounts, depending on the amount of their wages, for the entirety of their credited service with TRS. Tier VI TRS members are not eligible for any supplementary early-retirement plans.[4]

6. In addition, the BOE makes actuarially determined contributions to TRS to fund the pension benefits that TRS members employed by the BOE accrue pursuant to the RSSL and other applicable law.

7. Class members who were unable to join TRS due to the BOE's discrimination will not have made any employee contributions to TRS.

8. Class members who were able to join TRS, and made employee contributions to their QPP accounts during their counterfactual service period, may have made contributions for fewer years and based on lower BOE salaries than would have been the case absent BOE discrimination. Consequently, when a class member's TRS QPP account is adjusted to reflect

---

[3] These contributions are pre-tax with respect to federal income taxes, but post-tax with respect to New York state and local income taxes. Wherever the phrases "pre-tax" or "post-tax" appear in this Stipulation & Order, they refer solely to the tax treatment of contributions under federal tax law.

[4] TRS members who do not participate in a supplementary early-retirement plan are referred to herein as "basic" members of Tier IV or Tier VI, and the contributions made and benefits received by these members are likewise referred to as "basic."

counterfactual-service-and-salary history, pursuant to the procedures set forth herein, there may be a deficit in historical employee contributions.

9. Class members who were able to join TRS during their counterfactual service period and made contributions to their QPP account during that period may have joined TRS as Tier VI members when they would have been Tier IV members absent BOE discrimination. As Tier VI members, these class members may have made contributions to TRS at rates that exceed Tier IV rates, and if these class members are reclassified as Tier IV members, there may be a surplus in employee contributions in their accounts.

Employee and Employer Contributions to Other Affected Retirement Systems

10. A number of class members, after suffering from BOE discrimination, obtained or maintained employment in positions that permitted or required participation in NYCERS or BERS. The protocol and procedures laid out in this Stipulation & Order afford these class members relief for the pension benefits they were denied, if any, due to BOE discrimination while allowing these class members to remain NYCERS or BERS members.

11. Members of NYCERS or BERS are required, upon joining, to make employee contributions to their pension accounts.[5] Specifically, all NYCERS or BERS members who joined the system on or after August 31, 1983, but prior to April 1, 2012, and are subject to Article 15 of the RSSL are Tier IV members and contribute, generally on a pre-tax basis, 3% of their annual wages to their retirement system for the first ten (10) years of their credited service. Under the RSSL, and to the extent these Tier IV NYCERS and BERS members do not participate in any

[5] New York City Police officers and firefighters are required to join, respectively, the New York City Police Pension Fund and the New York City Fire Department Pension Fund. To the extent class members participate in these funds and are eligible to receive a pension remedy pursuant to this Stipulation & Order, these pensions shall constitute "Outside Pensions," as that term is defined in Paragraph 43 of this Stipulation & Order, and the remedy available to these class members is set forth in Paragraph 61 of this Stipulation & Order.

supplementary early-retirement plan, as described below, the service-retirement benefits these members receive are identical to those of basic TRS Tier IV members.

12. All NYCERS or BERS members who joined the system on or after April 1, 2012, without prior public service entitling them to Tier IV membership, and who are subject to Article 15 of the RSSL, are Tier VI members and contribute between 3% and 6% of annual wages to their member accounts, depending on the amount of their wages, for the entirety of their credited service with the system. Under the RSSL, and to the extent these Tier VI NYCERS and BERS members do not participate in any supplementary early-retirement plan, as described below, the pension benefits these members receive are identical to those of basic TRS Tier VI members.[6]

13. As described below, eligible Tier IV and Tier VI members of NYCERS or BERS who opted into, or were mandated to enter, supplementary early-retirement plans make AMCs in addition to their basic employee contributions. The structure of some of these supplementary early-retirement plans, as set forth in the RSSL and described in Paragraph 27 of this Stipulation & Order, closely resembles that of the supplementary early-retirement plans available in TRS.[7]

14. Class members who were unable to join TRS due to BOE discrimination, but were able to secure positions resulting in membership in NYCERS or BERS may have made contributions, including AMCs, to NYCERS or BERS for fewer years and based on lower salaries than would have been the case absent BOE discrimination. Consequently, when these class members' accounts at their retirement system are adjusted to reflect counterfactual-service-and-salary history, pursuant to the procedures set forth herein, there may be a deficit in historical

[6] BERS and NYCERS members who do not participate in a supplementary early-retirement plan are referred to herein as "basic" members of BERS and NYCERS Tier IV or Tier VI plans, and the contributions made and benefits received by these members are likewise referred to as "basic."

[7] Certain other supplementary early-retirement plans administered by NYCERS and BERS do not closely resemble those available in TRS. These plans are described in Footnote 9 *infra*.

employee contributions. The deficit in historical AMCs may include amounts that these class members would not have paid as TRS members during the counterfactual service history, but that would have been required under the relevant NYCERS or BERS plans during that period of time if class members' counterfactual service is deemed to have been rendered in the positions that are the basis for their membership in NYCERS or BERS.

15. Class members who were able to join BERS or NYCERS during their counterfactual service period and made contributions to their member accounts during that period may have joined NYCERS or BERS as Tier VI members when they would have been Tier IV members absent BOE discrimination. As Tier VI members, they may have made contributions to NYCERS or BERS at rates that exceed Tier IV rates, and if these class members are reclassified as Tier IV members there may be a surplus in employee contributions in their accounts.

Interest Accrued on Employee Contributions

16. Ordinarily, when an account of a member of TRS, BERS, or NYCERS (collectively, the "Affected Systems") is adjusted to reflect additional past credited service, the member must pay employee contributions, including AMCs, attributable to that service, as well as interest on these delayed contributions. By law, interest on delayed employee contributions accrues at five percent (5%) per annum, compounded annually.

17. Because class members were either unable to participate in TRS or accrued reduced pension benefits due to BOE discrimination, when their Affected System accounts are created or adjusted to reflect counterfactual service and salary history, there will be statutory interest charges on the class members' delayed contributions that would not exist had the class members secured TRS-mandated positions with the BOE on their counterfactual appointment dates absent discrimination.

Tax Adjustment for Employee Contributions

18. As noted above, employee contributions to the Affected Systems that are attributable to ongoing employment are generally made pre-tax out of employees' paychecks in the normal course. Under the pension-relief structure described herein, however, class members will receive backpay awards from Defendant without historical-employee-pension contributions having been withheld and paid to TRS on a pre-tax basis. Class members who receive a pension remedy through one of the Affected Systems will then be required to pay employee contributions to the Affected System attributable to counterfactual service and salary out of their backpay awards. The employee contributions, having been paid to class members in backpay awards, will be taxed as ordinary income. Consequently, as a result of BOE discrimination, these class members will make contributions to the Affected Systems on a post-tax, rather than pre-tax, basis.

Supplementary Early-Retirement Plans in the Affected Systems

19. On February 27, 2008, Chapter 19 of the Laws of 2008 ("Chapter 19") amended the RSSL and the New York City Administrative Code to establish supplementary early-retirement programs to permit regularly appointed BOE teachers to retire prior to age 62.

20. Regularly appointed BOE teachers who were either: (a) in active service as of February 27, 2008; or (b) not in active service on February 27, 2008, but were entitled to a deferred vested benefit[8] based upon service rendered prior to that date and who returned to active service, were entitled to opt in to the "55/25 Plan." Under the 55/25 Plan, eligible TRS members who opted in to the program and paid AMCs, as set forth in the RSSL, could retire at age 55 if they have 25 or

[8] "Deferred vested" members of an Affected System are members not in active service, who have vested benefits, based upon credited service, and who will be eligible to receive a pension at normal retirement age. *See* RSSL § 612.

more years of credited service and would receive the same benefit as a basic Tier IV member retiring with the same amount of credited service at age 62.

21. Under Chapter 19, TRS members eligible to opt in to the 55/25 Plan had 180 days from the date of enactment to opt in to the 55/25 Plan (the "Enrollment Period"). Eligible members who did not elect to join the 55/25 Plan remained in the basic Tier IV plan, under which individuals could retire at age 62 provided that they had rendered at least 5 years of credited service, or at age 55 provided they had 30 or more years of credited service, without any reduction in benefits.

22. Regularly appointed BOE teachers who became members of TRS after February 27, 2008 and who had previously been members of a public retirement system of the State of New York prior to the enactment of Chapter 19, but were not eligible to receive a deferred vested benefit as a result of their service, were eligible to opt in to the "55/27 Plan." Under the 55/27 Plan, eligible TRS members who opted in to the program, and paid AMCs as provided in the RSSL, could retire at age 55 if they have 27 or more years of credited service and would receive the same benefit as a basic Tier IV member retiring with the same amount of credited service at age 62.

23. Under Chapter 19, regularly appointed BOE teachers eligible to opt in to the 55/27 Plan had 180 days from the date of returning to active service to opt in to the 55/27 Plan. Eligible members who did not elect to join the 55/27 Plan remained in the basic Tier IV plan.

24. Regularly appointed BOE teachers who joined TRS after February 27, 2008, but prior to April 1, 2012, and who had not previously been members of a public retirement system of the State of New York prior to the enactment of Chapter 19 were automatically enrolled into the 55/27 plan and were required to contribute AMCs as provided in the RSSL.

25. Many class members who would have been regularly appointed BOE teachers during the Enrollment Period absent the BOE's discrimination were either denied the opportunity

to enroll in the 55/25 or 55/27 Plans or made an election under circumstances that would not have existed absent the discrimination.

26. BERS administers 55/25 and 55/27 plans for certain BERS-eligible positions. Under the RSSL, these BERS 55/25 and 55/27 plans are substantially identical to the TRS 55/25 and 55/27 Plans.

27. NYCERS and BERS also administer similar supplementary early-retirement plans pursuant to Chapter 96 of the Laws of 1995 and other laws. In general, the statutory structure of these plans closely resembles that of the 55/25 and 55/27 Plans, insofar as members in an affected position upon the enactment of these plans were permitted to join these plans or remain basic Tier IV members if they declined to join these plans; members in affected positions who joined after the enactment date of the supplementary early-retirement plans were mandated to participate in these plans; and the plans provide that members must pay AMCs in exchange for the ability to retire prior to the standard Tier IV retirement age of 62 without any reduction in benefits, provided that specified age and service-credit requirements are met.[9] Hereinafter, these similar NYCERS and

[9] NYCERS and BERS also administer certain special plans—for sanitation workers, special officers, emergency medical technicians, and employees in certain designated "physically taxing" titles, for example—that require as a condition of the retirement benefit that the member render a specified period of service *in that specific title* and/or provide benefits that do not derive from the generally applicable Tier IV/VI benefit formula, and are therefore not comparable to the 55/27 and 55/25 Plans. To the extent class members participate in these special plans and are eligible to receive a pension remedy pursuant to this Stipulation & Order, such pensions shall constitute "Outside Pensions," as that term is defined in Paragraph 43 of this Stipulation & Order, and the remedy available to these class members is set forth in Paragraph 61 of this Stipulation & Order. NYCERS and BERS also administer similar special plans with respect to Tier VI members in particular titles and these plans likewise constitute "Outside Pensions" for purposes of this Stipulation & Order. In addition, certain claimants who are members of NYCERS or BERS may, by virtue of credited service in multiple positions and multiple retirement plans administered by their retirement system, be eligible for pensions consisting of a combination of benefits calculated under two or more such retirement plans. These multiple-benefit pensions also constitute "Outside Pensions" for purposes of this Stipulation & Order.

BERS supplementary early-retirement plans, along with the basic Tier IV and Tier VI NYCERS and BERS plans and the BERS 55/25 and 55/27 plans, are referred to as "Comparable Plans."[10]

Back-Pension Damages

28. Certain class members who were either never able to participate in TRS due to BOE discrimination, or whose credited service and final average salary, for purposes of the pensions they receive from an Affected System, are lower than they would have been absent BOE discrimination, have retired prior to entry of their individual judgments at or after reaching the normal retirement age required for retirement from an Affected System, or have reached such age since retiring.[11] Since retiring, these class members have either received no pension benefits or received lower monthly pension payments from an Affected System than they would have received based on their counterfactual-service-and-salary histories (the "Back-Pension Damages").

Death Benefits in the Affected Systems

29. When a member of an Affected System dies, either in active service; after separation from service, but before retirement; or following retirement, that member's estate, or beneficiaries

[10] As noted above, certain of the supplementary early-retirement plans available to Tier IV NYCERS and BERS members that constitute Comparable Plans are available to Tier VI members occupying the titles encompassed by the plan. *See*, e.g., RSSL § 604-g (concerning automotive workers). These Tier VI members pay the same AMCs as Tier IV participants in the supplementary early-retirement plan, but are otherwise subject to benefits alterations applicable to Tier VI members, such as changes in vesting periods, final average salary, and basic member contribution rates. These Tier VI supplementary early-retirement plans also constitute "Comparable Plans."

[11] The phrase "normal retirement age" refers to the age at which a member of TRS or an Affected System becomes eligible to retire and receive benefits on the basis of the age and service requirements of the retirement plan in which the member participates. For example, class members who are entitled to basic Tier IV benefits, the phrase "normal retirement age" refers to age 62, with at least five years of credited service. For class members who are entitled to basic Tier VI benefits, "normal retirement age" refers to age 63, with at least ten years of credited service. For class members who are entitled to benefits under the 55/25 Plan, "normal retirement age" refers to age 55, with at least 25 years of credited service. For class members who are entitled to benefits under the 55/27 Plan, "normal retirement age" refers to age 55, with at least 27 years of credited service. For members who have not satisfied these service requirements upon attaining the corresponding age requirements, "normal retirement age" refers to the age when the member will meet the applicable service requirement. With respect to disability retirees, as addressed in Paragraphs 39 and 60 below, "normal retirement age" refers to the date the member was retired for disability.

previously designated by the member, may be eligible to receive a lump-sum death benefit, as determined by law. For retired members, the death benefit also includes any portion of pension payments that may be payable for the month in which the member died (the "Fractional" benefit).

30. Members of an Affected System may designate one or more beneficiaries for the death benefit at any time.[12] If a member fails to designate a beneficiary for the death benefit or if all designated beneficiaries predecease the member, the benefit will be paid to the member's estate upon the member's death.

31. As noted above, certain class members who were denied the opportunity to participate in TRS have passed away. These class members' estates, or other potential beneficiaries, did not, therefore, receive the death benefit to which they would have been entitled absent BOE discrimination.

32. Certain other class members were able to become TRS members, or were able to attain positions that allowed them to become members of NYCERS or BERS, and then passed away either while in active service; after separation from service, but before retirement; or after retirement. These class members' designated beneficiaries, or the class members' estates if no beneficiaries had been designated, may have received lower death-benefit payments than they would have received absent the BOE's discrimination.

Election of a Retirement Payment Option at Retirement

33. Members of an Affected System generally file a retirement-application form to notify their system of their intent to retire and receive benefits. On this form, a member selects how the member's monthly pension payments will be distributed (the "Retirement Payment Option").

---

[12] NYCERS does not permit a member to designate a beneficiary for the portion of pension payments payable for the month in which a member dies. Such payments pass to the member's estate.

34. Members have a number of choices regarding the Retirement Payment Option. A member could elect one of the following:

a. The maximum monthly pension payments for the rest of his or her life, with no survivor benefits (the "Maximum Option");

b. Reduced monthly payments for the rest of his or her life, followed by ongoing payments for the life of a designated beneficiary after the member's death, provided the beneficiary is living at the time of the member's death (a "Joint and Survivor Option"). Members are permitted to designate a single beneficiary for a Joint and Survivor Option. If that beneficiary predeceases the member, there is no continuing payment after the member's death.[13]

c. Reduced monthly payments for the rest of his or her life, followed by a set number of monthly payments to one or more beneficiaries—in an amount necessary to guarantee either 60 or 120 total monthly payments to the member and all beneficiaries—in the event the member dies before 60 or 120 monthly payments are made (a "5/10 Year Certain Option"). Members who select a 5/10 Year Certain Option may name one or more primary beneficiaries and one or more contingent beneficiaries.[14] If the member dies before receiving the guaranteed number of monthly payments, the primary beneficiaries receive the remaining monthly payments in the proportion dictated by the member. If both the member and all primary beneficiaries die before receiving the specified number of monthly

[13] For this reason, there also exists a "pop-up" Joint and Survivor Option, whereby the member can revert to the maximum retirement allowance in the event the designated beneficiary predeceases the member.

[14] BERS does not permit a member who selects a 5/10 Year Certain Option to name multiple primary beneficiaries; BERS does permit these members to name multiple contingent beneficiaries.

payments, the contingent beneficiaries receive the remaining payments as a lump sum in the proportion dictated by the member.

35. Members may change their Retirement Payment Option within thirty (30) days after the date of payability of their retirement allowances (*i.e.*, the date members begin receiving monthly pension benefit payments). After those thirty days have passed, retired members of an Affected System may not alter their Retirement Payment Option.

36. Members of TRS, prior to selecting their Retirement Payment Option, are generally able to access a "calculator" through TRS's website that estimates the monthly payments a member, and/or that member's designated beneficiary, would receive under the different Retirement Payment Options described above in Paragraph 34 (the "Retirement Allowance Calculator"). This Retirement Allowance Calculator is not publicly available; only TRS members can access it by logging into their online accounts.[15]

37. A number of class members who were denied the opportunity to participate in an Affected System have already retired after reaching the normal retirement age required for retirement from that Affected System, or have reached normal retirement age since retiring. Other class members who were denied the opportunity to participate in an Affected System will retire at the normal retirement age prior to receiving a final judgment in this case. Some class members who were denied the opportunity to participate in an Affected System have retired after reaching the normal retirement age, and have since passed away. The class members described in this paragraph were denied the opportunity to elect a Retirement Payment Option for the pension benefits they would have received absent BOE discrimination.

---

[15] This estimate is not binding or determinative of the final calculation of the cost of any such option. That calculation is performed by the New York City Office of the Actuary.

38. Other class members may have participated in an Affected System and already retired, and elected a Retirement Payment Option upon their retirement. These class members' pension benefits, however, may not reflect the service-and-salary history they would have achieved absent the BOE's discrimination. Had their pension benefits been greater, these class members may have made different decisions regarding their election of a Retirement Payment Option.

Disability Pensions

39. Members of an Affected System who have at least 10 years of credited service and incur an alleged disability[16] are eligible to apply for ordinary disability-retirement benefits, as set forth in RSSL § 605(b)(1). In addition, a member of an Affected System, regardless of length of service, who alleges that his or her alleged disability was the result of an "accident"—as that term appears in the RSSL and is interpreted in case law—that occurred in the course of his or her employment with the City of New York or the BOE, is eligible to apply for accident-disability-retirement benefits provided by RSSL § 605. Class members who, due to BOE discrimination, were unable to obtain TRS-eligible positions or were delayed in participating in an Affected System, and who left the workforce by reason of a disability, may not have been eligible to apply for these disability-retirement benefits.

Pension Mitigation

40. Certain class members who were either denied the opportunity to participate in TRS, or whose TRS membership was delayed by the BOE's discrimination, were able to participate in other defined-benefit pension systems during some or all of their counterfactual service history.

[16] As used herein, the phrase "disability" refers to a condition or impairment of sufficient severity to entitle a member of an Affected System to disability retirement under the RSSL or New York City Administrative Code.

41. As a matter of equity, any defined-benefit pension a class member accrued during his or her counterfactual service history, whether with TRS or any other pension system, serves to mitigate the counterfactual pension the class member would have accrued in TRS absent BOE discrimination.

42. With respect to a pension accrued in TRS or in a Comparable Plan during a class member's counterfactual service history, mitigation is most equitably achieved by incorporating the class member's counterfactual service-and-salary history into the class member's existing pension account at the Affected System, and combining the counterfactual service-and-salary history with the existing service, salary, and contribution history of the class member to yield a single, unified pension account. For periods in which there are both counterfactual and actual service histories, the higher of the counterfactual or actual salary histories would remain.

43. With respect to any other defined-benefit pension accrued during a class member's counterfactual service history (collectively, "Outside Pensions"), including any hybrid pension plan that includes a defined-benefit component, the parties agree that these pensions can be appropriately valued on an actuarial basis for purposes of this Stipulation & Order.

44. The parties agree that employer-sponsored defined-contribution plans that provide for pre-tax employer contributions not includable in the class member's taxable income, such as employer-matching 401(k) plans, do not qualify as "Outside Pensions" for the purposes of this Stipulation & Order.

**IT IS HEREBY ORDERED THAT**: Based on the Special Master's recommendation,

45. The BOE will provide, for each class member who is contemplated to receive a benefit pursuant to this Stipulation & Order, counterfactual service-and-salary information in accordance with the class member's individual judgment award such as is necessary for the

Affected System to determine the pension benefits the class member would have received absent BOE discrimination. The BOE will provide this counterfactual service and salary information to each Affected System or, with respect to class members receiving relief pursuant to Paragraphs 59 and 61 of this Stipulation & Order, to the New York City Office of the Actuary ("NYCOA"). This information will be transmitted by the BOE for each class member as soon as practical following the Court's entry of each class member's individual judgment, in a manner and scope agreed upon by the BOE and the Affected System or NYCOA. For class members receiving relief pursuant to Paragraph 61 of this Stipulation & Order, TRS, NYCERS, and BERS will also provide the NYCOA with any existing pension-account data concerning the class members' non-counterfactual service. When the information described in this paragraph is transmitted to the Affected System or NYCOA, the BOE will also produce this information to Plaintiffs' counsel.

46. For each class member who participates in an Outside Pension that is not administered by a New York City retirement system, Plaintiffs' counsel will provide all necessary documents related to the class member's Outside Pension account to Risk & Regulatory Consulting ("RRC"), the Court-appointed retirement-pension valuation expert.

47. **Pension Relief Optional.** Class members may opt out of the pension relief described in this Stipulation & Order. If a class member fails to make timely payments and elections contemplated by the remaining paragraphs of this Stipulation & Order, or show good cause—as determined by the Special Master on the basis of evidence presented in an individual hearing[17]—

[17] "Good cause," as used in, or required by, this Stipulation & Order, is automatically established without the necessity of a hearing before the Special Master if a class member has not yet received his or her backpay award from the BOE before the date an Affected System mails the class member notice of his or her deficit in required employee contributions pursuant to Paragraph 49 of this Stipulation & Order below. In these cases, Plaintiffs shall notify the Affected System that the 90-day deadline set forth in Paragraph 49 shall be tolled until the date upon which the class member receives his or her backpay award. When the class member receives that award, Plaintiffs will notify the Affected System accordingly.

for having failed to do so, the class member will be deemed to have opted out of the pension relief described herein. Alternatively, at any time prior to the deadline by which a class member must pay employee contributions pursuant to this Stipulation & Order, class members, through Plaintiffs' counsel, may affirmatively notify BOE counsel, in a method agreed upon by the parties, of their intent to opt out of the pension relief described herein.

48. **Tier Reinstatement.**

a. To the extent class members currently participate in TRS as Tier VI members, but would have been Tier IV members on the basis of an earlier membership date established by their counterfactual-service history, TRS will automatically reclassify these members as Tier IV members as soon as practicable after entry of each class member's individual judgment, and will adjust the class members' contribution rates accordingly.

b. To the extent class members currently participate as Tier VI members in a Comparable Plan with NYCERS or BERS, but would have been Tier IV members on the basis of an earlier membership date established by their counterfactual service history, and want to be reclassified as Tier IV members, they must submit a tier-reinstatement form following the entry of their individual judgments, and NYCERS or BERS will adjust the class members' contribution rates following receipt and approval of that form.

49. **Employee Contributions**. Subject to Paragraphs 50 and 57 of this Stipulation & Order, each class member who elects to receive pension relief pursuant to this Stipulation & Order will be required to make all employee contributions, including AMCs, he or she would have made to the Affected System during his or her counterfactual service history, and will receive the pension relief described herein only if all required contributions are made, or if the amounts of those contributions are otherwise credited to the class member's account through the operation of this

Stipulation & Order.[18] Class members will only be eligible to receive credited service for, and will only pay employee contributions on, counterfactual-service-and-salary that is creditable by law.[19] Each class member who receives pension relief pursuant to this Stipulation & Order will receive a membership date in his or her Affected System that corresponds to the earliest date of such creditable counterfactual service, provided this date precedes any existing membership date with respect to the class member.

a. With respect to class members who did not obtain mitigating pensions, TRS will compute the employee contributions attributable to the counterfactual service period that each class member owes as soon as practical following receipt of the necessary information for those calculations from the BOE pursuant to this Stipulation & Order. Once the amount is computed, TRS will send notice to the class members of the amount due and instructions for payment of the amount.[20] Class members will then pay the employee contributions directly to TRS within ninety (90) days of TRS mailing the notice.

b. With respect to class members who are current members of TRS or a Comparable Plan and will remain in the positions that rendered them eligible for

[18] Contributions can be "otherwise credited" to a class members account only as follows: To the extent any class member has a surplus in any member account at an Affected System as a result of this Stipulation & Order or otherwise, that surplus, whether deriving from an account for basic member contributions or AMCs, will be deemed available to satisfy any deficit in any other account resulting from this Stipulation & Order, if the Affected System, in its sole discretion, determines that it is administratively feasible to do so. Any class member that withdrew funds from an Affected System prior to the counterfactual service period must return all withdrawn funds to the Affected System to receive service credit for that time.

[19] For example, if a class member's counterfactual-service-and-salary history reflects a period of unpaid leave, that period of unpaid leave will not be creditable in an Affected System, just as periods of unpaid leave are not creditable in those systems in the normal course.

[20] Prior to the date the BOE transmits counterfactual-service-and-salary information to the Affected Systems pursuant to this Stipulation & Order, Plaintiffs' counsel must provide the Affected Systems with current address information for any class member that will receive correspondence from an Affected System, as well as the class member's date of judgment. Plaintiffs' counsel will promptly inform the Affected Systems of any changes to an address previously provided.

participation; class members who are deferred vested or retired members of TRS or a Comparable Plan; and deceased class members who were members of TRS or a Comparable Plan, the Affected System will compute the employee contributions attributable to the counterfactual-service period that each class member owes in excess of those already paid, if any, as soon as practical following receipt of the necessary information for those calculations from the BOE pursuant to this Stipulation & Order. Pursuant to the Special Master's ruling, class members who participate in comparable plans with NYCERS or BERS, and who wish to receive credit for their counterfactual service in these systems, will be responsible for additional AMCs they would not have paid as TRS members during their counterfactual service history, but that were required by the relevant NYCERS or BERS plans during that period of time. Once the deficit in employee contributions is computed, the Affected System will provide written notice to these class members of the amount due and instructions for payment of the amount. These class members will then pay the amount to the Affected System within ninety (90) days of the Affected System mailing the notice. For purposes of these computations, the counterfactual service rendered by the class member will be deemed to be service in the position that rendered the class member eligible to participate in the Affected System.

c. To the extent any surplus in employee contributions exists in a class member's member account in an Affected System as a result of this Stipulation & Order, and that surplus is not otherwise credited to satisfy a deficit in the class member's member account, the Affected System will refund that surplus to the class member as soon as

practical after the surplus has been calculated, provided that the rules of the Affected System permit refunds of surplus contributions prior to retirement.[21]

50. **Employee Contributions Tax Adjustment.** Class members who, by operation of this Stipulation & Order, incur a deficit in employee contributions attributable to their counterfactual service periods, will be responsible for only 84% of any unpaid employee contributions, including AMCs, attributable to their counterfactual service history. The notice an Affected System sends to class members regarding unpaid employee contributions, as per the process described above in Paragraph 49 of this Stipulation & Order, will notify class members of this reduced unpaid contribution amount. The BOE will be responsible for paying the remaining 16% of unpaid employee contributions into a class member's account with the Affected System—as identified and invoiced by the Affected System—to compensate class members for their contributions being made on a post-tax basis, when absent the BOE's discrimination these contributions would have been made on a pre-tax basis.

51. **Employer Contributions**. The BOE will be required to make all actuarially determined employer contributions attributable to class members' counterfactual service, as determined by the NYCOA.

52. **Statutory Interest Accrued on Delayed Contributions**. Class members will not be responsible for any statutory interest on employee contributions that accrued following the beginning of the class members' counterfactual service periods, which would not have accrued absent BOE discrimination. Specifically, a class member will not be responsible for statutory interest on unpaid contributions, including AMCs, attributable to the class member's counterfactual

[21] The Affected Systems that do not permit refunds of a member's surplus contributions prior to retirement refund any surplus contributions subsequent to retirement.

service and salary history. The BOE will instead be responsible for this interest as may be identified by the Affected Systems and invoiced to the BOE. Pursuant to the Special Master's ruling, the statutory interest for which the BOE is responsible includes interest attributable to employee contributions that class members, as a result of their employment in positions that permitted BERS, NYCERS, or TRS membership during the counterfactual service period, would have made had they joined the pension system for which they were eligible.

53. **Supplementary Early Retirement Plans.**

a. For each class member eligible to opt in to the TRS 55/25 or 55/27 plans pursuant to this Stipulation & Order, Plaintiffs' counsel will provide class members with information explaining the costs and benefits of the 55/25 and 55/27 plans and an election form to opt in to the TRS 55/25 or 55/27 plans (the "Early Retirement Plan Election Form"), both of which will be in a format agreed upon by the parties. Class members who would have been eligible to opt in to the TRS 55/25 or 55/27 plans absent BOE discrimination will have ninety (90) days from the date the Court enters their individual judgments to submit the Early Retirement Plan Election Form to TRS. Any class members who elect to opt in to the 55/25 or 55/27 plans will be responsible for any AMCs due as a result of their choice, as determined by TRS. Class members who would have been mandated to join the TRS 55/27 plan absent BOE discrimination will be required to participate in the 55/27 Plan and will be responsible for any AMCs due as a result of that participation, as determined by TRS.

b. Class members who already participate in a Comparable Plan with NYCERS and BERS and will remain in the positions that rendered them eligible for participation, or who are deferred-vested members of, or retirees from, a Comparable Plan, will remain

members of their Comparable Plan, and the counterfactual service rendered by these members will be deemed to have been rendered in the position that rendered them eligible for the Comparable Plan. These class members will be responsible for any AMCs due, in excess of AMCs already paid, as a result of the inclusion of counterfactual service, as determined by the Affected System. The BOE will be responsible for paying statutory interest, as computed by the Affected System, on any unpaid AMCs attributable to the counterfactual service and salary history.[22]

c. Class members who currently participate in TRS and were mandated to join 55/27 or to enroll as basic Tier VI TRS Members based on their membership date, but who would have been basic Tier IV TRS Members eligible to opt in to the TRS 55/25 or 55/27 plans absent BOE discrimination, will have ninety (90) days from the date the Court enters their individual judgments to submit Early Retirement Plan Election Forms to TRS. Plaintiffs' counsel will likewise provide these members with information explaining the costs and benefits of the 55/25 and 55/27 plans, as well as the Early Retirement Plan Election Form. Any class members who elect to opt in to the 55/25 or the 55/27 Plans will be responsible for any AMCs due, in excess of AMCs already paid, as a result of the inclusion of this counterfactual service, as determined by TRS.

54. **Deferred Vested Members**. Certain class members may have participated in TRS or a Comparable Plan during their counterfactual service period and left the positions that rendered them eligible for participation in circumstances that entitle the class member to a deferred-vested

---

[22] Class members who are currently Tier VI members of NYCERS or BERS, who do not participate in a supplementary early-retirement plan, and who would have participated in a supplementary early-retirement plan constituting a Comparable Plan had they joined NYCERS or BERS in their current title on the date their counterfactual service began, will, as set forth in Paragraph 48 of this Stipulation & Order, be reclassified as Tier IV members and will be deemed to have participated in a Comparable Plan as of the date their counterfactual service began. The payment of AMCs and interest resulting from the reclassification and inclusion of counterfactual service will be governed by this paragraph.

benefit from the Affected System or will entitle the class member to a deferred-vested benefit when an existing membership is combined with counterfactual service. Any deferred-vested benefit for these class members will be adjusted by the Affected System in the manner set forth in Paragraphs 45 through 53 of this Stipulation & Order.

55. **Prior Withdrawals from Affected System Accounts.** Pursuant to the Special Master's ruling, class members who withdrew their employee contributions from an Affected System after leaving BOE service subsequent to failing the LAST exam, and who apply to buy back service credits from their pre-counterfactual service period following the Court's entry of their individual judgments in this case, will be responsible for paying any statutory interest that has accrued on unpaid employee contributions from their pre-counterfactual service period.

56. **Back Pension**. Retired class members are entitled to receive, as Back-Pension Damages, the pension payments they did not receive prior to entry of their individual judgments as a result of BOE discrimination, provided the class members pay all employee contributions owed to the Affected System. The payment of Back-Pension Damages will be made as follows:

a. For class members who retired from TRS or a Comparable Plan, the Affected System will compute the Back-Pension Damages, if any, over and above pension payments already made by the Affected System. The Affected System will then pay the Back-Pension Damages to the class member—along with pre-judgment interest from the dates the class member would have received those prior pension payments to the date of judgment and post-judgment interest that will accrue from the date of judgment to the date of the payment[23]—in a lump sum.

---

[23] Notwithstanding any other rates of interest applied by the Affected Systems for benefit recalculations or payment delays, the rate of interest to be applied for any calculation of pre-judgment and post-judgment interest pursuant to this

b. For retired class members who did not obtain mitigating pensions, except for class members who died prior to their dates of judgment,[24] TRS will compute Back-Pension Damages, if any, attributable to any period of retirement subsequent to the class member reaching TRS's normal retirement age during which the class member would have been eligible to receive a pension payment from TRS by virtue of his or her counterfactual service. TRS will pay the Back-Pension Damages to the class member, along with pre- and post-judgment interest as described above in Subparagraph 56(a), in a lump sum.

c. For deceased class members who retired from TRS or a Comparable Plan before their deaths, the Affected System will pay any Back-Pension Damages, along with pre- and post-judgment interest, in a lump sum to class members' previously designated beneficiaries or estates as follows, except insofar as Back-Pension Damages attributable to the portion of the pension payable in the month the class member died constitute a component of the death benefits governed by Paragraph 57 of this Stipulation & Order:[25]

i. If a deceased retired class member took the Maximum Option, the Back-Pension Damages shall be paid to the class member's estate.

ii. If a deceased retired class member took a Joint and Survivor Option, any Back-Pension Damages that would have been payable to the class member shall

Stipulation & Order will be that set forth in 28 U.S.C. § 1961. The Affected Systems may invoice the BOE for any post-judgment or pre-judgment interest they must pay to class members pursuant to this Stipulation & Order.

[24] These class members' beneficiaries or estates will receive either the lump-sum pension award pursuant to Paragraph 59 of this Stipulation & Order or death benefits pursuant to Paragraph 57, depending on whether they attained TRS's normal retirement age.

[25] To the extent the Affected Systems do not already have the information they require regarding a class member's designated beneficiary or estate, any person or entity seeking a payment from an Affected System pursuant to this Stipulation & Order must satisfy the administrative procedures established by the Affected System for any payment to an estate or beneficiary of a member in the normal course. This generally requires the completion of claim forms, submission of a tax identification number and original letters of administration or letters testamentary with respect to an estate, submission of the name and contact information for executors, and submission of photo identification and social security card with respect to a named beneficiary.

be paid to the class member's estate. Any Back-Pension Damages that would have been paid to the Joint and Survivor beneficiary named by the class member shall be paid to that Joint and Survivor beneficiary. If that beneficiary is deceased, the Back-Pension Damages owed to that beneficiary shall be paid to that beneficiary's estate.

iii. If a deceased retired class member took a 5/10 Year Certain Option, any Back-Pension Damages attributable to the period before the class member died shall be paid to the class member's estate. Any Back-Pension Damages attributable to the period after the class member died shall be paid to the beneficiary named by the class member. If that beneficiary died subsequent to the class member's death, but prior to the end of the guaranteed monthly retirement payments period, the remaining Back-Pension Damages shall be paid to the contingent beneficiary. If the contingent beneficiary also died prior to the end of the guaranteed monthly retirement payments period, or if no contingent beneficiary was named, any remaining Back-Pension Damages shall be paid to the class member's estate.

d. The Affected Systems will pay any Back-Pension Damages governed by this Stipulation & Order as soon as practical after the class member has paid any employee contributions owed for his or her counterfactual service pursuant to Paragraph 49 of this Stipulation & Order.

57. **Death Benefit**. Deceased class members' beneficiaries or estates are entitled to receive the death benefit to which they would have been entitled absent the BOE's discrimination.[26] To the extent a portion of any death benefit for a deceased class member would consist of employee contributions that would otherwise be payable to the Affected System pursuant to Paragraph 49 of

---

this Stipulation & Order, the estate of the class member will not be required to pay those contributions, and the Affected System will calculate the death benefit without reference to a refund of those contributions.[27] The payment of the death benefit for these deceased class members will be made as follows:

a. For deceased class members who did not obtain mitigating pensions, TRS will pay the death benefit, along with pre- and post-judgment interest, to the class members' estates.

b. For deceased class members who participated in TRS or a Comparable Plan and died before retirement, the Affected System will pay the death benefit, in excess of that already paid, along with pre- and post-judgment interest to the date of the payment, to the previously designated beneficiaries. With respect to members who failed to designate a beneficiary before death, the Affected System will pay the death benefit, along with pre- and post-judgment interest, to the class member's estate.

c. For deceased class members who participated in TRS or a Comparable Plan and died after retirement, the Affected System will pay the post-retirement death benefit in excess of any post-retirement death benefit already paid, along with pre- and post-judgment interest to the date of the payment, to the previously designated beneficiaries. With respect to members who failed to designate a beneficiary before death, the Affected System will pay the death benefit, along with pre- and post-judgment interest, to the class member's estate.

[27] Contributions by class members can be "otherwise credited" pursuant to this Stipulation & Order only by the process set forth in Footnote 18 of this Stipulation & Order.

d. The Affected Systems will pay any death benefit governed by this Stipulation & Order as soon as practical following entry of an individual class member's judgment.

58. **Retirement Payment Option**. The election of a Retirement Payment Option for class members who retired prior to entry of their individual judgments will be made as follows:

a. For each retired class member eligible to make a Retirement Payment Option election pursuant to Subparagraph 58(c) below, Plaintiffs' counsel will provide the class member a form detailing the Retirement Payment Options available under the class member's pension plan (the "Retirement Payment Option Election Form").

b. As soon as practical after the entry of this Stipulation & Order, TRS will provide Plaintiffs' counsel with a document or application, in a form agreed upon by the parties, which substantially replicates the functionality of the Retirement Allowance Calculator, so that Plaintiffs' counsel may assist retired class members in estimating the costs and benefits of available options. The Affected System will update the document or application as it would update the Retirement Allowance Calculator for ordinary system members.

c. Retired class members who have reached TRS's normal retirement age, and who did not obtain mitigating pensions, will have ninety (90) days following the entry of their individual final judgments to complete and return the Retirement Payment Option Election Form to TRS.[28] The subsequent calculation of option costs will be undertaken by the NYCOA as provided by applicable law.

[28] Retired class members who are vested but have not yet reached TRS's normal retirement age will be treated as deferred vested members for purposes of this Stipulation & Order.

d. Retired class members, whether living or deceased, who were able to participate in TRS or a Comparable Plan, and selected a Retirement Payment Option upon their actual retirement, will, as a default rule, maintain the same Retirement Payment Option once their accounts have been adjusted to account for their counterfactual service. However, these class members have the opportunity to prove at an individual hearing before the Special Master that they would have selected an alternative Retirement Payment Option absent the BOE's discrimination. The class member bears the burden of proof, and the burden of proof may be met only if the class member demonstrates with objective, documentary evidence, dated prior to or contemporaneous with the date the class member initially selected a Retirement Payment Option, that he or she would have selected a different Retirement Payment Option had he or she been entitled to a larger pension. If a class member satisfies this burden, and, as a result of this alternative election, the Affected System determines that the class member received higher historical pension payments under the prior Retirement Payment Option than he or she would have received under the new Retirement Payment Option, the amount of those excess historical pension payments, as computed by the Affected System, must be repaid to the Affected System by the class member prior to any option change and within ninety (90) days from the date he or she receives notice from the Affected System of the cost of effecting this option change, absent good cause for a delay in payment, as determined by the Special Master on the basis of evidence presented in an individual hearing. If the class member has died since the initial selection of a Retirement Payment Option, the estate of the class member will have the right to a hearing with respect to the Retirement Payment Option and will bear the burden and,

where applicable, repayment obligation for excess historical pension payments described in this paragraph.

59. **Certain Deceased Retirees**. Class members who did not obtain mitigating pensions, and who: (1) retired at, or after, TRS's normal retirement age, or reached that age after their retirement but before entry of their individual judgments; and (2) died after reaching that age, but before entry of their individual judgments,[29] will receive a lump-sum payment equal to the actuarial value of the TRS pension attributable to their counterfactual service as of the later of the date they retired or the date they reached normal retirement age, without regard to the selection of a Retirement Payment Option, less employee contributions that would have been payable to TRS, as determined by the NYCOA. The BOE will make this payment, along with post-judgment interest, to the estate of these class members as soon as practical following the entry of an individual class member's judgment.

60. **Disability Retirement Determinations**. Any class member who permanently left the workforce as a result of an alleged disability during the time period he or she is deemed to have engaged in counterfactual service; who, at the time the class member left the workforce, either was not a member of a pension system that would have permitted him or her to apply for disability retirement benefits on the basis of that disability or was a member of such a pension system and applied for and received disability benefits;[30] and who satisfies the length-of-service requirements

[29] Class members who did not obtain mitigating pensions, who retired, and who died before TRS's normal retirement age will, pursuant to Paragraph 57 of this Stipulation & Order, be eligible to receive the death benefits available to deferred vested members that they would have received absent BOE discrimination.

[30] Any such disability benefits will be taken into account for purposes of pension mitigation. If a class member receives disability benefits from NYCERS or BERS under a Comparable Plan, any additional disability benefits received pursuant to this paragraph—*i.e.*, a higher disability benefit due to the inclusion of counterfactual service and salary—will be administered by NYCERS or BERS.

for ordinary disability retirement set forth in RSSL § 605(b)(1) by virtue of his or her counterfactual service will be eligible to seek ordinary disability retirement benefits provided by that Section.[31] Pursuant to the Special Master's ruling, any class member, regardless of length of service, who alleges that his or her disability was the result of an "accident"—as that term appears in the RSSL and is interpreted in case law—that occurred in the course of the class member's employment with the City of New York or the BOE during his or her counterfactual service period, will be permitted to apply for the accidental disability retirement benefits provided by RSSL § 605. Notwithstanding any contrary procedure set forth in law or board resolution, the following procedures govern applications for disability retirement as part of the relief in this case:[32]

a. Any claim for disability-retirement benefits must be submitted to the BOE counsel prior to the Court's entry of a class member's individual judgment. Claims for disability retirement benefits will be resolved prior to entry of a class member's individual judgment.

b. Any class member who submits a claim for disability retirement benefits pursuant to this paragraph must identify the nature of the disability and the date he or she would have ceased employment with the City of New York or the BOE as a result of the disability. The class member must furnish BOE counsel with all medical records germane to the disability contemporaneously with his or her claim.

---

[31] Class members who were members of an Affected System when they permanently left the workforce as a result of a disability, but did not apply for ordinary disability retirement benefits because they had less than ten years of credited service at that time, may apply for ordinary disability benefits hereunder if they would have had ten or more years of credited service at that time had their counterfactual service been included in their computation of credited service.

[32] NYCERS does not consent to this paragraph but will abide by it once the Court orders this Stipulation & Order.

c. Ordinary Disability Retirement

i. On the basis of the evidence provided by the class member, in addition to the considered medical opinion of medical experts retained by BOE counsel, BOE counsel will determine whether the injury alleged constitutes a disability under the standard of RSSL § 605 and, if so, the date on which the disability would have prevented the member from remaining an employee of the City of New York or the BOE. BOE counsel and the medical experts may ask the class member to furnish additional medical records, as needed.

ii. Should BOE counsel find that a class member who seeks ordinary disability retirement benefits would have ceased his or her counterfactual service as a result of a disability, the class member will be entitled to an ordinary disability pension retroactive to the last day he or she would have been eligible to apply for that pension on the basis of the date the class member is deemed to have terminated employment with the City of New York or BOE as a result of the disability. BOE counsel will notify Plaintiffs' counsel as soon as practical of its determination. The Board of Trustees of the Affected System will adopt a resolution ratifying such ordinary disability pension as soon as practical after the class member has paid any employee contributions owed for his or her counterfactual service pursuant to Paragraph 49 of this Stipulation & Order.

d. Accident Disability Retirement

i. Any class member who submits a claim for accidental disability retirement benefits pursuant to this paragraph must further identify and describe the circumstances of the "accident" that the class member claims caused his or her

disability. The class member must furnish BOE counsel with all existing documentary evidence substantiating the alleged accident.

ii. On the basis of the evidence provided by the class member, in addition to the considered medical opinion of medical experts retained by BOE counsel, BOE counsel will determine whether the injury alleged constitutes a disability under the standard of RSSL § 605 and, if so, the date on which the disability would have prevented the member from remaining an employee of the City of New York or the BOE. BOE counsel and the medical experts may ask the class member to furnish additional medical records, as needed.

iii. BOE counsel will also determine, on the basis of the documentary evidence provided by the class member, whether the "accident" alleged by the class member: occurred; constituted an "accident" as that term appears in the RSSL and is interpreted in case law; and caused the class member's alleged disability. BOE counsel may ask the class member to furnish additional records, as needed.

iv. Should BOE counsel find that a class member who seeks accidental disability retirement benefits would have ceased his or her counterfactual service as a result of a disability that was caused by an "accident"—as that term appears in the RSSL and is interpreted in case law—that occurred in the course of the class member's employment with the City of New York or the BOE during the time period he or she will be deemed to have engaged in counterfactual service, the class member will be entitled to an accidental disability pension retroactive to the last day he or she would have been eligible to apply for that pension on the basis of the date the class member is deemed to have terminated employment with the City of New York

or the BOE as a result of that disability. BOE counsel will notify Plaintiffs' counsel as soon as practical of its determination. The Board of Trustees of the Affected System will adopt a resolution ratifying such accidental disability pension as soon as practical after the class member has paid any employee contributions owed for his or her counterfactual service pursuant to Paragraph 49 of this Stipulation & Order.

e. A class member will have the right to contest any adverse determination should BOE counsel determine: that a class member is not disabled; that the disability would have prevented the class member from remaining an employee of the City of New York or the BOE on a date different than that alleged by the class member; or that a class member seeking accidental disability retirement benefits did not become disabled as the result of an "accident"—as that term appears in the RSSL and is interpreted in case law—that occurred in the course of the class member's employment with the City of New York or the BOE during the time period he or she will be deemed to have engaged in counterfactual service.

f. The exclusive means to contest an adverse determination, as set forth above in subparagraph 60(e), is an individual hearing before the Special Master pursuant to the Special Master's Order of Appointment.[33] The class member bears the burden of proof, and the issue will be decided on the basis of the evidence previously submitted in connection with the class member's claim for disability retirement benefits.[34] Should the Special Master determine that the class member is entitled to the disability retirement benefits sought, the

---

[33] *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, No. 96-CV-8414 (KMW), Order of Appointment, ECF No. 435; *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, No. 96-CV-8414 (KMW), Second Amended Order of Appointment, ECF No. 524.

[34] The Special Master may, at his discretion, request additional evidence from the parties regarding a class member's disability claim; however, the parties retain the right to object to any such evidence.

Board of Trustees of the Affected System will adopt a resolution ratifying such disability pension as soon as practical after the class member has paid any employee contributions owed for his or her counterfactual service pursuant to Paragraph 49 of this Stipulation & Order.

g. Eligibility for disability retirement benefits will be specified in a class member's individual judgment. Upon entry of an eligible class member's individual judgment, BOE counsel will communicate the individual's eligibility to the Affected System—or the NYCOA if the class member will receive pension relief pursuant to Paragraph 61 of this Stipulation & Order—as soon as practical.

h. No class member will receive his or her disability retirement benefits until he or she has paid all employee contributions required by this Stipulation & Order, as described in Paragraph 49.

i. Any retroactive component of a disability pension will be treated as Back-Pension Damages, and paid in accordance with the process described in Paragraph 56 of this Stipulation & Order. Pre- and post-judgment interest will accrue on this retroactive component.

j. The Medical Board and Board of Trustees of each Affected System will retain their authority under existing law to order the reexamination of any member who receives disability retirement benefits pursuant to this Stipulation & Order and, if warranted, the Board of Trustees will have the sole discretion to recall a member to active service if, after reexamination, the Medical Board finds the class member is no longer disabled. Alternatively, with respect to a class member found no longer disabled, the Affected System has the authority to convert the class member's disability pension into a service-retirement

pension as of the date he or she is found no longer disabled, subject to payability at normal retirement age.

61. **Pension Mitigation for Class Members with Outside Pensions.** Pension mitigation with respect to an existing membership in TRS or in a Comparable Plan during the counterfactual service period is addressed by the preceding paragraphs of this Stipulation & Order. Class members who participated in an Outside Pension during their counterfactual service history, and who wish to receive pension relief pursuant to this Stipulation & Order, will receive pension relief pursuant to the procedures set forth in this paragraph.

a. As described below, where a class member with an Outside Pension is eligible to receive pension relief and did not die before attaining TRS's normal retirement age, the class member will participate in TRS pursuant to the preceding paragraphs of this Stipulation & Order; however, NYCOA and RRC will calculate an amount by which the Outside Pension will mitigate each pension payment a class member receives from TRS by operation of this Stipulation & Order (the "Monthly Outside Pension Offset").

b. Where the class member is entitled to elect a supplementary early-retirement plan in TRS on the basis of his or her counterfactual service, the class member will submit the Retirement Election Form to the NYCOA before the valuations contemplated in this paragraph are undertaken.

c. Class Members who retired from a New York City retirement system that qualifies as an Outside Pension pursuant to this Stipulation & Order will, as a default rule, maintain in TRS the same Retirement Payment Option and beneficiary or beneficiaries they selected in that New York City retirement system, subject to the procedures set forth above in Paragraph 58(d) of this Stipulation & Order. Class Members who retired from any other

Outside Pension will likewise maintain in TRS the same Retirement Payment Option and beneficiary or beneficiaries they selected in that Outside Pension system, subject to the procedures set forth in Paragraph 58(d) of this Stipulation & Order, insofar as they have selected a Retirement Payment Option that corresponds to a Retirement Payment Option available in TRS.[35] Class members who selected a Retirement Payment Option in the Outside Pension from which they retired that does not correspond to a Retirement Payment Option available in TRS will be permitted to select a Retirement Payment Option in TRS.

d. The value of all pensions from a New York City retirement system, whether counterfactual TRS pensions or Outside Pensions, will be determined by the NYCOA. The value of all other Outside Pensions will be determined by RRC.

e. RRC and the NYCOA will perform the calculations described in this paragraph on a rolling basis, and will submit their determinations to BOE counsel and Plaintiffs' counsel for each class member as soon as practical after the entry of each class member's individual judgment.

---

[35] For the purposes of this paragraph, a Retirement Payment Option will be deemed to correspond to the Maximum Option if the pension payment to the member is not reduced to provide for benefits to a beneficiary or beneficiaries after the member's death. A Retirement Payment Option will be deemed to correspond to a Joint and Survivor Option if: (1) the pension payment to the member is reduced to provide for ongoing payments, expressed as a percentage of the benefit payable to the member, for the life of a designated beneficiary after the member's death, provided that the beneficiary is living at the time of the member's death; and (2) the percentage chosen by the class member in the Outside Pension is identical to, or within, 10% of a percentage available in TRS for the purposes of a Joint and Survivor Option. A Retirement Payment Option will be deemed to correspond to the "pop-up" variant of a Joint and Survivor Option if it corresponds to a Joint and Survivor Option and possesses the additional feature that the pension payment to the member will revert to a higher amount if the designated beneficiary predeceases the member. A Retirement Payment Option will be deemed to correspond to a 5/10 Year Certain Option if: (1) the pension payment to the member is reduced to provide for monthly payments for the member's life, followed by a specified number of monthly payments to one or more beneficiaries in an amount necessary to guarantee a specified number of total monthly payments to the member and all beneficiaries; and (2) the number of guaranteed monthly payments chosen by the class member in the Outside Pension is identical to, or within, two years of an option for a number of guaranteed monthly payments available in TRS.

f. The below methods constitute the exclusive form of pension relief for any class member with an Outside Pension.

g. Outside Pensions from a New York State Public Retirement System[36]

i. **Class members who are members of a New York State public retirement system and have not yet retired:**

1. RRC or the NYCOA (if the Outside Pension is from a New York City retirement system) will calculate the monetary value of the Outside Pension attributable to the counterfactual service period as an annuity net of employee contributions by subtracting the annual benefit of the Outside Pension that accrued prior to the counterfactual service period from the annual benefit of the entire accrued Outside Pension as of the date the Court enters the class member's individual judgment. The NYCOA will then actuarially adjust the Outside Pension attributable to the counterfactual service period into its equivalent under the plan provisions of the TRS plan the member will enter (the "Outside Pension Annual Benefit").

2. The NYCOA will calculate the monetary value of the TRS pension attributable to the counterfactual service period as an annuity net of employee contributions by subtracting the annual benefit of a TRS pension incorporating all creditable New York State public service rendered by the class member prior to the counterfactual service period from the annual

[36] For the purposes of this Stipulation & Order, Outside Pensions from a New York State public retirement system include pensions from New York City retirement systems that qualify as Outside Pensions under this Stipulation & Order.

benefit of a TRS pension incorporating both prior creditable service and the class member's counterfactual service (the "TRS Pension Annual Benefit").

3. The NYCOA will then subtract the Outside Pension Annual Benefit from the TRS Pension Annual Benefit. If the difference is zero or less, the class member will not receive pension relief. If the difference is greater than zero, the class member's counterfactual-service-and-salary history will be transmitted to TRS, and the preceding paragraphs of this Stipulation & Order will govern the class member's participation in TRS, including the calculation and payment of employee contributions attributable to the class member's counterfactual service, except to the extent inconsistent with this subparagraph.

4. With respect to class members who enter TRS, the Outside Pension Annual Benefit will be divided by twelve to determine the Monthly Outside Pension Offset. Upon the class member's retirement from TRS, the Monthly Outside Pension Offset will be subtracted from the class member's TRS pension payments on an ongoing basis.

5. The class member's TRS account will not be credited with service rendered prior to the counterfactual service period unless that service is already credited in the class member's account at TRS when the account is adjusted pursuant to this subparagraph, and the class member will not be permitted to buy back creditable service with TRS.

ii. **Class Members who died prior to retirement and whose beneficiaries or estates received, or became entitled to receive, death benefits from a New York State public retirement system:**

1. The estate of the class member will receive from the BOE a lump sum that is equal to the difference between the TRS death benefit the class member would have received absent BOE discrimination and the death benefit the estate or any beneficiary has received or will receive from the New York State public retirement system, less the difference between the total employee contributions, including AMCs, that would have been payable to TRS had the class member participated in TRS during his or her counterfactual service period, and the total employee contributions, including AMCs, actually paid to the New York State public retirement system, as determined by RRC or the NYCOA (if the Outside Pension is from a New York City retirement system). If this calculation yields a difference of zero or less, the estate of the class member will receive no pension relief.

2. The BOE will make this lump-sum payment, along with post-judgment interest, as soon as practical following entry of an individual class member's judgment.

iii. **Class members who have retired from a New York State public retirement system**: Pension mitigation for these class members will be calculated pursuant to the procedures set forth above in Subparagraph 61(g)(i), and the Back-Pension Damages, if any, payable to these class members will be paid pursuant to

the procedures set forth in Paragraph 56 of this Stipulation & Order,[37] except insofar as each pension payment included in any calculation of Back-Pension Damages will be reduced by the applicable Monthly Outside Pension Offset, and pre- and post-judgment interest on Back-Pension Damages will be calculated on that reduced amount.

iv. **Class members who retired from a New York State public retirement system and died after attaining TRS's normal retirement age:** Pension mitigation for these class members will be calculated pursuant to the procedures set forth in Subparagraph 61(g)(i), and the Back-Pension Damages, if any, payable to the estates or beneficiaries of these class members will be paid pursuant to the procedures set forth in Paragraph 56 of this Stipulation & Order, except insofar as each pension payment included in the calculation of Back-Pension Damages will be reduced by the applicable Monthly Outside Pension Offset, and pre- and post-judgment interest on Back-pension Damages will be calculated on that reduced amount.

v. **Class members who retired from a New York State public retirement system and died before attaining TRS's normal retirement age:**

1. The estate of the class member will receive a lump-sum payment from the BOE that is equal to the difference between the TRS death benefit the class member would have received absent BOE discrimination and the actuarial value of the class member's Outside Pension from a New

[37] For purposes of this paragraph, the NYCOA and RRC will calculate the value of a class member's Back-Pension Damages pursuant to the actuarial-adjustment process set forth in Subparagraph 61(g)(i). Paragraph 56 of the Stipulation & Order will govern the manner in which Back-Pension Damages will be paid.

York State public retirement system as of the date of the class member's retirement, as determined by RRC or the NYCOA (if the Outside Pension is from a New York City retirement system), less the difference between the total employee contributions, including AMCs, that would have been payable to TRS had such member participated in TRS during his or her counterfactual service period and the total employee contributions actually paid to the Outside Pension. If this calculation yields a difference of zero or less, the class member will receive no pension relief.

2. The BOE will make the lump-sum payment, along with post-judgment interest, as soon as practical following entry of an individual class member's judgment.

h. <u>All Other Outside Pensions</u>

i. **Class members who are members of any other Outside Pension and have not yet retired:**

1. RRC will calculate the monetary value of the Outside Pension attributable to the counterfactual service period as an annuity net of employee contributions by subtracting the annual benefit of the Outside Pension that accrued prior to the counterfactual service period from the annual benefit of the entire accrued Outside Pension as of the date the Court enters the class member's individual judgment. The NYCOA will then determine the Outside Pension Annual Benefit by actuarially adjusting the Outside Pension attributable to the counterfactual service period into its equivalent under the plan provisions of the TRS plan the member will enter.

2. The NYCOA will calculate the monetary value of the TRS Pension Annual Benefit by subtracting the annual benefit of a TRS pension, incorporating all creditable New York State public service rendered by the class member prior to the counterfactual service period, from the annual benefit of a TRS pension, incorporating both prior creditable service and the class member's counterfactual service. The NYCOA will then subtract the Outside Pension Annual Benefit from the TRS Pension Annual Benefit. If the difference is zero or less, the class member will not receive pension relief. If the difference is greater than zero, the class member's counterfactual-service-and-salary history will be transmitted to TRS, and the preceding paragraphs of this Stipulation & Order will govern the class member's participation in TRS, including the calculation and payment of employee contributions attributable to the class member's counterfactual service, except to the extent inconsistent with this subparagraph.

3. With respect to class members who enter TRS, the Outside Pension Annual Benefit will be divided by twelve to determine the Monthly Outside Pension Offset. Upon the class member's retirement from TRS, the Monthly Outside Pension Offset will be subtracted from the class member's TRS pension payments on an ongoing basis.

4. The class member will be permitted to buy back with TRS any creditable service rendered prior to the counterfactual service period on the same terms as other TRS members who buy back prior creditable service.

ii. **Class Members who died prior to retirement and whose beneficiaries or estates received, or became entitled to receive, death benefits from an Outside Pension:**

1. The estate of the class member will receive from the BOE a lump sum that is equal to the difference between the TRS death benefit the class member would have received absent BOE discrimination and the death benefit the estate or any beneficiary has received or will receive from the Outside Pension, less the difference between the total employee contributions, including AMCs, that would have been payable to TRS had the class member participated in TRS during his or her counterfactual service period, and the total employee contributions actually paid to the Outside Pension, as determined by RRC. If this calculation yields a difference of zero or less, the estate of the class member will receive no pension relief.

2. The BOE will make the lump-sum payment, along with post-judgment interest, as soon as practical following entry of an individual class member's judgment.

iii. **Class members who have retired from any other Outside Pension**: Pension mitigation for these class members will be calculated pursuant to the procedures set forth above in Subparagraph 61(h)(i), and the Back-Pension Damages, if any, payable to these class members will be paid pursuant to the procedures set forth in Paragraph 56 of this Stipulation & Order, except insofar as each pension payment included in any calculation of Back-Pension Damages will be

reduced by the applicable Monthly Outside Pension Offset, and interest on Back-Pension Damages will be calculated on that reduced amount.

iv. **Class members who retired from any other Outside Pension and died after attaining TRS's normal retirement age:** Pension mitigation for these class members will be calculated pursuant to the procedures set forth in Subparagraph 61(h)(i), and the Back-Pension Damages, if any, payable to estates or beneficiaries of these members will be paid pursuant to the procedures set forth in Paragraph 56 of this Stipulation & Order, except insofar as each pension payment included in the calculation of Back-Pension Damages will be reduced by the applicable Monthly Outside Pension Offset, and interest on Back-Pension Damages will be calculated on that reduced amount.

v. **Class members who retired from any other Outside Pension and died before attaining TRS's normal retirement age:**

1. The estate of the class member will receive a lump-sum payment from the BOE that is equal to the difference between the TRS death benefit the class member would have received absent BOE discrimination and the actuarial value of the class member's Outside Pension as of the date of the class member's retirement, as determined by RRC, less the difference between the total employee contributions, including AMCs, that would have been payable to TRS had the class member participated in TRS during his or her counterfactual service period and the total employee contributions actually paid to the Outside Pension. If this calculation yields a difference of zero or less, the class member will receive no pension relief.

2. The BOE will make the lump-sum payment, along with post-judgment interest, as soon as practical following entry of an individual class member's judgment.

i. If Plaintiffs or Defendant wish to contest any pension-valuation determination made by RRC or the NYCOA pursuant to Paragraph 61 of this Stipulation & Order, either party may seek a hearing before the Special Master, who will resolve all pension-valuation disputes pursuant to his Order of Appointment.[38]

62. **Employer-Sponsored Defined-Contribution Plans.** To the extent a class member received employer contributions in a defined-contribution plan during the class member's counterfactual service period, the portion of the class member's account balance in the plan as of the entry of his or her individual judgment that constitutes employer contributions will mitigate the class member's backpay damages, not the class member's pension relief. Pursuant to a ruling by the Special Master, any investment returns on the portion of the class member's account balance that constitutes employer contributions will also mitigate the class member's backpay damages.

63. Except to the extent necessary to effectuate the relief contemplated by this Stipulation & Order and any future order issued by the Court, the Affected Systems are not obligated to implement policies and procedures not detailed in this Stipulation & Order or any future order of the Court.

64. Except as detailed herein or in any future order issued by this Court, the calculation and administration of benefits for individual class members will be undertaken in accordance with the RSSL and other applicable law. The parties acknowledge that any payment to a class member

[38] The Special Master will only review the valuations performed by the NYCOA and RRC as necessary to effectuate the relief set forth in this Stipulation & Order.

contemplated by this Stipulation & Order may be offset to satisfy any deficit—to the extent such a deficit is unrelated to BOE discrimination—that a class member may have relating to his or her participation in an Affected System or other New York City or State public pension system.

65. All functions directed to be performed by an Affected System may be performed by other parties, provided the assignment of the function to another party does not affect the purpose or intent of this Stipulation & Order.

66. To the extent individual class members present unique factual scenarios that are not covered by the terms of this Stipulation & Order; otherwise applicable law; or a rule, policy, or practice of an Affected System, the signatories agree to work together in good faith to determine the appropriate pension relief for those class members. The Court retains jurisdiction over any disputes between the parties related to these class members, and the Special Master's Order of Appointment extends to resolve these disputes.

67. The Court also retains jurisdiction over any disputes regarding the operation of this Stipulation & Order, and the Special Master's Order of Appointment extends to resolve these disputes.

68. This Stipulation & Order may be executed in counterparts, each of them will be deemed an original, and all of them together will constitute one and the same instrument. This Stipulation & Order may be executed by facsimile or PDF signatures.

STIPULATED AND AGREED UPON BY:

Joshua S. Sohn
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
*Counsel for Plaintiffs*

William S. Fraenkel
Assistant Corporation Counsel
The City of New York Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendant*

Patricia Reilly
Executive Director
Teachers' Retirement System of the City of New York
55 Water Street
New York, NY 10041

Sanford R. Rich
Executive Director
Board of Education Retirement System of the City of New York
65 Court Street, 16th Floor
Brooklyn, NY 11201

Melanie Whinnery
Executive Director
New York City Employees' Retirement System
335 Adams Street, Suite 2300
Brooklyn, NY 11201

STIPULATED AND AGREED UPON BY:

________________________

Joshua S. Sohn
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
*Counsel for Plaintiffs*

William S. Fraenkel
Assistant Corporation Counsel
The City of New York Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendant*

________________________

Patricia Reilly
Executive Director
Teachers' Retirement System of the City of New York
55 Water Street
New York, NY 10041

________________________

Sanford R. Rich
Executive Director
Board of Education Retirement System of the City of New York
65 Court Street, 16th Floor
Brooklyn, NY 11201

________________________

Melanie Whinnery
Executive Director
New York City Employees' Retirement System
335 Adams Street, Suite 2300
Brooklyn, NY 11201

STIPULATED AND AGREED UPON BY:

______________________
Joshua S. Sohn
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
*Counsel for Plaintiffs*

______________________
William S. Fraenkel
Assistant Corporation Counsel
The City of New York Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendant*

______________________
Patricia Reilly
Executive Director
Teachers' Retirement System of the City of New York
55 Water Street
New York, NY 10041

______________________
Sanford R. Rich
Executive Director
Board of Education Retirement System of the City of New York
65 Court Street, 16th Floor
Brooklyn, NY 11201

______________________
Melanie Whinnery
Executive Director
New York City Employees' Retirement System
335 Adams Street, Suite 2300
Brooklyn, NY 11201

STIPULATED AND AGREED UPON BY:

________________________
Joshua S. Sohn
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
*Counsel for Plaintiffs*

________________________
William S. Fraenkel
Assistant Corporation Counsel
The City of New York Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendant*

________________________
Patricia Reilly
Executive Director
Teachers' Retirement System of the City of New York
55 Water Street
New York, NY 10041

________________________
Sanford R. Rich
Executive Director
Board of Education Retirement System of the City of New York
65 Court Street, 16th Floor
Brooklyn, NY 11201

________________________
Melanie Whinnery
Executive Director
New York City Employees' Retirement System
335 Adams Street, Suite 2300
Brooklyn, NY 11201

STIPULATED AND AGREED UPON BY:

Joshua S. Sohn
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
*Counsel for Plaintiffs*

William S. Fraenkel
Assistant Corporation Counsel
The City of New York Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendant*

Patricia Reilly
Executive Director
Teachers' Retirement System of the City of New York
55 Water Street
New York, NY 10041

Sanford R. Rich
Executive Director
Board of Education Retirement System of the City of New York
65 Court Street, 16th Floor
Brooklyn, NY 11201

Melanie Whinnery
Executive Director
New York City Employees' Retirement System
335 Adams Street, Suite 2300
Brooklyn, NY 11201

ON RECOMMENDATION OF THE SPECIAL MASTER

SO ORDERED.

Dated: ____________, 2018

_____________________________
KIMBA M. WOOD
United States District Judge

# Exhibit C

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELSA GULINO, MAYLING RALPH, PETER WILDS, and NIA GREENE, on behalf of themselves and all others similarly situated, Plaintiffs, - against - THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Defendant. | 96 Civ. 8414 (KMW) |

**SETTLEMENT AND RELEASE AGREEMENT BETWEEN MAURICE OPARAJI SR. AND THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK**

This Settlement and Release Agreement (this "Agreement"), effective on this 9th day of Sept. 2021 (the "Effective Date") is entered into by and among Maurice Oparaji Sr. with Claim No.: 1002693 and residing at 245-11 133 Road, Rosedale, NY, 11422, on the one hand, and the Board of Education of the City School District of the City of New York ("BOE"), on the other hand. Maurice Oparaji Sr. and BOE may sometimes be referred to individually as a "Party" and, collectively as the "Parties."

**WITNESSETH**

WHEREAS, Maurice Oparaji Sr. is a class member in a Title VII class-action filed against BOE in the United States District Court for the Southern District of New York titled *Gulino et al. v. Board of Education of the City School District of the City of New York*, No. 96 CV 8414 (KMW) (the "Court Action");

WHEREAS, on February 19, 2021, the United States District Court for the Southern District of New York entered an individual final judgment for Maurice Oparaji Sr. against BOE for monetary and non-monetary relief, *Gulino et al. v. Board of Education of the City School District of the City of New York*, No. 96 CV 8414 (KMW), [ECF No. 7422] (the "Judgment");

WHEREAS, Maurice Oparaji Sr.'s total judgment amount equals $37,120.00 (the "Monetary Relief");

WHEREAS, if the Parties continue to litigate the Court Action, and if Maurice Oparaji Sr. were to prevail in an appeal of the Judgment, Maurice Oparaji Sr. would be entitled to post-judgment interest calculated from the date of entry of the Judgment. Post-judgment interest is calculated based on the weekly average one-year constant maturity rate published by the United States Treasury as of the calendar week preceding the date of the Judgment. Currently, the post-judgment interest rate is approximately 0.08% and was approximately 2.5% in 2019;

WHEREAS, to avoid the expense, risk, continued delay, disruption, and uncertainty of BOE's appeal of the Judgment, BOE and Maurice Oparaji Sr. have agreed upon terms by which BOE will satisfy the Judgment to resolve all pending disputes between or among them relating to the Liberal Arts and Sciences Test (the "LAST") and/or the Court Action;

NOW, THEREFORE, in consideration of the mutual agreements, conditions, covenants, promises, and representations set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, BOE and Maurice Oparaji Sr. agree to the following:

1. <u>Payment of Monetary Relief to Maurice Oparaji Sr..</u>
   a. Together with a signed copy of this Agreement, Maurice Oparaji Sr. will submit to the Claims Administrator, Garden City Group ("GCG" also known as Epiq) a completed W-9 form, a copy of which is attached as Exhibit A;

b. The Monetary Relief will be paid no later than December 31, 2021 (the "Payment"). Payment on behalf of BOE will include both back wages and other monetary damages;

c. Upon receipt of a fully executed settlement agreement, payment options will be provided to Maurice Oparaji Sr. and the Payment will be distributed according to Maurice Oparaji Sr.'s payment option election;

d. Maurice Oparaji Sr. understands that the Payment is taxable. BOE will withhold applicable federal, state, and local taxes from the Payment. Maurice Oparaji Sr. is responsible for paying any applicable taxes in connection with the Payment not withheld by BOE;

e. Maurice Oparaji Sr. understands that in exchange for the certainty of the Payment, Maurice Oparaji Sr. is giving up his right to payment of post-judgment interest.

2. Non-Monetary Relief. The non-monetary relief to which Maurice Oparaji Sr. is entitled pursuant to the Judgment remains unaffected by the terms of this Agreement, and BOE will effectuate the non-monetary relief to which Maurice Oparaji Sr. is entitled pursuant to the terms of the Judgment and any other applicable orders of the Court, including the terms of the Court's Order dated December 17, 2018 (Pension Stipulation & Order [ECF No. 1014]).

3. Office of the Gulino Ombudsman. BOE has created a team responsible for monitoring and assisting in effectuating the provision of the Monetary Relief and Non-Monetary Relief described in Paragraphs 1.b.and 2 of this Agreement (the "Office of the Gulino Ombudsman"). The Office of the Gulino Ombudsman can be contacted at: GulinoInquiries@schools.nyc.gov. To the extent Maurice Oparaji Sr. has any questions or concerns related to the administration of his Monetary Relief and/or Non-Monetary Relief,

Maurice Oparaji Sr. can direct those questions and/or concerns to the Office of the Gulino Ombudsman.

4. Release of BOE. Effective upon Maurice Oparaji Sr.'s receipt of the Payment described in Paragraph 1.b., as well as all non-monetary relief described in Paragraph 2., Maurice Oparaji Sr. for himself and on behalf of his respective heirs, successors and assigns, and anyone claiming by, through or under any of the aforementioned persons or entities, hereby releases BOE and all of its current, former or future officials, employees, agents, insurers, representatives, successors, divisions, offices, departments, and agencies, from all manner of liabilities, claims, causes of action, actions, proceedings, suits, demands, debts, damages, and sums of money, related to Maurice Oparaji Sr.'s Title VII Claim and Judgment.

5. Parties to Forgo Appeals. Maurice Oparaji Sr. and BOE each agree to forgo or discontinue any and all appeals of the Judgment, including, but not limited to, a petition for a writ of certiorari to the United States Supreme Court seeking review of the Judgment.

6. Binding Agreement. This Agreement is binding upon and inures to the benefit of Maurice Oparaji Sr. and BOE, and each of their respective agents, officers, directors, partners, employees, representatives, attorneys, successors, predecessors, parents, subsidiaries, affiliates, and assigns.

7. Entire Agreement. This Agreement represents the entire agreement between BOE and Maurice Oparaji Sr. with respect to the subject matter hereof. This Agreement may not be modified, changed, amended, supplemented or rescinded except pursuant to a written instrument duly executed by BOE and Maurice Oparaji Sr..

8. Governing Law. The validity, construction and performance of this Agreement (and any claim, dispute or matter arising under or in connection with it or its enforceability, including,

without limitation, any non-contractual claim, dispute or matter) shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts to be performed wholly within the State of New York.

9. Headings. The headings herein are for convenience only and shall not limit, expand, affect, or alter the meaning of any text.

10. Counterparts. The Parties agree that this Agreement may be executed in counterparts, which when taken together shall constitute a single document.

**[THE REST OF THIS PAGE LEFT BLANK]**

IN WITNESS THEREOF, the Parties have executed this Agreement as of the date first written above.

**ACKNOWLEDGED AND AGREED:**

**MAURICE OPARAJI SR.**

By: *Maurice Oparaji*

)

STATE OF *NEW YORK* ) ss:

COUNTY OF *QUEENS* )

On the *9th* day of *SEPTEMBER*, 2021, before me, the undersigned, a Notary Public in and for the State of *NEW YORK*, personally appeared Maurice Oparaji Sr., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

MARCIA M PHILLIPS
NOTARY PUBLIC, STATE OF NEW YORK
01PH6152203
QUALIFIED IN QUEENS COUNTY
COMMISSION EXPIRES SEPTEMBER 25, 20*22*

*Marcia M Phillips*
NOTARY PUBLIC

**BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK**

By:______________________________

Title:______________________________



Claim No.: 1002693

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELSA GULINO, MAYLING RALPH, PETER WILDS, and NIA GREENE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK,<br><br>Defendant. | 96 Civ. 8414 (KMW) |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR <u>MAURICE OPARAJI</u>**

# I. PROCEDURAL HISTORY — MAURICE OPARAJI

A. As contemplated by the scheduling order in this case, on May 28, 2020, Plaintiffs' counsel ("Plaintiffs") submitted Maurice Oparaji's demand for damages (the "Demand") to the Board of Education of the City School District of the City of New York ("BOE" or "Defendant").[1] The Demand articulated the evidentiary basis for Mr. Oparaji's backpay damages, with and without interest; Mr. Oparaji's LAST-fee damages, with and without interest; Mr. Oparaji's tax-component award; and Mr. Oparaji's Cumulative Absence Reserve ("CAR") day damages.[2] The Court has previously found, and Defendant has not objected to the finding, that class members are entitled to pension-related relief based on their counterfactual service and salary histories, as determined pursuant to the procedures set forth in the Pension Stipulation & Order.[3] Because pension-related relief is determined pursuant to the Pension Stipulation & Order, the Demand did not detail the scope or the amounts of Mr. Oparaji's pension-related relief.

[1] Maurice Oparaji Individual Pre-Hearing Damages Chart, dated May 28, 2020, attached as Exhibit D ("M. Oparaji Demand").

[2] *Id.*

[3] *See* Classwide Conclusions of Law, [ECF No. 1008]; *see also* Pension Stipulation & Order, [ECF No. 1014]; *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, Opinion and Order, 1:96-cv-08414, [ECF No. 800] ("[T]he parties agree that class members are entitled to the lost pensions they would have received absent the discriminatory LAST.").

B. Mr. Oparaji's Demand did not seek to modify the Court-ordered backpay damages model.[4]

C. In total, Mr. Oparaji's Demand sought $37,338 in monetary damages, as of his presumed date of judgment of December 31, 2020.[5] The Demand noted that Mr. Oparaji's total monetary relief is subject to change based on Mr. Oparaji's actual date of judgment.[6]

D. On June 11, 2020, Defendant responded to Mr. Oparaji's Demand (the "Response").[7] Defendant objected that Mr. Oparaji was not entitled to damages other than the LAST fees.[8]

E. On July 9, 2020, Defendant withdrew its objection to Mr. Oparaji's Demand.[9]

F. During a conference held by the Special Master on July 23, 2020, Defendant did not request a hearing and did not contest Mr. Oparaji's credibility.[10]

G. Accordingly, the Special Master ruled that Mr. Oparaji satisfied his burden of proving that $37,338 is the appropriate total damages amount based on the evidence presented, as of his presumed date of judgment.[11] Mr. Oparaji's monetary damages continue to accrue through Mr. Oparaji's actual date of judgment.[12]

## II. FINDINGS OF FACT — MAURICE OPARAJI[13]

### A. Background

1. Maurice Oparaji is an African-American man who was born on [redacted][14]

---

[4] *See* M. Oparaji Demand.

[5] *See id.*

[6] *See id.*

[7] Def.'s Responses & Objections to M. Oparaji Demand, attached as Exhibit E ("Def.'s Response").

[8] *See id.*

[9] *See* Maurice Oparaji Individual Final Damages Demand Chart, attached as Exhibit F ("M. Oparaji Final Demand").

[10] *See* July 23, 2020 Special Master Conference Summary, [ECF No. 6407].

[11] *See id.*; *see also* M. Oparaji Final Demand.

[12] The parties stipulate, without waiving any previous objections to the Special Master's prior rulings, that Exhibits A, B, and C set forth: (1) any agreed-upon corrections to Mr. Oparaji's damages calculations since the Special Master resolved his Demand, and (2) Mr. Oparaji's accrual of damages through his actual date of judgment.

[13] This section details the Special Master's findings of fact for Mr. Oparaji as of July 23, 2020, the date the Special Master resolved Mr. Oparaji's Demand.

[14] *See* M. Oparaji Demand.

2. Mr. Oparaji was employed by the BOE as a teacher after June 29, 1995.[15]

3. Mr. Oparaji failed the Liberal Arts and Sciences Test ("LAST").[16]

4. Because Mr. Oparaji failed the LAST, the BOE did not hire him for a regularly appointed teacher position.[17]

[15] *See* Stipulated Exhibit E, Classwide Exhibits referenced in the so-ordered Fifth Supplemental Stipulation Concerning Admissibility of Exhibits (the "Classwide Exhibits") at GULEX 1100.000001, [ECF No. 5942]; Stipulated Exhibit F, Classwide Exhibits at GULEX 1100.000002; Stipulated Exhibit G, Classwide Exhibits at GULEX 1200.000001; Stipulated Exhibit J, Classwide Exhibits at GULEX 1200.000002; Stipulated Exhibit K, Classwide Exhibits at GULEX 1200.000003; Stipulated Exhibit L, Classwide Exhibits at GULEX 1200.000004; Stipulated Exhibit R, Classwide Exhibits at GULEX 1200.000005; Stipulated Exhibit S, Classwide Exhibits at GULEX 1200.000006; Stipulated Exhibit AE, Classwide Exhibits at GULEX 1100.000006; Stipulated Exhibit AF, Classwide Exhibits at GULEX 1200.000013; Stipulated Exhibit AG, Classwide Exhibits at GULEX 1100.000007; Stipulated Exhibit AH, Classwide Exhibits at GULEX 1300.000015; Stipulated Exhibit AK, Classwide Exhibits at GULEX 1100.000008; Stipulated Exhibit AL, Classwide Exhibits at GULEX 1100.000009; Stipulated Exhibit AM, Classwide Exhibits at GULEX 1100.000010; Stipulated Exhibit AN, Classwide Exhibits at GULEX 1100.000011; Stipulated Exhibit AP, Classwide Exhibits at GULEX 1300.000016; Stipulated Exhibit AQ, Classwide Exhibits at GULEX 1100.000013; Stipulated Exhibit AR, Classwide Exhibits at GULEX 1100.000014; Stipulated Exhibit AS, Classwide Exhibits at GULEX 1100.000015; Stipulated Exhibit AT, Classwide Exhibits at GULEX 1100.000016; Stipulated Exhibit AU, Classwide Exhibits at GULEX 1300.000017; Stipulated Exhibit AX, Classwide Exhibits at GULEX 1100.000017; Stipulated Exhibit AV, Classwide Exhibits at GULEX 1200.000014; Stipulated Exhibit AW, Classwide Exhibits at GULEX 1200.000015; Stipulated Exhibit AY, Classwide Exhibits at GULEX 1100.000018; Stipulated Exhibit AZ, Classwide Exhibits at GULEX 1100.000019; Stipulated Exhibit BA, Classwide Exhibits at GULEX 1100.000020; Stipulated Exhibit BC, Classwide Exhibits at GULEX 1100.000021; Stipulated Exhibit BD, Classwide Exhibits at GULEX 1200.000016; Stipulated Exhibit BE, Classwide Exhibits at GULEX 1300.000018; Stipulated Exhibit BF, Classwide Exhibits at GULEX 1100.000022; Stipulated Exhibit BG, Classwide Exhibits at GULEX 1100.000023; Stipulated Exhibit BH, Classwide Exhibits at GULEX 1200.000017; Stipulated Exhibit BI, Classwide Exhibits at GULEX 1100.000024; Stipulated Exhibit BJ, Classwide Exhibits at GULEX 1300.000019; Stipulated Exhibit BS, Classwide Exhibits at GULEX 1200.000018; Stipulated Exhibit BT, Classwide Exhibits at GULEX 1200.000019; Stipulated Exhibit BU, Classwide Exhibits at GULEX 1100.000025; Stipulated Exhibit BV, Classwide Exhibits at GULEX 1100.000026; Stipulated Exhibit BW, Classwide Exhibits at GULEX 1100.000027; Stipulated Exhibit BX, Classwide Exhibits at GULEX 1300.000020; Stipulated Exhibit BY, Classwide Exhibits at GULEX 1200.000020; Stipulated Exhibit BZ, Classwide Exhibits at GULEX 1100.000028; Stipulated Exhibit CA, Classwide Exhibits at GULEX 1100.000029; Stipulated Exhibit CB, Classwide Exhibits at GULEX 1200.000021; Stipulated Exhibit CD, Classwide Exhibits at GULEX 1300.000021; Stipulated Exhibit CE, Classwide Exhibits at GULEX 1100.000030; Stipulated Exhibit CF, Classwide Exhibits at GULEX 1200.000022; Stipulated Exhibit CG, Classwide Exhibits at GULEX 1300.000022; Stipulated Exhibit CH; Classwide Exhibits at GULEX 1100.000031; Stipulated Exhibit CK, Classwide Exhibit at GULEX 1100.000032; Stipulated Exhibit CL, Classwide Exhibit at GULEX 1100.000033; Stipulated Exhibit CM, Classwide Exhibit at GULEX 1200.000024; Stipulated Exhibit CN, Classwide Exhibit at GULEX 1300.000023; Stipulated Exhibit CO, Classwide Exhibit at GULEX 1200.000025; Stipulated Exhibit CP, Classwide Exhibit at GULEX 1200.000026; Stipulated Exhibit UU, Classwide Exhibits at GULEX 1200.000007; Stipulated Exhibit VV, Classwide Exhibits at GULEX 1200.000008; Stipulated Exhibit WW, Classwide Exhibits at GULEX 1200.000009; Stipulated Exhibit XX, Classwide Exhibits at GULEX 1200.000010; Stipulated Exhibit YY, Classwide Exhibits at GULEX 1200.000011; Stipulated Exhibit ZZ, Classwide Exhibits at GULEX 1200.000012 (collectively, "BOE Payroll and Service Data").

[16] *See* Stipulated Exhibit EE, Classwide Exhibits at GULEX 1400.000001.

[17] *See* BOE Payroll and Service Data.

B. Class Membership

1. Mr. Oparaji is an African-American man who was employed as a New York City public school teacher by the BOE, after June 29, 1995, who failed to achieve a qualifying score on an administration of the LAST, and as a result was denied a permanent teaching appointment.

2. Mr. Oparaji submitted a claim form in this case and is a member of the Plaintiff class.

3. Accordingly, Mr. Oparaji is entitled to monetary relief from the BOE as compensation for the injuries he suffered as a result of the BOE's discrimination.[18]

C. Calculation of Backpay

The series of collective bargaining agreements between the BOE and the United Federation of Teachers ("UFT") that govern the salary and benefits for New York City public school teachers (collectively, the "CBA") provide that regularly appointed teachers with different educational credentials are paid at different levels.[19] The CBA also provides that a regularly appointed teacher's salary increases at regular intervals according to the CBA salary table, which also provides for various longevity bonuses and other incentives.

Based on the tables in the CBA and the evidence presented, determining what Mr. Oparaji's salary would have been absent the BOE's discrimination depends on this Court's determination of when he would have been appointed as a regularly appointed teacher for the BOE, how long he would have worked as a regularly appointed teacher, and the educational advancement he would have achieved absent the discrimination.[20]

1. *Counterfactual Appointment Date/Beginning of Damages Accrual Period*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that:

---

[18] *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, Opinion and Order, 1:96-cv-08414, [ECF No. 321]; *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, Opinion and Order, 1:96-cv-08414, [ECF No. 386].

[19] *See, e.g.*, Appendix A to October 16, 1995-November 15, 2000 Collective Bargaining Agreement, Stipulated Exhibit T, Classwide Exhibits at GULEX 1600.000193-200; Stipulated Exhibit U, Classwide Exhibits at GULEX 1300.000006-13.

[20] *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, Opinion and Order, 1:96-cv-08414 at 10, [ECF No. 800] (adopting the Special Master's June 13, 2016 Interim Report and Recommendation, at 11, [ECF No. 777]); *see, e.g.*, Stipulated Exhibit T, Classwide Exhibits at GULEX 1600.000193-200; Stipulated Exhibit U, Classwide Exhibits at GULEX 1300.000006-13.

(1) Absent the BOE's discrimination, Mr. Oparaji would have been appointed as a regularly appointed teacher in April 1998; and

(2) Mr. Oparaji is eligible to accrue backpay damages beginning in April 1998.

b) Based on the evidence presented and the parties' agreement, the Court finds that Mr. Oparaji's counterfactual appointment date is April 1998, and Mr. Oparaji is eligible to accrue backpay damages beginning in April 1998.

2. *Counterfactual Salary-Step Advancement*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that:

(1) Mr. Oparaji's Counterfactual Monthly Earnings on Exhibit A accurately reflect what Mr. Oparaji's salary-step advancement would have been, pursuant to the CBA, absent the BOE's discrimination; and

(2) Mr. Oparaji's Counterfactual Monthly Earnings on Exhibit A accurately reflect the longevity bonuses to which Mr. Oparaji would have been entitled, pursuant to the CBA, absent the BOE's discrimination.

b) Based on the evidence presented and the parties' agreement, the Court finds that Mr. Oparaji's Counterfactual Monthly Earnings on Exhibit A accurately reflect Mr. Oparaji's counterfactual salary-step advancement and counterfactual longevity bonuses.

3. *Counterfactual Educational Advancement*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that Mr. Oparaji's Counterfactual Monthly Earnings on Exhibit A accurately reflect the educational advancement Mr. Oparaji would have achieved absent the BOE's discrimination.

b) Based on the evidence presented and the parties' agreement, the Court finds that Mr. Oparaji's Counterfactual Monthly Earnings on Exhibit A accurately reflect Mr. Oparaji's counterfactual educational advancement.

4. *Backpay Damages End Date*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that:

(1) Absent the BOE's discrimination, Mr. Oparaji would have worked as a regularly appointed teacher until February 16, 2001; and

(2) Mr. Oparaji's backpay damages should not be reduced by a probability of pre-retirement attrition and he should receive full backpay damages until February 16, 2001.

b) Based on the evidence presented and the parties' agreement, the Court finds that Mr. Oparaji would have worked as a regularly appointed teacher until February 16, 2001, and his backpay damages should not be reduced by a probability of pre-retirement attrition.

5. *Counterfactual Earnings*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that Mr. Oparaji's monthly BOE earnings as a regularly appointed teacher, absent the BOE's discrimination, would have been as listed in the column entitled Counterfactual Monthly Earnings on Exhibit A.

b) Based on the evidence presented and the parties' agreement, the Court finds that, absent the BOE's discrimination, Mr. Oparaji's counterfactual BOE earnings would have been as listed in Counterfactual Monthly Earnings on Exhibit A. The Court also finds that Mr. Oparaji's counterfactual annual BOE salary would have been as listed in the column entitled Annual Salary on Exhibit B.

6. *Additional Earnings*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that absent the BOE's requirement that its teachers pass the LAST to be eligible to work in various job titles, Mr. Oparaji would have earned monetary compensation in addition to the base salary set forth in the CBA ("Additional Earnings").[21]

---

[21] These Additional Earnings derive from the average additional compensation regularly appointed BOE teachers earned during the damages period. *See* Stipulated Exhibit H, Classwide Exhibits at GULEX 1100.000003; *see also* Stipulated Exhibit AD, Classwide Exhibits at GULEX 1100.000005.

b) Based on the evidence presented and the parties' agreement, the Court finds that, absent the BOE's discrimination, Mr. Oparaji's Additional Earnings are accurately accounted for in the calculation of his Monthly Mitigation on Exhibit A.[22]

7. *Mitigation*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that Mr. Oparaji's monthly mitigation during each month of the damages period was as listed in the column entitled Monthly Mitigation on Exhibit A.

b) Based on the evidence presented and the parties' agreement, the Court finds that Mr. Oparaji's monthly mitigation during each month of the damages period was as listed in the column entitled Monthly Mitigation on Exhibit A.

8. *Backpay Damages*

a) The parties agree, based on the Special Master's prior rulings and without waiving their prior objections to those rulings, that Mr. Oparaji is entitled to the monthly backpay damages listed in the column entitled Monthly Damages on Exhibit A.

b) Based on the evidence presented and the parties' agreement, the Court finds that Mr. Oparaji is entitled to the monthly backpay damages listed in the column entitled Monthly Damages on Exhibit A.

D. <u>LAST Fee Damages</u>

*LAST fees* — Mr. Oparaji took the LAST six times and is entitled to $420 to compensate him for the fees he paid to take the LAST.[23]

E. <u>Pension Damages</u>

The Court has previously found, and Defendant has not objected to the finding, that class members are entitled to pension-related relief based on their

[22] Additional Earnings are applied on a pro rata basis for the time periods when Mr. Oparaji was not employed by the BOE and his Social Security earnings are used to calculate his monthly mitigation, as detailed in Section II(C)(7) herein.

[23] *See* Stipulated Exhibit FF, Classwide Exhibits at GULEX 1500.000001-63; *see also* Stipulated Exhibit EE, Classwide Exhibits at GULEX 1400.000001.

counterfactual service and salary histories, as determined pursuant to the procedures set forth in the Pension Stipulation & Order.[24]

Based on the evidence presented, and pursuant to the procedures set forth in the Pension Stipulation & Order, the Court finds that the following information regarding Mr. Oparaji should be imported into the Teachers' Retirement System of the City of New York ("TRS"):

1. Date of Birth — [redacted]

2. Gender — Male

3. Address [redacted]

4. Counterfactual date of appointment as a regularly appointed teacher — April 26, 1998

5. BOE Employment Title — As listed in column entitled Title on Exhibit B

6. Annual contractual salary — As listed in column entitled Annual Salary on Exhibit B

7. Monthly contractual salary — As listed in column entitled Counterfactual Monthly Earnings on Exhibit A

8. Dates of breaks in service (if any) — N/A

9. Termination of regularly appointed teacher service (if any) — February 16, 2001

10. Retirement date (if any) — November 14, 2012

F. Retroactive Seniority Adjustment

1. The Court finds, and Defendant does not object to the finding, that Mr. Oparaji was denied seniority as a result of the BOE's discrimination.[25] Accordingly, the Court finds that Mr. Oparaji is entitled to the seniority he was denied from April 26, 1998 through February 16, 2001 ("Retroactive Seniority").

---

[24] *See* Classwide Conclusions of Law, [ECF No. 1008]; *see also* Pension Stipulation & Order, [ECF No. 1014]; *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, Opinion and Order, 1:96-cv-08414, [ECF No. 800] ("[T]he parties agree that class members are entitled to the lost pensions they would have received absent the discriminatory LAST.").

[25] *See* January 24, 2018 Special Master Conference Summary, Classwide Exhibits at GULCS 000380-387 ("The parties stated that they agree claimants will receive retroactive seniority with respect to salary-step advancement, longevity bonuses, accrual of years of service for pension, post-retirement health care benefits, accrual of CAR days, sabbatical leave rights, restoration of health leave rights, and hardship transfers.").

2. The Court finds that Mr. Oparaji is entitled to the following adjustments in the BOE's records to reflect his Retroactive Seniority:

a) *CAR Days* — Mr. Oparaji should receive $430 in monetary damages for the CAR days he would have accrued as a regularly appointed BOE teacher during his counterfactual service period.

G. Tax-Component

The parties stipulate, without waiving any previous objections to the Special Master's prior rulings, that Mr. Oparaji is entitled to a tax-component award in the amount of $2,583.

Dated: October 27, 2020
New York, New York

# Exhibit E

Maurice Oparaji
245-11 133 Road
Rosedale, NY 11422
Home: (718) 978-3581
Mobile: (347) 650-7895
mroparaji@yahoo.com

October 28, 2021

Teachers' Retirement System of the City of New York
55 Water Street
New York, NY 10041

STROOCK
180 Maiden Lane, New York, NY 10038
D: 212.806.1224
F: 212.806.1006
|www.stroock.com

Dear Sir/Madam:

**RE: MAURICE U. OPARAJI SR.**
**File Number 639512**
**TRS Membership No.: 00T814057**

Record indicates my letter dated March 17, 2021, with tracking number: 70142120000291991154 was delivered to you at 9:39 am on March 19, 2021. In the letter, I attached Notice of Entry and Judgment of the United States District Court for the Southern District of New by Hon. Kimba M. Wood, dated February 19, 2021.

I write for you to forward your invoice for pension contributions that is expected to be paid in order to receive pension credit from Teachers' Retirement

System of the City of New York, pursuant to the February 19, 2021 Judgment of the United States District Court for the Southern District of New by Hon. Kimba M. Wood. See Attached Judgment, **Exhibit A.** ***See also*** Settlement and Release Agreement between Maurice Oparaji Sr. and The Board of Education of the City School District of the City of New York dated September 9, 2021, **Exhibit B.**

I look forward to hearing from you.

Yours,

Maurice Oparaji

cc: By Mail: TRS, 55 Water Street, New York NY 10041
By Email: AskTRSNYC@trs.nyc.ny.us
By Fax: (212) 918-9253

gulino@stroock.com
Stevens, Rachel V. <rstevens@stroock.com
Sohn, Joshua <jsohn@stroock.com
Lyon, Alexandra M. alyon@stroock.com
Parilla, jparilla@stroock.com
Udo, Ezeudo3@outlook.com

# Exhibit F

trs

TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK
55 Water Street, New York, NY 10041 • www.trsnyc.org • 1 (888) 8-NYC-TRS

January 03, 2022
TRS Membership No.: 00T142296
Tier: Tier IV

Maurice U Oparaji
24511 133Rd Rd
Unit I
Rosedale, NY 11422-1419

# Welcome to TRS!

Dear Maurice U Oparaji:

**Welcome to TRS.** Now that you're a member of TRS, please note the following important information.

- First, go to **www.trsnyc.org** and register for the secure section of our website. Whether you're on a desktop or a mobile device, setting up your username and password is simple.

- Next, complete your enrollment online:
  - Designate your beneficiaries under the Qualified Pension Plan (QPP).
  - Upload proof of your date of birth.

  You can submit a birth certificate, passport, or naturalization document. If you don't have any of those documents, you can submit *two* of the following: driver's license; certificate of military record; Form SSA-2458 (Report of Confidential Social Security Benefit Information); or other government-issued identification. Please note that any date-of-birth documentation in a language other than English must be accompanied by a translation. Photocopies of all documents are acceptable.

Please submit your documentation as soon as possible. TRS cannot calculate your retirement benefits if we do not have this documentation.

TRS is here to serve you!

At any time, feel free to call our 24-hour information line at 1 (888) 8-NYC-TRS. During regular business hours, you can speak to a Member Services Representative at this number, or visit our Member Services Center at 55 Water Street in lower Manhattan.

On behalf of the Trustees of the Teachers' Retirement Board and TRS staff, welcome to TRS!

Sincerely,

TRS Member Services

(EN113)

TEACHERS' RETIREMENT SYSTEM
OF THE
CITY OF NEW YORK
55 WATER STREET
NEW YORK, N.Y. 10041

PITNEY BOWES
US POSTAGE
$00.530
FEB 09 2022
ZIP 10041
02 1T
3004288

11422$1419 C087

# Exhibit G

www.comptroller.nyc.gov

THE CITY OF NEW YORK
OFFICE OF THE COMPTROLLER
CLAIMS AND ADJUDICATIONS
1 CENTRE STREET ROOM 1200
NEW YORK, N.Y. 10007-2341

**Brad Lander**
**COMPTROLLER**

015 - 151

Date: 9/30/2022
Claim Number: 2022LW027731
RE: Acknowledgment of Claim
Your Claim/Policy#:

MAURICE OPARAJI
245-11 133 RD
ROSEDALE NY 11422
mroparaji@yahoo.com

Dear Claimant:

We acknowledge receipt of your claim, which has been assigned the claim number shown above. Please refer to this claim number in any correspondence or inquiry you may have with our office.

We will do our best to investigate and, if possible, settle your claim. However, if we are unable to resolve your claim, **any lawsuit against the City must be started within one year and ninety days from the date of the occurrence.**

If you have any questions regarding your claim, you may contact us at 212-669-4729 for claims involving personal injury.

If you need to communicate in a language other than English, please let us know, and we will make translation services available to you.

Sincerely,

Bureau of Law & Adjustment

# Exhibit H

trs

A publication of the
Teachers' Retirement System
of the City of New York

# New Law Affects Vesting, Contributions



Chapter 56 of the Laws of 2022, enacted in April, brings major changes for TRS members:

## Five-Year Vesting

All members are now considered vested after they have attained five years of service credit. Previously, the requirement was ten years for all Tier VI members as well as UFT-affiliated Tier IV members who joined TRS after December 10, 2009.

As a result of this change, several thousand members are now vested—meaning they qualify for a pension upon reaching retirement age. TRS will contact these members by letter over the summer and is in the process of updating our online materials to reflect this change.

## Tier VI Contribution Rates

For Tier VI members, pension contribution rates are calculated based on each member's projected or recent wages. Chapter 56 excludes "overtime" pay from the calculation for a period of about 24 months. TRS is reviewing the impact of this change, but it is possible that some Tier VI members may have a lower contribution rate temporarily.

We will publish updates on our website and in future editions of *In-Service News* when more information is available.

## Retiree Earnings Limit

Service retirees under age 65 normally are allowed to earn up to $35,000 per year in public employment within New York State without impacting their retirement allowance. As a result of Chapter 56, work in New York State public schools from April 9, 2022 through June 30, 2023 will not count toward that limit.

*Earnings After Retirement*

**Retirement Checklist / 2**

**Pension Calculation / 2**

**Beneficiary Designations / 3**

**Especially for New Members:**

- **Maximize Your Membership / 4**
- **Avoid Deficits / 4**
- **Fit TDA in Your Budget / 5**

**TRS Plans Rank High / 5**

**Investment Results / 6**

**Outsmart Web Imposters / 7**

**Publications / 8**

**Calendar / 8**

# Are You Retiring This Summer?

Here's a checklist to help you get ready:

✔ **Attend a virtual "Getting Ready for Retirement" session.** Register online on our Educational Programs page. (www.trsnyc.org ▶ Resources ▶ Educational Programs).

✔ **Purchase any outstanding service credit, to boost your retirement allowance.** You'll need to start the purchase process before you retire.

✔ **Make a decision about your TDA account.** You can:

1) annuitize your account and receive an additional monthly payment,
2) roll over (or withdraw) your TDA funds, or
3) elect TDA Deferral status and leave your TDA account at TRS.

✔ **Be aware of any QPP loans.** Outstanding loan balances or new loans you take at retirement will reduce your monthly retirement allowance.

✔ **Consider your beneficiary designations.** Your retirement payment option may provide for one or more beneficiaries, but other benefits require designations too: "Death Benefit #2" applies to most retired members, and there's a smaller "fractional" benefit based on your retirement allowance payment for the month in which you die.

✔ **Get paid electronically.** Unless you file with TRS to change accounts, you'll receive your retirement allowance automatically in the same account where you currently receive paychecks.

✔ **Apply for health insurance benefits.** Once you file with TRS and receive written verification of your retirement date, you should file for health insurance with your employer.

✔ **Plan to file for retirement online.** You can complete the retirement "e-forms" and upload supporting documentation. (Log in at www.trsnyc.org ▶ E-Forms)

# How Is My Pension Calculated?

No matter how far away from retirement you are, it's important to understand how your pension–sometimes called your retirement allowance–will be calculated. The actual calculations differ based on your tier and retirement plan, but in simple terms your pension will be based on four key factors:

1. Age
2. Total Service Credit
3. Final Average Salary (FAS)
4. Benefit Rate – based on your years of service

**Here's the formula: Final Average Salary (FAS) x Service Credit x Benefit Rate = Annual Pension**

For Tier IV or Tier VI members with less than 20 years of service credit, the benefit rate is $1^2/_3$%. With 20 or more years of service credit, the benefit rate increases–which means a higher pension.

Where does age fit in? Full retirement benefits are generally payable at age 62 for Tier IV members and 63 for Tier VI members. If you choose to retire before that age, you can do so as early as age 55, but you will receive a reduced pension in most cases. (*Note: For participants in the Age 55 Retirement Program, the rules differ.*)

TRS' *Service Retirement Plans and Benefits* brochures explain the details of the pension calculation, plus possible reductions related to age, payment option, and loan balances.

*(Continued on page 3)*

# Naming a Charity, Minor, or Trust as Beneficiary?

Designating beneficiaries for your TRS accounts is easy to do in the secure section of our website. For most individual beneficiaries, you'll need to enter a full name, address, date of birth, and Social Security number (except for foreign individuals). But in cases where your beneficiary is a charity, minor, or a trust, you'll need to provide some specialized information:

**Charity (Organization)**

- The full name of the charity/organization
- The tax identification number (TIN)
  - *Tip*: Confirm the TIN with the charity (and check for typos)

**Minor**

- The full name of the minor
- The minor's date of birth and Social Security number (SSN)
- The name, address, email address, and phone number of the custodian

**Trust**

- The full name of the trust document
- "Verification of Trust Instrument Legality" (code EN4), a TRS form available upon request
  - *Tip*: Upload the completed form to TRS' website as part of your online designation



If you provide the needed information when designating your beneficiaries, TRS will be able to implement your wishes without delay. Review your designations periodically to make any changes.

When you need to update contact information for a beneficiary, you can use the Beneficiary Profiles feature. (Log in at www.trsnyc.org ► **Beneficiaries** ► **Beneficiary Profiles**. If you want to make a change to your actual list of beneficiaries, go to ► **Beneficiaries** ► **QPP Beneficiaries** or **TDA Beneficiaries** instead.)

## How Is My Pension Calculated?

*(Continued from page 2)*

If you are age 50 or older, your Annual Benefits Statement (published each fall) provides a personalized projection of your pension calculation based on your actual employment. General information is available in the publications listed below and in our online Educational Programs. (www.trsnyc.org ► **Resources** ► **Educational Programs**)

*Service Retirement Plans and Benefits for Tiers III/IV Members*

*Service Retirement Plans and Benefits for Tier VI Members*

### TRS' Qualified Pension Plan (QPP)

The QPP is the source of your future pension. It's where your pension contributions go after they are deducted from your pay, and it's also where employer contributions (over $3 billion in 2021) are invested.

The QPP is known as a defined-benefit plan because the pension benefit is established by a pre-defined formula (as described in this article) and not by the performance of investments, like many other retirement plans.

# Get the Most from Your TRS Membership

### *Tune in to online educational programs*



All year long, TRS offers virtual educational programs that are informative—and free. During the school year, most classes begin at 3:00 p.m. and are completed within two hours. June's offerings are focused on retirement-related classes. In July and August, classes are held throughout the day, and there are offerings for early-, mid-, and late-career members—every phase of your path toward retirement.

Advance registration is required for all programs. The information you'll obtain will help you make important decisions throughout your career and even after you retire.

These programs are specifically designed for newer members of TRS:

**Tier VI—Planning for Tomorrow:** Designed just for Tier VI members, this program describes TRS benefits, contributions, and services. The session also explains purchasing service credit, enrolling in the TDA Program, and using the TRS website to manage your account. **Next session: Monday, August 8**

**What is Service Buyback?:** Service credit is one of the key factors in determining a member's retirement allowance. And increasing service credit means increasing the amount of your retirement allowance. This program will review the different types of creditable service and the options to purchase service. **Next session: Tuesday, August 9**

**Introduction to the TDA Program:** This program is for in-service members who are new to the Tax-Deferred Annuity Program, TRS' supplemental retirement plan. The plan's features and benefits are presented, and the steps for enrolling are explained. Whether you haven't joined TDA yet or you want to learn how to maximize your participation, this session is for you. **Next session: Thursday, August 11**

View the complete schedule on our website's Educational Programs page and register today! (www.trsnyc.org ▶ Resources ▶ Educational Programs)

# Avoid Deficits in Your Pension Contributions

### *Check your pay statements*

Your TRS membership requires you to contribute a portion of your salary toward your pension: 3% to 6% for new members, depending on your salary. This deduction is shown on your pay statements by the code TRS PEN STD. If you're a Tier VI member and you do not see this deduction on your pay statements, the required contributions are not being taken from your pay, and you should contact TRS immediately.

The exact amount of your pension deductions is based on data and wage information that your employer provides to TRS. And, while all members should monitor their pay statements to ensure expected TRS deductions are taken it is especially important for CUNY employees to do this. Currently, CUNY does not have an automated process to provide TRS with employment data for all titles, so errors leading to missed contributions are possible.

When required contributions are not deducted from a member's pay, a "deficit" situation can result. In this case, TRS contacts members by letter to notify them of the missed contributions and provide payment options (usually, one direct payment online or a payment plan of deductions from pay). Interest charges also accrue on the cost of a deficit, so it's better to resolve deficits sooner than later.

TRS makes every effort to prevent deficits and notifies members as soon as possible once a deficit is discovered. But you can help out by keeping an eye on your pay statements for that TRS PEN STD deduction.

# Make Your Next Smoothie at Home

### *Your retired self will thank you*

Ever feel like your paycheck is spent before it hits your bank account? You're not alone. Life is expensive. And retirement costs more than you think.

Of course, many expenses are unavoidable: housing, food, phone, electricity. It's the discretionary expenses where you can exercise some control—and direct the savings toward your future, by investing in TRS' Tax-Deferred Annuity (TDA) Program.

Small changes over time make a huge difference. Consider the person with a smoothie habit. Buying five smoothies a week at $8 a pop incurs a monthly expense of $160! Cutting out some of those smoothies and instead putting that money into a TDA account could lead to a big boost in retirement income. And since TDA contributions are deducted from pay before taxes, TDA participants also reduce their current taxable income.

You can find tons of money-saving tips online, but here are a few:

- Prepare your meals at home instead of buying takeout—and that includes smoothies!
- Limit impulse buys and create shopping lists.
- Create a monthly budget and stick to it.



Consider tracking your expenses for the next 30 days. See exactly where your money is going. Find ways to economize, and then steer those dollars to your TDA account. If you do, more of your paycheck will go to Future You, instead of toward your taxes.

**Tips for taking full advantage of TDA:**

- Next time you receive a salary increase or a retroactive payment, direct that money to your TDA account.
- Set a reminder to increase your TDA contributions by 1% each year on a date that you choose.
- Consider contributing at your Full-Year, Full-Contribution Rate. This allows you to make the maximum allowable investment in your TDA account from year to year.
- If you're over age 50 or have more than 15 years of City service, you can make extra TDA contributions each year, above the general annual limit ($20,500 in 2022). See the *TDA Program Summary* for details.

## TRS Plans Rank High

According to *Pensions & Investments* magazine's annual survey of retirement funds, TRS' Tax-Deferred Annuity (TDA) Program remains America's:

✓ 2nd largest 403(b) plan

✓ 4th largest public defined-contribution plan

TRS' Qualified Pension Plan (QPP) is part of the combined New York City retirement plan—which is ranked the 5th largest overall fund, and the 4th largest defined-benefit plan in the country.

The *Pensions & Investments* survey was published in the February 14, 2022 issue, based on reported assets as of September 30, 2021.

# Semiannual Investment Results: 12/31/2021

## TRS Passport Funds

TRS' Passport Funds are available to all Tax-Deferred Annuity (TDA) Program participants and members in Tiers I and II for a portion of their funds in the Qualified Pension Plan (QPP).

For more recent investment results, please visit our website. (www.trsnyc.org ▶ **Investments** ▶ **Investment Returns**)

For more details about the Passport Funds, please review our annual *Fund Profiles* booklet.

### Annualized Investment Returns

| | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| Diversified Equity Fund | 20.24% | 22.09% | 15.37% | 13.92% |
| Balanced Fund** | 6.22% | 8.19% | N/A | N/A |
| International Equity Fund | 8.44% | 15.08% | 10.89% | 8.96% |
| Sustainable Equity Fund | 30.36% | 30.98% | 20.31% | 16.67% |
| U.S. Equity Index Fund*** | 25.82% | N/A | N/A | N/A |
| International Equity Index Fund*** | 7.87% | N/A | N/A | N/A |

*Returns for the Fixed Return Fund are set by New York State Law. Currently, members affiliated with the United Federation of Teachers are credited with 7% annually on TDA investments in the Fund. Other members' TDA investments in the Fund, and any member's QPP investments in the Fund, are currently credited with 8.25% annually. Historical rates are published on our website. For retirees and annuitants who have Fixed Return Fund investments, the guaranteed return is factored into their monthly payments. Funds that members allocate to the Fixed Return Fund are invested with the Pension Fund.

**5- and 10-year investment returns are not available for the Balanced Fund, which began on 1/1/2018.

***3-, 5-, and 10-year investment returns are not available for the U.S. Equity Index and International Equity Index funds, which began on 1/1/2020. The 1-year returns shown above represent the actual returns of the U.S. Equity Index Fund and the International Equity Index Fund. Any difference between the returns of the U.S. Equity Index Fund and the International Equity Index Fund and that of their underlying mutual funds is due to the timing of cash flows.

### Five-Year Performance vs. Benchmarks

**Diversified Equity Fund:**

- ↓ 0.59% Hybrid Benchmark
- ↓ 2.15% Global Market Composite Benchmark

**Balanced Fund[1]:**

- ↓ 0.11% Custom Benchmark

**International Equity Fund:**

- ↑ 0.9% International Equity Fund Composite Benchmark

**Sustainable Equity Fund:**

- ↓ 2.07% Sustainable Equity Fund Composite Benchmark

[1] As of 1/1/2018, the Bond Fund became the Balanced Fund, so no 5-year comparison is available. A 3-year comparison is shown above.

## TRS Plans

TRS offers two plans to members.

All members participate in the Qualified Pension Plan (QPP), a defined-benefit plan that is funded by employer contributions and member contributions. TRS also administers a Tax-Deferred Annuity (TDA) Program, a supplemental defined-contribution plan. The TDA Program is funded by member contributions.

**QPP Total Investments**
**$80.89 Billion***

**TDA Total Investments**
**$40.00 Billion***

*As of 12/31/2021 (unaudited)*

# Outsmart Web Imposters and Other Cybercriminals

Today, we live in a virtual environment. And with all the benefits of the Internet, there are some downsides–including cybercriminals. Fraudsters jump at the chance to hack your personal information. Two common gateways are web imposters and fake apps.



## Web Imposters

When a fraudulent web address is created to mimic a popular website, that's a web imposter. Instead of Walmart.com, for example, an imposter may create Wallmart.com. A simple change to the company web address can fool unsuspecting people and can lead to theft of data.

### Avoid becoming the next victim:

When you visit a website, check the address bar for the site's security status.

- A padlock icon should display before the web address. Avoid sites without the icon!
- The padlock indicates that any information you send to the site is sent securely and can't be intercepted.

Dashes and symbols in the domain name (like **www.Apple #$%-.com**) are a red flag indicating a likely web imposter.

The domain extension is often a clue.

- Common extensions for legitimate businesses: .org, .com, .edu, .gov
- Domain extensions like .biz or .info tend to be illegitimate.
- Note that .com and .net are the easiest extensions to obtain.

When you have trusted websites that you visit frequently, use the bookmark tool on your computer to "remember" those sites. Doing so allows you to visit sites you've previously confirmed with confidence.

To be sure you're visiting the real TRS online, here are our web locations:




- Website: https://www.trsnyc.org
- Facebook: https://www.facebook.com/mytrsnyc
- Instagram: https://www.instagram.com/trsnyc
- Twitter: https://twitter.com/mytrsnyc
- YouTube: https://www.youtube.com/user/trsnyc

**TRS does not have an app, and we are not currently on any other social media platforms.**

## Fake Apps

While it may seem that every company has an application (app) for Apple or Android phones, that's not true. **TRS does not have an app.** Yet, there are TRS app imposters!

### Don't let imposter apps fool you. Confirm that the app is legitimate:

Obtain apps from Apple's App Store or the Google Play Store.

- Unfortunately, some fake apps may be there, too.
- Read the app score and customer reviews before downloading.

Check the company's website to see if the app is referenced.

- If it's not mentioned on the company website, it probably doesn't exist.

Most apps are available at no cost.

- If there is a cost, confirm the app is legit by contacting the company first.

Change your system settings to not allow third-party apps to be downloaded from untrusted sites.

Think twice before clicking a link or downloading anything on the Internet. Assume all unsolicited requests for information are phishing attempts. Whether it's a web imposter or fake app, spelling errors, bad formatting, and poorly written content are obvious clues. If you keep these tips foremost in your mind, you're less likely to fall into traps set by cybercriminals.

Teachers' Retirement System of the City of New York
Public Information Office
55 Water Street, New York, NY 10041

PRESORTED STANDARD
US POSTAGE PAID
PITTSBURGH
PERMIT NO 5

Volume XXVII, Number 2

TEACHERS' RETIREMENT BOARD
Debra Penny, Chairperson
Thomas Brown
David Kazansky
Brad Lander
Preston Niblack
Lindsey Oates

EXECUTIVE DIRECTOR
Patricia Reilly

trsnyc

*********************AUTO**5-DIGIT 11413
MAURICE OPARAJI
24511 133RD RD
ROSEDALE, NY 11422-1419

## Publications

The following TRS publications were recently updated and are available on our website (www.trsnyc.org ▶ Publications

- *Enrolling in TRS*
- *Investment Portfolios*
- *Summary Plan Description Updates*
- *TDA Program Summary*
- *TRS Guide to Domestic Relations Orders*
- *Earnings After Retirement*

## Calendar

**July 1, 2022:** Effective date of investment election changes that members filed by May 31, 2022.

**August 2022:** Posting of Quarterly Account Statements for the second quarter of 2022.

**October 2022:** Expected availability of 2022 Annual Benefits Statements. Effective date of investment election change that members file by August 31, 2022.

TRS offices will be closed to observe official New York City holidays on these dates: **June 20**, **July 4**, **September 5**, a **October 10, 2022**. On Fridays from **July 8** through **September 9**, we will close at 1:00 p.m.

Stay informed between issues of *In-Service News*. Please follow TRS on social media.

# Exhibit I

trs

TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK
55 Water Street, New York, NY 10041 • www.trsnyc.org • 1 (888) 8-NYC-TRS

December 17, 2021
TRS Membership No.: 00T814057
Re: *Gulino v. NYCBOE*

Maurice U Oparaji
24511 133Rd Rd
Unit 1
Rosedale, NY 11422-1419

VIA CERTIFIED MAIL
(Return Receipt Requested)

## *GULINO* INVOICE FOR PENSION CONTRIBUTIONS

The information provided in this document is not intended as legal advice. It is not intended to comprehensively describe or explain the pension relief granted by *Gulino v. Board of Education*, 96 Civ. 8414. All governing provisions of law apply except as specifically modified by the *Gulino v. Board of Education* Pension Stipulation and Order (the "Pension Order").

Dear Maurice U Oparaji:

This is an invoice from the Teachers' Retirement System of the City of New York (TRS) for Basic Member Contributions (BMCs) that you must pay in order to receive the retirement service credit awarded to you in *Gulino v. Board of Education*. Please consult your personal judgment documents for details on the specific salary periods for which you are being billed.

**Payment Due**
The below indicates the amount you owe:

The cost of BMCs owed is: $2,575.65.

**TRS must receive your total payment of $2,575.65 within 90 days of the certified mailing date of this letter, or within 90 days of your receipt of the DOE back-pay award, whichever is later.**

Failure to pay the total above amount by the above deadline will result in an opt-out of *Gulino* pension relief and a forfeiture of your right to receive pension credit attributable to *Gulino* (unless otherwise directed by the court).

**Cost of Your BMCs**
In general, the cost of your BMCs is 3% of your counterfactual salary attributable to *Gulino* for the duration of your counterfactual service attributable to *Gulino* that is subject to the payment of BMCs. If you are a current TRS member, the cost of your BMCs pertains to only that increment of counterfactual service and salary attributable to *Gulino* that exceeds existing service and salary already credited in TRS. In addition, the total amount of your BMCs has been reduced by 16%, pursuant to the terms of the Pension Order.

**How to Pay Your Invoice**
You must submit payment in a **single** check for the **total** amount due (partial payments or multiple checks will not be accepted).

Please make your check payable to "Teachers' Retirement System of the City of New York" and indicate "Gulino Invoice for Pension Contributions" on the check. Do not staple anything to your check. Mail your check, **with the attached voucher**, to:

**Teachers' Retirement System of the City of New York**
**Bowling Green Station**
**P.O. Box 5010**
**New York, NY 10274**

**For Further Information**
TRS cannot answer questions about the *Gulino* litigation. For more information, please contact the *Gulino* Plaintiffs' Attorney at the address below:

Stroock & Stroock & Lavan LLP
c/o Rachel Stevens
180 Maiden Lane
New York, NY 10038
212-806-1229

Sincerely,

TRS Member Services

# *GULINO* PAYMENT VOUCHER
## For Pension Contributions

PLEASE RETURN THIS VOUCHER WITH YOUR FULL PAYMENT TO:

**Teachers' Retirement System of the City of New York**
**Bowling Green Station**
**P.O. Box 5010**
**New York, NY 10274**

- Your check must be payable to "Teachers' Retirement System of the City of New York" and indicate "Gulino Invoice for Pension Contributions."
- Your check must be in the full amount shown below. Partial payments will not be accepted.
- You must submit payment in a **single** check for the **total** amount due.
- Failure to pay the total amount by the deadline in the attached letter will result in an opt-out of *Gulino* pension relief and a forfeiture of your right to receive pension credit attributable to *Gulino* (unless otherwise directed by the court).

**TRS Membership No.: 00T814057**

**Name: Maurice U Oparaji**

**Payment Amount: $2,575.65**

*2537760*

SB255

# Exhibit J

ELSA GULINO, MAYLING RALPH, PETER WILDS, and NIA GREENE, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK,

*Defendant*.

96 CIV. 8414

**REPORT AND RECOMMENDATION**

TO THE HONORABLE KIMBA M. WOOD, United States District Court Judge.

John S. Siffert, SPECIAL MASTER

For the reasons stated below, I recommend that the Court so order the attached proposed Pension Stipulation & Order.

## I. Background

The facts of this case are set forth fully in previous opinions by the District Court over the course of this litigation. *See, e.g.*, *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.* (*Gulino I*), 201 F.R.D. 326 (S.D.N.Y. 2001) (Motley, J.); *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.* (*Gulino V*), 907 F. Supp. 2d 492 (S.D.N.Y. 2012) (Wood, J.). I recite only those facts relevant to this Report and Recommendation.

From 1994 to 2014, the Board of Education of the City School District of New York ("Defendant" or "BOE") required permanent teachers to pass various iterations of the Liberal

Arts and Sciences Test ("LAST") as a condition of employment, even though the tests were not properly validated and had a disparate impact on African-American and Latino teachers. Plaintiffs represent a class of approximately 4,500 African-American and Latino teachers who lost or were denied permanent teacher positions as a result of this discriminatory policy. In 2012, the District Court found that Defendant's use of the LAST violated Title VII, and in 2013, it certified a remedy-phase class. Since then, the Court enjoined Defendant from using the test to make hiring decisions and has ordered that certain class members be deemed certified for the purposes of BOE hiring decisions.

The Court has ordered that class members are entitled to pension damages to compensate them for pension benefits that they would have received absent the discrimination for which Defendant has been found liable. *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, No. 96-cv-8414 (KMW), 2016 WL 4129111, at *3 (S.D.N.Y. Aug. 3, 2016) ("[T]he parties agree that class members are entitled to the lost pensions they would have received absent the discriminatory LAST.").

The Court appointed me Special Master to oversee the two-stage remedial phase that it outlined in its Certification Order. That Order directed that the first stage address "classwide issues, including calculation of backpay, pension benefits, and seniority" and that the second stage address "individual issues, including mitigation and the amount of backpay to which each claimant is entitled." *See Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.* (*Gulino VI*), No. 96-cv-8414, 2013 WL 4647190, at *6 (S.D.N.Y. Aug. 29, 2013) (Wood, J.). In accordance with my Order of Appointment (*see* May 20, 2014 Order of Appointment, [ECF No. 435]; November 12, 2014 Second Amended Order of Appointment, [ECF No. 524]), I submitted Interim Reports and Recommendations which the Court has adopted. (*See* IRR dated

October 24, 2014, [ECF No. 516], Order, [ECF No. 536]; IRR dated July 17, 2015, [ECF No. 678], Opinion & Order, [ECF No. 674]; IRR dated June 13, 2016, [ECF No. 777], Order, [ECF No. 800]).

## II. Agreement by the Parties

The Pension Stipulation & Order was drafted by the parties in consultation with me. It is the culmination of many months of effort to deal with complex and arcane factual and legal issues. In particular, the efforts of Bryan Berge, Senior Counsel at the New York City Law Department, should be credited with engaging the three New York City retirement systems to achieve a fair solution to what initially appeared to be an intractable problem. Plaintiffs' counsel, especially Robert A. Mantel, also deserve special mention for completing the Pension Stipulation & Order.

The New York City Teachers' Retirement System ("TRS"), the Board of Education Retirement System ("BERS"), and the New York City Employee Retirement System ("NYCERS")—public pension systems in which a portion of the plaintiff class are current or retired members—consent to those protocols and procedures detailed in the Pension Stipulation & Order.[1]

The parties agree to waive the timeframe and procedure in the Second Amended Order of Appointment [ECF No. 524] for submission of their objections, as they agree the objections they previously set forth should be deemed submitted to the Court.

[1] TRS, BERS, and NYCERS are non-parties that have consented to the terms that pertain to them and for which consent has not been expressly withheld. TRS, BERS, and NYCERS have consented to these terms solely for the purpose of effectively administering the pension relief due to class members. TRS, BERS, and NYCERS were not parties to the discrimination for which the BOE has been found liable and take no position on the litigation.

## III. Conclusion

For the foregoing reasons and for the reasons contained in the record, I recommend that the Court adopt the Pension Stipulation & Order.

Special Master

Dated: New York, New York
September 7, 2018

# Exhibit K

# QPP DIRECT ROLLOVER ELECTION FORM
## *FOR WITHDRAWAL/DISTRIBUTION OF ACCUMULATIONS FROM THE QUALIFIED PENSION PLAN*

TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK (TRS)
55 Water Street, New York, NY 10041
www.trsnyc.org • 1 (888) 8-NYC-TRS

## INSTRUCTIONS
*PLEASE READ CAREFULLY*

- Please use this form to roll over all or part of the taxable portion of a distribution you receive from TRS' Qualified Pension Plan (QPP) to one or more eligible Individual Retirement Arrangements (IRAs) or other successor programs; any tax-free portion is not eligible for rollover and must be paid directly to you. (See "General Provisions" for more information.)
- Do not file this form if you want 100% of your distribution paid directly to you; in this case, you only need to file one of the forms listed in the next bullet. Do not file this form if you want to withdraw funds from your Tax-Deferred Annuity (TDA) Program account; separate forms exist for that purpose.
- This form must be filed *in conjunction with* one of the following forms in order to be considered valid:
  - The "TRS Membership Transfer Form" (code RW39), which allows 1) Tiers III, IV, and VI members to withdraw and/or directly roll over their Annuity Savings Accumulation Fund (ASAF) as part of a membership transfer, and 2) certain members to withdraw and/or directly roll over the employee portion of Additional Member Contributions (AMCs) made under the Age 55 Retirement Program as part of a membership transfer. (See "General Provisions" for more information about AMCs.)
  - The "Application for Withdrawal of QPP Accumulations" (code RW41), which allows members to withdraw and/or directly roll over their QPP accumulations (including, for certain members, the employee portion of AMCs made under the Age 55 Retirement Program) after separating from their TRS-eligible position. (See "General Provisions" for more information about AMCs.)
  - The "Application for Withdrawal of Additional Member Contributions at Retirement" (code RW116), which allows certain retiring members to withdraw and/or directly roll over the employee portion of AMCs made under the Age 55 Retirement Program.
  - The "Excess Withdrawal Application" (code RW74), which allows Tiers I/II members to withdraw and/or *directly* roll over any annuity accumulations that are in excess of those required to fund a full retirement benefit.
- This form may be canceled within 30 days only if you file a "Request for Withdrawal of Form/Application" (code MI5) with TRS; you may subsequently file a new "QPP Direct Rollover Election Form." TRS would implement the elections that are indicated on your most recent form on file.
- For your convenience, TRS forms and publications are available on our website. If you require additional assistance, please contact our Member Services Center at 1 (888) 8-NYC-TRS.

**In Part A:** All information must be provided.

**In Part B:** You must indicate the type(s) of withdrawal that you are requesting:

1. Withdrawal of your QPP accumulations after separating from your TRS-eligible position
2. Withdrawal of your excess accumulations (*for Tiers I/II members only*)
3. Withdrawal of the employee portion of your AMCs in conjunction with retirement
4. Withdrawal of your ASAF balance as part of a membership transfer to another retirement system *(for Tiers III, IV, and VI members only)*
5. Withdrawal of the employee portion of your AMCs as part of a membership transfer to a retirement system *other than BERS* (*for Tiers II, III, and IV members only*)

CONTINUED ON PAGE 2

CONTINUED FROM PAGE 1

**In Part C:** You must elect how your withdrawal will be distributed.

If you elect #1, TRS will directly roll over 100% of your withdrawal to the eligible IRA(s) or other successor program(s) that you name in Part D. You may list a maximum of three eligible programs under this election.

If you elect #2, TRS will distribute your withdrawal amount by a combination of two methods: 1) Direct Withdrawal, which means that you will be issued a *direct payment*, and 2) Direct Rollover to the eligible IRA(s) or other successor program(s) that you name in Part D. You may list a maximum of two eligible programs under this election. Please note the following:

- If you write in the percentage(s) you wish to designate for each distribution method (*i.e.*, Direct Withdrawal and Direct Rollover), the total must equal 100%; otherwise, your form(s) would be canceled.
- If you know the exact amount of your distribution, you may write in the dollar amount you wish to designate for each distribution method (*i.e.*, Direct Withdrawal and Direct Rollover).
- If you do not know the exact amount of your distribution, you may designate a dollar amount for one distribution method and write "the balance" in the "$" box for the remaining distribution method.
- If you file an "Excess Withdrawal Application" in conjunction with this form, and you write an amount that does not equal the withdrawal amount you elected on your "Excess Withdrawal Application," your forms would be canceled.
- You may be eligible to receive your Direct Withdrawal via Electronic Fund Transfer (EFT) if you are currently an in-service TRS member paid on the City of New York payroll through direct deposit or if you currently receive payments from TRS via EFT. In either case, you may elect that your withdrawal be forwarded via EFT to the account where the above payments are deposited. (Charter School employees, and City University of New York (CUNY) employees paid on the New York State payroll, are not eligible to receive this payment via EFT.) If you are not eligible to receive your withdrawal via EFT, it will be mailed to your home address. **Please note that withdrawal checks may no longer be placed on hold for pickup at TRS.**

**In Part D:** You must do the following:

1. List the eligible program(s) that you want to receive this Direct Rollover;* and
2. Indicate the percentage or dollar amount of your withdrawal that should be distributed to each program you list.
   - If you elect to directly roll over funds to ONE program, write "100" in the "%" box above the program.
   - If you elect to directly roll over funds to more than one program:
     - You may write the percentage you want each program to receive in the "%" box above the program; or
     - If you know the exact amount that you are directly rolling over, you may write the dollar amount you want each program to receive in the "$" box above the program; or
     - If you do not know the exact amount that you are directly rolling over, you may write the dollar amount for one program (or two, if you have chosen three programs in all) in the "$" box(es) and write "the balance" in the "$" box for the remaining selection.

* If you elected #1 in Part C, you may list a maximum of three programs; if you elected #2 in Part C, you may list a maximum of two programs.

**In Part E:** You must read the attestation and sign and date this form.



CONTINUED ON PAGE 3

CONTINUED FROM PAGE 2

## GENERAL PROVISIONS

### Taxability of ASAF and AMC Balances

- *For Tiers III, IV, and VI members:* The entire balance in your ASAF is taxable.
- *For Tiers II/III/IV members participating in the Age 55 Retirement Program:* The entire balance in the employee portion of the AMCs you made under this program is taxable. (See below for more information about AMCs.)

### AMCs Made under the Age 55 Retirement Program

- *Members who are transferring their TRS membership to a retirement system other than BERS:* You may withdraw and/or directly roll over all or part of the balance in the *employee* portion of your AMCs.
- *Members who were laid off from their TRS-eligible position for reasons of economic hardship:* You may withdraw and/or directly roll over all or part of the balance in the *employee* portion of your AMCs.
- *Members who are retiring:* Under certain circumstances, you may withdraw and/or directly roll over all or part of the balance in the employee portion of your AMCs.
- For more information about AMCs, including AMC deficits, please refer to the "TRS Membership Transfer Form" or the "Application for Withdrawal of QPP Accumulations," as applicable.

### Required Minimum Distributions (RMDs)

- Upon reaching age 70½, certain non-retired individuals with TRS accounts must receive an annual RMD amount. Any amount representing an RMD would not be eligible for rollover in most cases. (However, if you are subject to RMD rules and you meet your requirements by receiving a distribution from a Section 401(a) Plan not administered by TRS, the entire QPP withdrawal may be eligible for rollover.)

### Additional Tax Information

- Internal Revenue Service (IRS) rules require that TRS withhold 20% of any taxable amount you withdraw that you do not instruct TRS to directly roll over into an eligible IRA(s) or other successor program(s). This 20% would be sent to the IRS as credit toward your federal taxes for the year of distribution. (Within 60 days of the distribution date, you may roll over any taxable amount you receive, or roll over the entire amount of the distribution by replacing the 20% withheld by TRS with money from other sources.)
- Any amount that is distributed through a Direct Rollover is not taxable until it is received as income. The 20% withholding will not apply to these amounts.

### Minimum Rollover Amount

- The minimum amount that TRS will directly roll over to a successor program is $200. (This minimum amount may be greater depending on the successor program's minimum requirements.)
- Any payment of less than $200 will be sent directly to you and will not be subject to the 20% withholding; this includes any payment based on a percentage election made on the "QPP Direct Rollover Election Form" that is calculated to be less than $200.

CONTINUED ON PAGE 4

This page intentionally left blank.

TEACHERS' RETIREMENT SYSTEM
OF THE CITY OF NEW YORK (TRS)
55 Water Street, New York, NY 10041
www.trsnyc.org • 1 (888) 8-NYC-TRS

# *QPP DIRECT ROLLOVER ELECTION FORM*

## *FOR WITHDRAWAL/DISTRIBUTION OF ACCUMULATIONS FROM THE QUALIFIED PENSION PLAN*

**Please read the instructions before completing this form.**
**(NOTE: Please print in black or blue ink, and initial any changes that you make on this form.)**
**PART A:** All information must be provided below.

First Name ☐ MI ☐ Last Name ☐

Social Security Number (last 4 digits only) ☒☒☒-☒☒-☐☐☐☐

Permanent Home Address ☐ Apt. No. ☐

TRS Membership Number ☐

City ☐ State ☐ Zip Code ☐

Primary Phone Number (Check one: ☐Home ☐Work ☐Mobile)
(☐☐☐) ☐☐☐-☐☐☐☐

Alternate Phone Number (Check one: ☐Home ☐Work ☐Mobile)
(☐☐☐) ☐☐☐-☐☐☐☐

Please keep your personal information with TRS up to date. We will update our records based on the information you provide above, so *do not enter a temporary address*; instead, TRS suggests that you consult the U.S. Postal Service about having your mail forwarded on a temporary basis. To register any changes to your permanent address (and/or phone number), please access our website or file a "Member's Change of Address Form" (code DM13) with TRS.

If you are providing new information above, please indicate the effective date: ☐☐/☐☐/☐☐☐☐

**PART B:** Please indicate the type(s) of withdrawal for which you are filing and write your initials in the space provided next to your choice. **Note:** You must file one of the applicable forms listed in the third bullet under "Instructions" on page 1 *in conjunction with* this form.

____ ☐ Withdrawal of your QPP accumulations after separating from your TRS-eligible position (including the employee portion of any AMC balance if you were laid off from your TRS-eligible position for reasons of economic hardship)

____ ☐ Withdrawal of your excess accumulations (*for Tiers I/II members only*)

____ ☐ Withdrawal of your AMC balance (employee portion) in conjunction with retirement

____ ☐ Withdrawal of your ASAF balance as part of a membership transfer to another retirement system (*for Tiers III, IV, and VI members only*)

____ ☐ Withdrawal of your AMC balance (employee portion) as part of a membership transfer to a retirement system *other than BERS* (*for Tiers II, III, and IV members only*)


**CONTINUED ON PAGE 6**

CONTINUED FROM PAGE 5

**PART D:** Please read the following statement and sign and date below in the presence of a notary.

*I certify that I have read this form in its entirety and understand all consequences of filing it with TRS. I hereby apply for the withdrawal of my QPP accumulations.*

*I understand that, upon my filing of this application, my membership in TRS (including my tier status) will be terminated. In addition, I acknowledge that, if I am a vested member, filing this application would nullify my vested rights, my right to a retirement allowance from TRS, and any other benefits based on my membership in TRS.*

*I also understand that any funds I have in TRS' TDA Program will stop accruing investment return/interest as of the date that TRS receives this application. I further understand that, upon withdrawal of my QPP accumulations from TRS, I must also withdraw my TDA funds by filing a "TDA Withdrawal Application" (code TD32) (as well as a "TDA Direct Rollover Election Form" (code TD22) as applicable).*

*I certify that I have completed the appropriate portions of this form. I have also attached the required documentation pertaining to my official separation from service, as indicated in the Instructions of this form. I hereby certify that the information I have provided above is accurate to the best of my knowledge.*

MEMBER'S SIGNATURE ______________________________ DATE (M/D/Y) ______________

**PART E:** TO BE COMPLETED BY A NOTARY (NOTE: Attestation made outside the U.S. must be executed before an American consul

State of ______________________)
) s.s.:
County of ______________________)

On the __________ day of ____________________, ________, before me personally appeared the person known to me to be ________________________________________________, the individual who executed the foregoing instrument and acknowledged to me that (s)he executed the same.

Signature: ________________________________________

Official Title: ________________________________________

Expiration Date of Commission: ____________________________

CONTINUED FROM PAGE 6

**PROGRAM #3**

Name of Firm (check will be made payable to)

Type of Program

Name of Account

Account Number

Address

City

State

Zip Code

**PART E:** Please read the following and sign and date below.

*I certify that I have read this form in its entirety. I have completed the appropriate parts of this form; I have also attached one of the required forms as indicated in the Instructions.*

*I certify that the successor program(s) named on this form is qualified to receive this Direct Rollover under the applicable provisions of the Internal Revenue Code. I acknowledge that such certification is provided as a basis for TRS' reasonable reliance on same.*

*I am aware that, by law, I must be given notice of a distribution not less than 30 days, nor more than 90 days, prior to receiving it. I hereby waive this right.*

*I hereby certify that the information I have provided above is accurate to the best of my knowledge.*

MEMBER'S SIGNATURE ______________________ DATE (M/D/Y) __________

# Exhibit L

CHASE

-$2,575.65

Total

Jan 6, 2022

Post date

334

Check #

1-2/210 334

MAURICE U. OPARAJI
24511 - 133RD RD 347-650-7895
ROSEDALE, NY 11422-1419

DATE 12/23/2021

PAY TO THE ORDER OF TRS $2575.65

Two Thousand Five Seventy Five 65/100 DOLLARS

CHASE
JPMorgan Chase Bank, N A
www.Chase.com

MEMO BMC-00T814057

⑆021000021⑆ 857773076⑈0334

# Exhibit M

# APPLICATION FOR WITHDRAWAL OF QPP ACCUMULATIONS

trs

TEACHERS' RETIREMENT SYSTEM
OF THE CITY OF NEW YORK (TRS)
55 Water Street, New York, NY 10041
www.trsnyc.org • 1 (888) 8-NYC-TRS

## INSTRUCTIONS

*PLEASE READ CAREFULLY*

You may file this application only if you have separated from your TRS-eligible position and you elect to withdraw (and/or directly roll over) your Qualified Pension Plan (QPP) accumulations.

EFFECTS OF WITHDRAWING YOUR QPP FUNDS

- Upon TRS' receipt of this application, your membership in TRS (including your tier status) will be terminated; upon termination of your membership rights, investment return/interest on your QPP accumulations will cease.
- If you are a vested member, filing this application would nullify your vested rights and your rights to a retirement allowance from TRS. (See "General Provisions" for more information about vesting.)
- If you are a Tiers I/II member, filing this application would result in your forfeiting any Increased-Take-Home-Pay (ITHP) contributions that the City of New York made to your QPP account.

QPP FUNDS AVAILABLE FOR WITHDRAWAL

- For Tiers I/II members, your QPP accumulations equal your Annuity Savings Fund (ASF) balance; for Tiers III, IV, and VI members, your QPP accumulations equal your Member Contributions Accumulation Fund (MCAF) and your Annuity Savings Accumulation Fund (ASAF) balances.
- If you are a Tier II, III, or IV member who participated in the Age 55 Retirement Program, and *you were laid off from* your TRS-eligible position for reasons of economic hardship, your QPP accumulations available for withdrawal would also include the balance in the *employee* portion of the Additional Member Contributions (AMCs) you made under this program. (See "General Provisions" for more information about AMCs, including AMC deficits.)
- To learn the amount of your QPP accumulations eligible for withdrawal, please refer to your most recent Quarterly Account Statement (QAS).

ELIGIBILITY TO WITHDRAW QPP FUNDS

- You may withdraw your QPP funds after separating from service in the following cases:
  - ➢ If you are a non-vested member;
  - ➢ If you are a vested Tiers I/II member;
  - ➢ If you are a vested Tiers III/IV member who has at least five, but less than ten, years of Total Service Credit; please see "General Provisions" for information about vesting requirements.

ADDITIONAL DOCUMENTATION REQUIRED

- When you file this application, the following must be attached:
  - ➢ For teachers – An official resignation or termination notice supplied by the Department of Education (DOE).
  - ➢ For all members working in Charter Schools – An official service history and official resignation or termination notice supplied by your school's business manager or Human Resources representative.
  - ➢ For college personnel – An official service history and official resignation or termination notice supplied by your college's Personnel Office.
  - ➢ For paraprofessionals – An official resignation or termination notice supplied by your District Office, the DOE, or your payroll secretary.
- If you elect to directly roll over all or part of the taxable portion of your withdrawal to one or more eligible Individual Retirement Arrangements (IRAs) or other successor programs, you must attach a completed "QPP Direct Rollover Election Form" (code RW29) with this application. In all cases, the tax-free portion of your withdrawal will be paid directly to you.

CONTINUED ON PAGE 2

CONTINUED FROM PAGE 1

TDA PARTICIPANTS

- If you file this form and are a participant in TRS' Tax-Deferred Annuity (TDA) Program, you must also withdraw your TDA funds at this time by filing a "TDA Withdrawal Application" (code TD32). You may elect that TRS effect a Direct Rollover of your TDA withdrawal by filing a "TDA Direct Rollover Election Form" (code TD22) with your withdrawal application.

*Note: As a result of Internal Revenue Service (IRS) regulations governing Section 403(b) Plans, TDA participants are currently not permitted to move funds from TRS' TDA Program to a Section 403(b) Plan outside of New York City. On the advice of outside tax counsel, TRS has suspended all processing of requests to move TDA funds to a Section 403(b) Plan (except the New York City Board of Education Retirement System) pending further clarification from the IRS.*

CANCELLATION OF THIS APPLICATION

- This form may be canceled if you file a "Request for Withdrawal of Form/Application" (code MI5) with TRS within 30 days of filing this application. You may subsequently file a new "Application for Withdrawal of QPP Accumulations"; TRS would implement the elections that are indicated on your most recent form on file.

PROCESSING OF THIS APPLICATION

- Processing of your QPP withdrawal should be completed within four months of TRS' receipt of all completed forms and required documentation.

For your convenience, TRS forms and publications are available on our website. If you require additional assistance, we encourage you to contact our Member Services Center at 1 (888) 8-NYC-TRS.

**In Part A:** All information must be provided.

**In Part B:** You must elect how your withdrawal will be distributed.

You may elect to receive your withdrawal through one of the following methods or a combination:

- Direct Withdrawal, in which the withdrawal would be made payable directly to you.
- Direct Rollover, in which all or part of the taxable portion of your withdrawal would be made payable directly to an eligible IRA(s) or other successor programs.

You may be eligible to receive your Direct Withdrawal via Electronic Fund Transfer (EFT) if you are currently an in-service TRS member paid on the City of New York payroll through direct deposit or if you currently receive payments from TRS via EFT. In either case, you may elect that your withdrawal be forwarded via EFT to the account where the above payments are deposited. (Charter School employees, and City University of New York (CUNY) employees paid on the New York State payroll, are not eligible to receive this payment via EFT.) If you are not eligible to receive your withdrawal via EFT, it will be mailed to your home address. **Please note that withdrawal checks may no longer be placed on hold for pickup at TRS.**

If you elect to directly roll over all or part of your withdrawal, you must file a "QPP Direct Rollover Election Form" (code RW29) in conjunction with this application. Please note that the minimum amount that TRS will directly roll over to a successor program is $200. (This amount may be greater depending on the successor program's requirements.) See the "QPP Direct Rollover Election Form" for more information.

**In Part C:** You must provide the requested information.

**In Part D:** You must read the attestation and sign and date this form.

**In Part E:** You must have this application notarized.

CONTINUED ON PAGE 3

CONTINUED FROM PAGE 2

## GENERAL PROVISIONS

**Vesting:**

- For most members, vesting occurs upon attaining five years of Total Service Credit. However, ten years of Total Service Credit are required for those with a TRS membership date later than March 31, 2012 (or December 10, 2009, for members represented by the United Federation of Teachers). If you are not sure whether you are vested, or if you have questions about vesting, please contact TRS' Member Services Center at 1 (888) 8-NYC-TRS before filing this application.
- When non-vested members separate from service, their QPP accumulations would continue to accrue investment return/interest for a limited period of time. If they separated from service on or before July 13, 1993, investment return/interest stopped as of five years after their separation date. If they separated from service on or after July 14, 1993, investment return/interest would cease as of seven school years after their separation date.

**AMCs Made under the Age 55 Retirement Program:**

- Tiers II/III/IV members participating in this program make AMCs representing 1.85% of their gross compensation; 50% of AMCs are deemed *employee* contributions, and 50% are deemed *employer* contributions. (Some members may have a deficit in their AMC balance; see below.)
- Members who were laid off from their TRS-eligible position for reasons of economic hardship are eligible to withdraw and/or roll over the employee portion of their AMCs.
- *For members who were laid off from their TRS-eligible position for reasons of economic hardship:* If there is a deficit in the **employer portion** of their AMCs at the time of withdrawal, the deficit amount would be deducted from the member's employee portion; any remaining employer AMC deficit would be deducted from the member's ASF (Tier II) or MCAF (Tiers III/IV) balance.

  *For all other members:* If there is any deficit (employer and/or employee portion) in their AMCs at the time of withdrawal, the deficit amount would be deducted from the member's ASF (Tier II) or MCAF (Tiers III/IV) balance.

## TAX CONSEQUENCES

- The taxable portion of any withdrawn QPP funds is taxable upon receipt and will be reported to the IRS in January following the calendar year in which it is distributed. The IRS requires that TRS withhold 20% of any taxable amount you withdraw that you do not instruct TRS to directly roll over into an eligible IRA(s) or other successor program(s). This 20% will be forwarded to the IRS and credited toward your federal taxes for the year of distribution. (Within 60 days of the distribution date, you may roll over any taxable amount you receive, or roll over the entire amount of the distribution by replacing the 20% withheld by TRS with money from other sources.)
- If you have an outstanding and/or defaulted QPP loan balance(s) as of the date you file this application, the total balance(s) would be charged against your QPP accumulations, and your QPP accumulations available for withdrawal would be reduced. Any outstanding balance would be deemed a distribution and reported to the IRS in January following the calendar year in which it is deemed a distribution. For more information about outstanding and/or defaulted QPP loans, please see the *QPP Loans* brochure.
- If a QPP loan is deemed a distribution in the same tax year in which you receive your QPP withdrawal, the IRS would require TRS to withhold 20% of the taxable portion of the deemed distribution from the QPP withdrawal (in addition to the 20% withholding required separately for the QPP withdrawal). The total amount withheld would be forwarded to the IRS and credited toward your taxes for the current year.

Please note that ALL withdrawals may be subject to an additional IRS-imposed 10% tax unless one of the following exceptions applies:

- The withdrawal is made in conjunction with your separation from service during or after the year in which you attain age 55; or
- The withdrawal is made during or after the year you reach age 59½; or
- The withdrawal is a qualified hardship withdrawal; or
- The withdrawal is made in conjunction with your disability retirement; or
- The withdrawal is made by your beneficiary in conjunction with a death benefit payment.

CONTINUED ON PAGE 4

CONTINUED FROM PAGE 3

This page intentionally left blank.

CONTINUED ON PAGE 5

## APPLICATION FOR WITHDRAWAL OF QPP ACCUMULATIONS

TEACHERS' RETIREMENT SYSTEM
OF THE CITY OF NEW YORK (TRS)
55 Water Street, New York, NY 10041
www.trsnyc.org • 1 (888) 8-NYC-TRS

**Please read the Instructions before completing this application.**
**(NOTE: Please print in black or blue ink, and initial any changes that you make on this application.)**

**PART A:** All information must be provided below.

First Name ______ MI __ Last Name ______

Social Security Number (last 4 digits only) X X X - X X - ☐☐☐☐

Permanent Home Address ______ Apt. No. ______

TRS Membership Number ______

City ______ State ______ Zip Code ______

Primary Phone Number (Check one: ☐Home ☐Work ☐Mobile) (☐☐☐) ☐☐☐-☐☐☐☐

Alternate Phone Number (Check one: ☐Home ☐Work ☐Mobile) (☐☐☐) ☐☐☐-☐☐☐☐

Please keep your personal information with TRS up to date. We will update our records based on the information you provide above, so *do not enter a temporary address*; instead, TRS suggests that you consult the U.S. Postal Service about having your mail forwarded on a temporary basis. To register any changes to your permanent address (and/or phone number), please access our website or file a "Member's Change of Address Form" (code DM13) with TRS.

If you are providing new information above, please indicate the effective date: ☐☐/☐☐/☐☐☐☐

**PART B:** Please elect ONE of the following choices and write your initials in the space provided next to your choice.

____ ☐ ***I want 100% of my withdrawal (including the balance in the employee portion of my AMCs, if applicable) paid directly to me.*** *I understand that TRS is required to withhold 20% of the taxable amount distributed, that this amount will be forwarded to the IRS, and that I may claim the amount as federal tax paid on my tax return for the year of distribution.*

Please elect how you would like to receive your payment; see EFT eligibility requirements on page 2.

☐ by Mail ☐ via EFT (If you are ineligible to receive your payment via EFT, a check will be mailed to your home address.)

**OR**

____ ☐ ***I want to roll over ALL OR PART of the taxable portion of my withdrawal (including the balance in the employee portion of my AMCs, if applicable),*** *and I have therefore attached a "QPP Direct Rollover Election Form" (code RW29) to this form.*

**PART C:** Please complete the following.

*I certify that I have separated from my TRS-eligible position as a(n)* ______ (your title), *effective* ______ (M/D/Y).

*I also certify that, based on the information I have received from my employer and TRS, I am a*

____ ☐ *vested member of TRS.*

____ ☐ *non-vested member of TRS.*



**CONTINUED ON PAGE 6**

CONTINUED FROM PAGE 5

**PART C:** Please elect **ONE** of the following two choices, and write your initials in the space provided next to your choice.

____ ☐ **#1:** *I want 100 % of the taxable portion of this withdrawal DIRECTLY ROLLED OVER to the eligible IRA(s) or other successor program(s) that I name in Part D; I understand that I may list up to three programs. (I also understand that any tax-free portion of this distribution is not eligible for rollover and will be paid directly to me.)*

____ ☐ **#2:** *I want this withdrawal to be distributed by the following combination of methods: (I understand that any tax-free portion of this distribution is not eligible for rollover and will be paid directly to me.)*

*I want* ☐☐ *% (or $* ☐ *) of this withdrawal PAID DIRECTLY to me as a DIRECT WITHDRAWAL. I understand that TRS is required to withhold 20% of the taxable amount distributed to me, that this withheld amount will be forwarded to the IRS, and that I may claim the amount withheld as credit toward my federal income taxes for the year of distribution.*

Please elect how you would like to receive your payment; see EFT eligibility requirements on page 2.

☐ by Mail ☐ via EFT (If you are ineligible to receive your payment via EFT, a check will be mailed to your home address.)

**AND**

*I want* ☐☐ *% (or $* ☐ *) of the taxable portion of this withdrawal to be DIRECTLY ROLLED OVER to the eligible IRA(s) or other successor program(s) that I name in Part D of this form.*

**PART D:** 1) Please list the eligible program(s) that you want to receive this Direct Rollover; 2) Indicate the percentage or dollar amounts of the total taxable portion of your withdrawal that should be distributed to each program. **If you elected #1 in Part C of this form, you may list up to three programs; If you elected #2 in Part C, you may list up to two programs.**

*I want* ☐ *% (or $* ☐ *) of my benefit to be directly rolled over to:* __________

**PROGRAM #1**

Name of Firm (check will be made payable to)

Type of Program

Name of Account

Account Number

Address

City

State

Zip Code

*I want* ☐ *% (or $* ☐ *) of my benefit to be directly rolled over to:* __________

**PROGRAM #2**

Name of Firm (check will be made payable to)

Type of Program

Name of Account

Account Number

Address

City

State

Zip Code

*I want* ☐ *% (or $* ☐ *) of my benefit to be directly rolled over to:* __________



CONTINUED ON PAGE 7

CONTINUED FROM PAGE 6

**PROGRAM #3**

Name of Firm (check will be made payable to)

Type of Program

Name of Account

Account Number

Address

City

State

Zip Code

**PART E:** Please read the following and sign and date below.

*I certify that I have read this form in its entirety. I have completed the appropriate parts of this form; I have also attached one of the required forms as indicated in the Instructions.*

*I certify that the successor program(s) named on this form is qualified to receive this Direct Rollover under the applicable provisions of the Internal Revenue Code. I acknowledge that such certification is provided as a basis for TRS' reasonable reliance on same.*

*I am aware that, by law, I must be given notice of a distribution not less than 30 days, nor more than 90 days, prior to receiving it. I hereby waive this right.*

*I hereby certify that the information I have provided above is accurate to the best of my knowledge.*

MEMBER'S SIGNATURE ______________________________ DATE (M/D/Y) ______________

# Exhibit N

# Burlington N. & Santa Fe Ry. Co. v. White

Document Cited authorities 34 Cited in 4100 Precedent Map Related
Vincent

| | |
|---|---|
| Court | United States Supreme Court |
| Citation | 126 S.Ct. 2405,548 U.S. 53,165 L.Ed.2d 345,74 USLW 4423 |
| Decision Date | 22 June 2006 |
| Docket Number | No. 05–259.,05–259. |
| Parties | BURLINGTON NORTHERN & SANTA FE RAILWAY CO., Petitioner, v. Sheila WHITE. |

548 U.S. 53
126 S.Ct. 2405
165 L.Ed.2d 345
74 USLW 4423
BURLINGTON NORTHERN & SANTA FE RAILWAY CO., Petitioner,
v.Sheila WHITE.
No. 05–259.
Supreme Court of the United States
Argued April 17, 2006.
Decided June 22, 2006.
OPINION TEXT STARTS HERE
***Syllabus****

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a), and its antiretaliation provision forbids "discrimination against" an employee or job applicant who, *inter alia,* has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation, § 2000e–3(a). Respondent White, the only woman in her department, operated the forklift at the Tennessee Yard of petitioner Burlington Northern & Santa Fe Railway Co. (Burlington). After she complained, her immediate supervisor was disciplined for sexual harassment, but she was removed from forklift duty to standard track laborer tasks. She filed a complaint with the Equal Employment Opportunity Commission (EEOC), claiming that the reassignment was unlawful gender discrimination and retaliation for her complaint. Subsequently, she was suspended without pay for insubordination. Burlington later found that she had not been insubordinate, reinstated her, and awarded her back pay for the 37 days she was suspended. The suspension led to another EEOC retaliation charge. After exhausting her administrative remedies, White filed an action against Burlington in federal court claiming, as relevant here, that

Burlington's actions in changing her job responsibilities and suspending her for 37 days amounted to unlawful retaliation under Title VII. A jury awarded her compensatory damages. In affirming, the Sixth Circuit applied the same standard for retaliation that it applies to a substantive discrimination offense, holding that a retaliation plaintiff must show an "adverse employment action," defined as a "materially adverse change in the terms and conditions" of employment. The Circuits have come to different conclusions about whether the challenged action has to be employment or workplace related and about how harmful that action must be to constitute retaliation.

*Held:*

1. The antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The language of the substantive and antiretaliation provisions differ in important ways. The terms "hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee" explicitly limit the substantive provision's scope to actions that affect employment or alter workplace conditions. The antiretaliation provision has no such limiting words. This Court presumes that, where words differ as they do here, Congress has acted intentionally and purposely. There is strong reason to believe that Congress intended the differences here, for the two provisions differ not only in language but also in purpose. The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their status, while the antiretaliation provision seeks to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. To secure the first objective, Congress needed only to prohibit employment-related discrimination. But this would not achieve the second objective because it would not deter the many forms that effective retaliation can take, therefore failing to fully achieve the antiretaliation provision's purpose of "[m]aintaining unfettered access to statutory remedial mechanisms," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808. Thus, purpose reinforces what the language says, namely, that the antiretaliation provision is not limited to actions affecting employment terms and conditions. Neither this Court's precedent nor the EEOC's interpretations support a contrary conclusion. Nor is it anomalous to read the statute to provide broader protection for retaliation victims than for victims of discrimination. Congress has provided similar protection from retaliation in comparable statutes. And differences in the purpose of the two Title VII provisions remove any perceived "anomaly," for they justify this difference in interpretation. Pp. 2411–2414.

2. The antiretaliation provision covers only those employer actions that would have been materially adverse to a reasonable employee or applicant. This Court agrees with the Seventh and District of Columbia Circuits that the proper formulation requires a retaliation plaintiff to show that the challenged action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Rochon v. Gonzales, 438 F.3d 1211, 1219. The Court refers to *material* adversity to separate significant from trivial harms. The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms by prohibiting employer actions that are likely to deter discrimination victims from complaining to the EEOC, the courts, and employers. Robinson, *supra,* at 346, 117 S.Ct. 843. The Court refers to a *reasonable* employee's reactions because the provision's standard for judging harm must be objective, and thus judicially administrable. The standard is phrased in general terms because the significance of any given act of retaliation may depend upon the particular circumstances. Pp. 2414–2416.

3. Applying the standard to the facts of this case, there was a sufficient evidentiary basis to support the jury's verdict on White's retaliation claim. Contrary to Burlington's claim, a reassignment of duties can constitute retaliatory discrimination where both the former and present duties fall within the same job description. Almost every job category involves some duties that are less desirable than others. That is presumably why the EEOC has consistently recognized retaliatory work assignments as forbidden retaliation. Here, the jury had considerable evidence that the track laborer duties were more arduous and dirtier than the forklift operator position, and that the latter position was considered a better job by male employees who resented White for occupying it. Based on this record, a jury could reasonably conclude that the reassignment would have been materially adverse to a reasonable employee. Burlington also argues that the 37–day suspension without pay lacked statutory significance because White was reinstated with back pay. The significance of the congressional judgment that victims of intentional discrimination can recover compensatory and punitive damages to make them whole would be undermined if employers could avoid liability in these circumstances. Any insufficient evidence claim is unconvincing. White received back pay, but many reasonable employees would find a month without pay a serious hardship. White described her physical and emotional hardship to the jury, noting that she obtained medical treatment for emotional distress. An indefinite suspension without pay could well act as a deterrent to the filing of a discrimination complaint, even if the suspended employee eventually receives back pay. Thus, the jury's conclusion that the suspension was materially adverse was reasonable. Pp. 2416–2418.

364 F.3d 789, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C.J., and STEVENS, SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. ALITO, J., filed an opinion concurring in the judgment, *post,* p. 2418.

Gregory G. Garre for the United States as amicus curiae, by special leave of Court.

James H. Gallegos, Lawrence M. Stroik, David M. Pryor, Fort Worth, TX, Bryan P. Neal, Thompson & Knight LLP, Dallas, TX, Carter G. Phillips, Counsel of Record, Stephen B. Kinnaird, Eric A. Shumsky, Sidley Austin LLP, Washington, D.C., Ralph T. Gibson, Bateman Gibson, LLC, Memphis, TN, for Petitioner.

Donald A. Donati, Counsel of Record, William B. Ryan, Donati Law Firm, LLP, Memphis, TN, Eric Schnapper, School of Law, University of Washington, Seattle, WA, for Respondent.

**Justice BREYER delivered the opinion of the Court.**

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." Pub.L. 88–352, § 704, 78 Stat. 257, as amended, 42 U.S.C. § 2000e–2(a). A separate section of the Act—its antiretaliation provision—prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. § 2000e–3(a).

The Courts of Appeals have come to different conclusions about the scope of the Act's antiretaliation provision, particularly the reach of its phrase "discriminate against." Does that provision confine actionable retaliation to activity that affects the terms and conditions of employment? And how harmful must the adverse actions be to fall within its scope?

We conclude that the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

This case arises out of actions that supervisors at petitioner Burlington Northern & Santa Fe Railway Company.

plied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title.

**(b) Relationship to other laws**

Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter. Nothing in this chapter shall be construed to preclude the prohibition of, or the imposition of restrictions on, smoking in places of employment covered by subchapter I of this chapter, in transportation covered by subchapter II or III of this chapter, or in places of public accommodation covered by subchapter III of this chapter.

**(c) Insurance**

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter[1] I and III of this chapter.

**(d) Accommodations and services**

Nothing in this chapter shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit which such individual chooses not to accept.

(Pub. L. 101–336, title V, § 501, July 26, 1990, 104 Stat. 369.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 101–336, July 26, 1990, 104 Stat. 327, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

The Rehabilitation Act of 1973, referred to in subsec. (a), is Pub. L. 93–112, Sept. 26, 1973, 87 Stat. 355, as amended. Title V of the Rehabilitation Act of 1973 is classified generally to subchapter V (§790 et seq.) of chapter 16 of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 701 of Title 29 and Tables.

[1] So in original. Probably should be "subchapters".

Title IV of this Act, referred to in subsec. (c), means title IV of Pub. L. 101–336, July 26, 1990, 104 Stat. 366, which enacted section 225 of Title 47, Telegraphs, Telephones, and Radiotelegraphs, and amended sections 152, 221, and 611 of Title 47.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in title 29 sections 791, 793, 794.

### § 12202. State immunity

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in[1] Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

(Pub. L. 101–336, title V, § 502, July 26, 1990, 104 Stat. 370.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in title 29 sections 791, 793, 794.

### § 12203. Prohibition against retaliation and coercion

**(a) Retaliation**

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

**(b) Interference, coercion, or intimidation**

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

**(c) Remedies and procedures**

The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

(Pub. L. 101–336, title V, § 503, July 26, 1990, 104 Stat. 370.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in title 29 sections 791, 793, 794.

### § 12204. Regulations by Architectural and Transportation Barriers Compliance Board

**(a) Issuance of guidelines**

Not later than 9 months after July 26, 1990, the Architectural and Transportation Barriers Com-

[1] So in original. Probably should be "in a".

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAURICE OPARAJI,<br>Plaintiff,<br>-against-<br>TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK ("TRS"), BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF CITY OF NEW YORK, PATRICIA REILLY, SANFORD R. RICH, MELANIE WHINNERY<br>Defendant. | Case No.: 23-CV-5212<br><br>**Certification of Service** |

I certify that on December 12, 2023, I sent a copy of plaintiff Maurice Oparaji Sr. Amended Verified Complaint and Attachment incorporated to the Amended Verified Complaint, via Email and Regular Mail, upon:

Attorneys for Defendants
H. Keith Belfield
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
T: (212) 356-8767
E: hbelfiel@law.nyc.gov

Dated: December 12, 2023

Maurice Oparaji
245-11 133 Road
Rosedale, NY 11422
(347) 283-6009
mroparaji@yahoo.com

# Case No.: 23-CV-5212 _ MAURICE OPARAJI v. TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK ("TRS") _ Plaintiff Maurice Oparaji Sr.Amended Verified Complaint and Attachment incorporated to the Amended Verified Complaint (A-N):

From: prince oparaji (mroparaji@yahoo.com)

To: hbelfiel@law.nyc.gov

Date: Tuesday, December 12, 2023 at 06:49 PM EST

Dear Sir/Madam:

Attached, please find plaintiff Maurice Oparaji Sr.Amended Verified Complaint and Attachment incorporated to the Amended Verified Complaint.

/s/ Maurice Oparaji Sr.

Plaintiff Maurice Oparaji's Attachment incorporated to the Amended Verified Complaint.pdf
8.1MB

TRS Amended Verified Complaint.pdf
1.6MB